## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GEOMATRIX SYSTEMS, LLC, | ) | 3:20-CV-1900 (SVN) |
| *Plaintiff and Counterclaim Defendant,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ELJEN CORPORATION, | ) | |
| *Defendant and Counterclaim Plaintiff.* | ) | November 12, 2024 |

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

Sarala V. Nagala, United States District Judge.

Plaintiff and Counterclaim Defendant Geomatrix Systems, LLC ("Geomatrix"), a Connecticut-based company specializing in designing and selling wastewater treatment systems, alleges that one of its competitors, Defendant and Counterclaim Plaintiff Eljen Corporation ("Eljen"), has infringed Geomatrix's U.S. Patent No. 9,174,863 (the "'863 Patent") relating to a technology used in septic leach fields. Specifically, Geomatrix alleges that certain of Eljen's "Mantis" line products infringe various claims of the '863 Patent. In response, Eljen counters that it has not infringed the '863 Patent and counterclaims that the '863 Patent is invalid. Both parties have moved for summary judgment on various issues.

For the reasons described below, the Court DENIES Eljen's motion for summary judgment, and GRANTS in part and DENIES in part Geomatrix's motion for summary judgment. Specifically, as to infringement, the Court concludes that Geomatrix is entitled to judgment as a matter of law. As to invalidity, the Court finds that Geomatrix is entitled to judgment as a matter of law with respect to whether certain proposed prior art references are printed publications or were in public use or on sale prior to a certain critical date, which precludes some of Eljen's anticipation and obviousness theories, but finds that Eljen properly disclosed its invalidity contentions. Fact issues preclude entry of summary judgment for Geomatrix regarding its

reduction to practice arguments.  Finally, as to inequitable conduct, the Court determines that there is a genuine dispute of material fact that precludes entry of summary judgment in favor of either party.

### I.   BACKGROUND

#### A.   General Background

This patent case is about competing designs for wastewater leaching field technology for residential homes.  Approximately thirty percent of Connecticut's population has no sewer connection and must treat wastewater onsite.  Geomatrix's Opening Br., ECF No. 169-1 at 12. Leach fields are one component of an onsite wastewater treatment system used to collect and dispose of sewer waste.  *Id.* at 13.  A septic tank collects solid waste, while the liquid waste, or effluent, leaves the septic tank via an outlet pipe to a leach field buried underground.  *Id.*  The leach field is designed to treat the wastewater by dispersing it from the outlet pipe into the soil, where microbes can break down the effluent before it percolates to the water table.  *Id.*

#### B.   Geomatrix's Invention

David Potts is the founder and owner of Geomatrix.  *Id.* at 12.  On January 27, 2006, Mr. Potts filed his original patent application, U.S. Patent Application No. 11/340,917 (the "'917 Application"), on the subject matter of the '863 Patent.  Geomatrix's L.R. 56(a)2 St., ECF No. 179 ¶ 5.  As the '863 Patent explains, "[g]enerally, it is an aim to have aerobic treatment" of wastewater in soil.  '863 Patent, ECF No. 169-4 at col. 2:1–2.  The '863 Patent described that prior art conduits had limitations in aerobic treatment because their bottom surfaces typically fell well below the soil surface, where anaerobic conditions exist, and "a biomat" often formed on the bottom and sides of the conduit, lessening its effectiveness at properly infiltrating wastewater into soil.  *Id.* at cols. 1:51–56, 2:6–10.  Therefore, Mr. Potts set out to design (and patent) a wastewater system "that provides for greater aerobic conditions in leaching conduits, thereby allowing for greater

processing of the wastewater prior and during absorption into the soil." *Id.* at col. 2:16–19.  In its most basic terms, the '863 Patent discloses a leach field wherein wastewater is delivered from the homeowner's septic tank into an area under their lawn through a pipe perforated with holes for dispersion of the wastewater into specially-designed channels, which are sometimes referred to as "geonets."  Geomatrix's Opening Br. at 13.  Between the channels are voids, or separations, that promote oxygen infiltration and, as a result, aerobic conditions to treat the wastewater.  Hearing Tr., ECF No. 192 at 28.

The '863 Patent discloses a high aspect ratio conduit, meaning that the channels into which the wastewater is dispersed have an aspect ratio—height divided by width—between 3 and 96. *See* Geomatrix's Expert Opening Rep., ECF No. 169-41 ¶ 48.  A high aspect ratio system has two commercial advantages.  First, by utilizing volumes with a high height and short width, the '863 Patent maximizes the amount of oxygen to which the wastewater is exposed, resulting in efficiencies in wastewater treatment.  Geomatrix's Opening Br. at 13.  Second, a high aspect ratio system can be more compact, requiring less land for installation in a homeowner's yard.  ECF No. 169-41 ¶ 48.  A drawing from the '863 Patent (Figure 16) is reproduced below.



C. Eljen's Invention

Eljen's Accused Mantis Products[1] operate on the same basic principles as Geomatrix's '863 Patent. The Accused Mantis Products include a series of "Filter Support Modules" that are designed to accept wastewater from a mounted pipe called the "Support Distribution Pipe." Eljen's Opening Br., ECF No. 167-1 at 11. The Support Distribution Pipe has three one-inch holes positioned within each Filter Support Module to enable wastewater distribution. *Id.* Just like the Geomatrix patent, the Accused Mantis Products have a high aspect ratio design, allowing for highly efficient and compact leach fields. A diagram of a representative Accused Mantis Product from Eljen's brief is reproduced below. *Id.*



_____

[1] The allegedly infringing Mantis products are the Mantis 536-8, the Mantis Double-Wide, and the Mantis M5 (the "Accused Mantis Products"). Geomatrix's L.R. 56(a)2 St. ¶ 11.

D. The Disputed Claims

The '863 Patent contains three independent claims, numbered 1, 22, and 26. Because similar language is shared across all three independent claims, the Court reproduces only a representative example below, with the language relevant to the parties' present motions bolded:

1. A system for wastewater comprising:

a plurality of channels, where the channels each have a height to width aspect ratio in a range of as high as 96 and as low as 3, each have an uppermost surface and each include a pair of upright infiltrative surfaces,

where the paired upright infiltrative surfaces of each channel are substantially parallel to each other along a majority of their length, and have a length of substantially one foot or more,

where adjacent channels are separated along a majority of their length by two or more inches, the separations comprising sand, or a granular material, or a void comprising the majority or all of the volume of the separation,

the separations having a spacing of one foot or more along their length without an intervening intersecting infiltrative surface that connects the adjacent channels within the spacing,

at least two channels being **interconnected to each other below their uppermost surface**, and

a first wastewater delivery conduit with wastewater egress openings positioned such that **the area of the conduit having the wastewater egress openings traverses a majority of the paired infiltrative surfaces at an oblique or perpendicular angle**.

E. Procedural History

Geomatrix filed its first infringement action against Eljen in 2016, accusing Eljen of infringing on the '863 Patent. Geomatrix's L.R. 56(a)2 St. ¶ 1; *see also Geomatrix Sys., LLC v. Eljen Corp.*, No. 3:16-cv-00734-JBA (D. Conn.). After voluntarily dismissing the 2016 action, Geomatrix obtained three additional patents: U.S. Patent Nos. 9,650,271 (the "'271 Patent"); 10,065,875 (the "'875 Patent"); and 10,392,278 (the "'278 Patent"). Geomatrix's L.R. 56(a)2 St. ¶ 3.

In 2020, Geomatrix brought the instant action against Eljen, asserting that Eljen infringed on sixty-three claims across the four patents. *Id.* Following Geomatrix's submission of an amended complaint, ECF No. 56, Eljen brought counterclaims of non-infringement and invalidity of the four patents against Geomatrix. *See* Eljen's Answer & Countercl., ECF No. 61. Following proceedings under *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), in which the Court (Arterton, J.) resolved seven disputed categories of terms, *see Markman* Order, ECF No. 131, and the Court's decision denying in part Geomatrix's motion for leave to supplement its infringement contentions, *see* Order, ECF No. 146, Geomatrix decided not to proceed with its '278 Patent, '875 Patent, and '278 Patent infringement claims against Eljen. *See* Geomatrix's L.R. 56(a)2 St. ¶ 4 & n.1.

Accordingly, only the following claims and counterclaims related to the '863 Patent remain in this action: Geomatrix's claims that (1) Eljen has directly infringed and is directly infringing the '863 Patent by making, using, offering for sale, and selling, in the United States, the Accused Mantis Products (Counts One and Two); (2) Eljen contributes to the infringement of the '863 Patent by instructing others to infringe claims 1 and 22 of the '863 Patent (Count Sixteen); and (3) Eljen induces infringement of the '863 Patent by inducing others to use the Accused Mantis Products in a manner that directly infringes claims 1 and 22 of the '863 Patent (Count Seventeen); and Eljen's counterclaims for declaratory judgment that (1) Eljen has not and is not now infringing any claim of the '863 Patent under any legal or equitable theory or under any provision of 35 U.S.C. § 271 (Counterclaim Count One); (2) the claims of the '863 Patent are invalid because the alleged inventions fail to satisfy the conditions for patentability specified in 35 U.S.C. § 100 *et seq.* (Counterclaim Count Five); and (3) the '863 Patent is unenforceable due to Mr. Potts' inequitable conduct (Counterclaim Count Nine). *See* ECF Nos. 56, 61.

Presently pending before the Court are the parties' cross-motions for summary judgment. Eljen's motion argues that it is entitled to judgment as a matter of law for four reasons, any one of which it contends would independently support judgment in its favor:  (1) Eljen's Accused Mantis Products do not infringe the '863 Patent; (2) the '863 Patent is invalid for lack of an adequate written description; (3) the '863 Patent is invalid because it was anticipated by prior art; and (4) the '863 Patent was rendered obvious by the prior art.  *See* Eljen's Opening Br. at 12–14. Geomatrix, unsurprisingly, disputes each of Eljen's contentions.  It seeks summary judgment in its favor on its claim for infringement and the issues of invalidity by anticipation and obviousness. Geomatrix's Opening Br. at 9–10.  Further, it seeks summary judgment on Eljen's counterclaim alleging that the '863 Patent is unenforceable because Geomatrix committed inequitable conduct before the Patent and Trademark Office ("PTO").  *Id.* at 10.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A disputed fact is material only where the determination of the fact might affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  With respect to genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

The movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. A movant, however, "need not prove a negative when it moves for summary judgment on an issue that the [non-movant] must prove at trial. It need only point to an absence of proof on [the non-movant's] part, and, at that point, [the non-movant] must 'designate specific facts showing that there is a genuine issue for trial.'" *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at 324). The non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson*, 477 U.S. at 249. If the non-movant fails "to make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof," then the movant will be entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citation and internal quotation marks omitted). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Anderson*, 477 U.S. at 250–51).

In a patent action, non-infringement and invalidity are separate and independent responses to a suit for infringement. *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 643 (2015). Accordingly, "an accused infringer 'may prevail either by successfully attacking the validity of the

patent or by successfully defending the charge of infringement.'" *Id.* (quoting *Deposit Guaranty Nat'l Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 334 (1980)).

## III.    SUMMARY OF HOLDINGS

The Court first addresses the question of whether the Accused Mantis Products directly infringe the '863 Patent, and concludes, as a matter of law, that they do infringe.

The Court then turns to the questions of patent invalidity because "a finding that a patent is not infringed does not render the counterclaim for patent invalidity moot." *Pandrol USA, LP v. Airboss Ry. Prods., Inc.*, 320 F.3d 1354, 1364 (Fed. Cir. 2003) (citing *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 102–03 (1993)).

First, the Court determines that neither party is entitled to summary judgment on the question of whether the '863 Patent is invalid for lack of written description of an "oblique angle."

Second, the Court concludes, as a matter of law, that all "prior art references" at issue are not "prior art references," such that Eljen may rely on them to bring its anticipation theories, because Eljen has not sustained its burden of demonstrating they are printed publications or were in public use or on sale prior to a certain critical date. The Court additionally concludes that Eljen may not rely on any of those "prior art references" to bring its obviousness theories, to the extent that any of its obviousness theories rely on them.

Third, the Court finds that Eljen may rely on reference combinations disclosed in its invalidity contentions and on its expert report, to the extent that the Court has not otherwise found that the "prior art references" cannot support an invalidity claim.

Fourth, the Court finds that there are disputed issues of material fact concerning Eljen's theory that U.S. Patent No. 8,104,994 (the "Donlin '994 Patent")[2] had priority over the '863 Patent.

---

[2] "Donlin" refers to James Donlin, the inventor of the Accused Mantis Products.

Following the Court's analysis of patent invalidity, the Court finds that questions of fact also preclude entry of summary judgment as to whether Mr. Potts committed inequitable conduct in its dealings with the PTO.

## IV.    DIRECT INFRINGEMENT

For the reasons that follow, the Court finds that the Accused Mantis Products directly infringe the '863 Patent, and thus grants Geomatrix's motion for summary judgment as to patent infringement.

### A.    Legal Standard

"Summary judgment on the issue of infringement is proper when no reasonable jury could find that every limitation recited in a properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents." *PC Connector Sols. LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005) (citation omitted).    Only literal infringement is at issue here.

Determining patent infringement is a two-step process. *Niazi Licensing Corp. v. St. Jude Medical S.C., Inc.*, 30 F.4th 1339, 1350 (Fed. Cir. 2022).   First, the Court "determines the scope and meaning of the claims asserted, and then the properly construed claims are compared to the allegedly infringing device." *Id.*  While claim construction is a question of law, *Mas-Hamilton Grp. v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998), the determination of whether an accused device infringes a patent claim is a question of fact.  *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1429 (Fed. Cir. 2000).  "To prove literal infringement, the patentee must show that the accused device contains every limitation in the asserted claims. . . .  If even one limitation is missing or not met as claimed, there is no literal infringement."  *Mas-Hamilton Grp.*, 156 F.3d at 1211.

Because the ultimate burden of proving infringement rests with the patentee, an accused infringer may establish that summary judgment as to noninfringement is proper "either by providing evidence that would preclude a finding of infringement, or by showing that the evidence on file fails to establish a material issue of fact essential to the patentee's case." *Novartis Corp. v. Ben Venue Lab'ys, Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001) (citation omitted). If the moving party meets this initial requirement, the burden shifts to the party asserting infringement to set forth, by declaration or as otherwise permitted under Fed. R. Civ. P. 56, "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248–49. Summary judgment of noninfringement may only be granted "if, after viewing the alleged facts in the light most favorable to the nonmovant and drawing all justifiable inferences in the nonmovant's favor, there is no genuine issue whether the accused device is encompassed by the patent claims." *Novartis Corp.*, 271 F.3d at 1046.

The parties agree there are three "independent" claims contained in the '863 Patent—claims 1, 22, and 26. Geomatrix's L.R. 56(a)2 St. ¶ 15. Although worded slightly differently in each claim, two of the essential requirements of all of these claims are that (1) the "area" of the conduit having the wastewater egress openings traverses a majority of the paired infiltrative surfaces at an oblique or perpendicular angle; and (2) at least two channels are "interconnected" to each other below their uppermost surface. The parties' dispute about whether the Accused Mantis Products meet these two requirements turns on the meaning of the terms "area" and "interconnected." The Court concludes that the Accused Mantis Products contain both the "area" limitation and the "interconnected" limitation. A judgment of infringement as a matter of law in Geomatrix's favor is therefore appropriate.

B. "Area"

While the wording varies slightly, each of the disputed claims requires a wastewater distribution or delivery conduct positioned such that the "area" of the conduit having the wastewater egress openings traverses, in the words of the two more narrowly-worded claims (Claims 22 and 26), the separations between adjacent channels or the opposing infiltrative surfaces. Geomatrix's L.R. 56(a)2 St. ¶¶ 17–18.  The Court concludes that the conduit of the Accused Mantis Products is positioned such that the area that has the wastewater openings does traverse the separations.  The Accused Mantis Products therefore contain this limitation of the '863 Patent.

As noted above, both the '863 Patent and the Accused Mantis Products use a support distribution pipe to feed wastewater to the channels where the effluent is treated.  The parties agree that, in the Accused Mantis Products, the holes in the pipe (to use the '863 Patent's language, the "wastewater egress openings") exist solely within the channels themselves; there are no openings for wastewater to be dispersed in the voids/separations between the channels.  *Id.* ¶¶ 14, 25.  Eljen contends that, to satisfy the relevant limitation of the '863 Patent, the "area" having the holes must traverse out of the channels and into the separations between the channels.  Eljen's Opening Br. at 18–19.  Geomatrix, on the other hand, argues that the area of the conduit with water egress openings is measured from the first to last hole on the water distribution pipe, regardless of whether such openings allow wastewater to be fed both within and outside of the channels.  *See* Geomatrix's Opp'n Br., ECF No. 178 at 14–17.  The Court agrees with Geomatrix.

First, the Court rejects Eljen's attempt to resurrect its claim construction argument that the claims *require* the openings to traverse both the channels and the separations.  The central question in that claim construction dispute was "whether at least some of the water egress openings *need* to cross into the separations between the channels or if they can be confined to the channels themselves."  *See* ECF No. 131 at 23 (emphasis added).  Rather than answering the question

directly, Judge Arterton held that because the claims do not say that wastewater egress openings are required over the separations between the channels, "they will not limit the claimed system to require them." *Id.* This leaves open the possibility that these egress openings may traverse only the channels *or* traverse both the channels and the separations. *See id.* (noting that Eljen conceded in its *Markman* briefing that "there are probably numerous ways to adequately construe various terms within this claim element"). Although not explicitly stated in the *Markman* order, it appears Judge Arterton sided with Geomatrix that the term "area" need not be construed and should be interpreted according to its plain and ordinary meaning, given that she declined to construe any of the relevant terms in this group of claims. *Id.*; *see also* Joint Claim Construction Statement, ECF No. 80 at 15–16 (Geomatrix arguing that no construction is necessary for the term "area"). In so holding, the Court declined to adopt Eljen's specialized construction requiring the openings to cross into the separations between the channels. *See* ECF No. 131 at 22–23. Insofar as Eljen once again asks the Court to endorse the specialized meaning that was already rejected, the Court declines its request.

Further, the Court holds that the "area" claim limitation is met in the Accused Mantis Products. Both parties' experts—Bonneau Dickson for Geomatrix and Pio Lombardo for Eljen—appear to agree that the area having the openings is the entire length of the pipe from the first opening to the last opening, regardless of where the openings themselves are positioned. It is unsurprising that Mr. Dickson, as Geomatrix's expert, takes this position; but Mr. Lombardo also characterized the "area" having the openings this way in his deposition. *See* Dickson Dep., ECF No. 169-44 at 42:19–43:13; Lombardo Dep., ECF No. 169-8, 201:3–23 (discussing drawing providing that "L" is the area of the pipe having egress openings). Mr. Lombardo's drawing, identifying "L" as the area of the pipe having egress openings, is reproduced below.



*See* Geomatrix's Opp'n Br. at 17.

Eljen tries to overcome its own expert's view by arguing that the drawing was abstract and untethered from the actual technology at issue. *See* Eljen's Opp'n Br., ECF No. 180 at 50. But its strained efforts fail, and it takes too narrow a reading of the term "area" in this context. The Court concludes that there is no genuine dispute that the area of the Accused Mantis Products' Support Distribution Pipe having wastewater egress openings traverses both the channels and the separations, in that it includes the area from the first opening in the pipe to the last opening, and not simply the small one-inch openings inside each channel. Therefore, the Accused Mantis Products infringe the "area" limitation in the disputed claims.

    C.  <u>"Interconnected"</u>

Because literal infringement requires proving that the accused device contains *every* limitation from a claim, *see Mas-Hamilton Grp.*, 156 F.3d at 1211, the Court proceeds to consider whether at least two channels of the Accused Mantis Products are "interconnected to each other below their uppermost surface." It concludes they are.

The central dispute is the meaning of the word "interconnected." Three parts of the Accused Mantis Products are at issue: (1) cardboard corners, which appear at both the top and

bottom of the Products; (2) black plastic spacers[3]; and (3) the Support Distribution Pipe itself.  A diagram from Eljen's briefing is once again helpful for context:



GEOMATRIX_00000001.

Eljen's Opening Br. at 24.  Geomatrix argues that "interconnected" in the context of the '863 Patent is synonymous with "connected" in a broad sense, regardless of the purpose of the items that join the channels.  *See* Geomatrix's Suppl. Br., ECF No. 197 at 8–9.[4]  Thus, in Geomatrix's view, anything in the Accused Mantis Products that connects the channels together beneath their uppermost surface—including the vertical leg of the top cardboard corners, the bottom cardboard corners, the black spacers, and the distribution pipe—is considered a part that "interconnects" the channels to each other.  *See* Geomatrix's Opening Br. at 55.  Eljen concedes that the vertical leg of the top cardboard corners, the bottom cardboard corners, the black spacers, and Support Distribution Pipe *connect* the channels below their uppermost surface, but contends

---

[3] The black plastic spacers were used in what the parties refer to as the "prior" versions of the Accused Mantis Products, but are not used in the "current" versions of the Products.  *See* Eljen's Opening Br. at 11–12 n.2.
[4] The Court required the parties to submit supplemental briefing on the meaning of the word "interconnected" within the context of the '863 Patent.  Order, ECF No. 193.

they do not *interconnect* the channels *to each other*, as required by the claim limitation.  *See* Eljen's Opening Br. at 25–26.  Eljen argues that Geomatrix's interpretation is divorced from the context of the '863 Patent, and asserts that "interconnected" means, in the context of the Patent and its prosecution history, that the channels must be "mutually joined for fluid interflow."  *See* Eljen's Suppl. Br., ECF No. 196 at 8.  Eljen's definition would not include the Support Distribution Pipe, black spacers, and cardboard corners as parts that "interconnect" the Filter Support Modules to each other.  *See* Eljen's Opening Br. at 25–26.

### 1.   A Return to Claim Construction

During claim construction, Judge Arterton rejected Eljen's argument that "interconnected" means "contiguously shaped" to enable "contiguous flow between the channels apart from the main wastewater distribution pipe."  ECF No. 131 at 24–26.  Instead, she declined to construe the term "interconnected."  *Id.* at 26.  As is now clear, the parties continue to dispute the scope and meaning of the term.

"When the parties raise an actual dispute regarding the proper scope of . . . claims, the court, not the jury, must resolve that dispute."  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (citation omitted).  Specifically, where "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning'" is "inadequate" and "does not resolve the parties' dispute[,]" then "claim construction requires the court to determine what claim scope is appropriate in the context of the patents-in-suit."  *Id.* at 1361 (citations omitted).  Thus, even where a court has determined that a claim's terms have "common meaning[s]," if the parties "proceed[] to dispute the scope of that claim term," additional claim construction may be necessary.  *Id.*  In these instances, "[d]istrict courts may engage in a rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its

understanding of the technology evolves." *Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002); *see also In re Papst Licensing Digit. Camera Pat. Litig.*, 778 F.3d 1255, 1261 (Fed. Cir. 2015) ("[A] district court may (and sometimes must) revisit, alter, or supplement its claim constructions (subject to controlling appellate mandates) to the extent necessary to ensure that final constructions serve their purpose of genuinely clarifying the scope of claims for the finder of fact."); *Conoco, Inc. v. Energy & Env't Int'l, L.C.*, 460 F.3d 1349, 1359 (Fed. Cir. 2006) ("[A] district court may engage in claim construction during various phases of litigation, not just in a *Markman* order.").

Here, the parties continue to dispute the scope of the word "interconnected" in the '863 Patent's disputed claims. Accordingly, the Court must revisit claim construction to resolve the parties' dispute as to the plain and ordinary meaning of "interconnected" in the context of the '863 Patent's independent claims.

### 2. *Legal Standard*

"The patent system is based on the proposition that claims cover only the invented subject matter. As the Supreme Court has stated, '[i]t seems to us that nothing can be more just and fair, both to the patentee and the public, than that the former should understand, and correctly describe, just what he has invented, and for what he claims a patent.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed Cir. 2005) (*en banc*) (alteration in original) (quoting *Merrill v. Yeomans*, 94 U.S. 568, 573–74 (1876)). Ultimately, the purpose of claim construction is to "capture the scope of the actual invention." *Id.* at 1324.

"There is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharms. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013). The ordinary meaning of a claim term is not "the meaning of the term in the abstract," but,

rather, "its meaning to the ordinary artisan after reading the entire patent." *Phillips*, 415 F.3d at 1321. Ordinary meaning is not determined "in a vacuum." *Eon Corp. IP Holdings v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1320 (Fed. Cir. 2016) (quoting *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005). Rather, "[d]etermining the limits of a patent claim requires understanding its terms in the context in which they were used by the inventor, considered by the examiner, and understood in the field of the invention." *Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1299 (Fed. Cir. 1999).

"When construing claim terms [courts] first look to, and primarily rely on, the intrinsic evidence, including the claims themselves, the specification, and the prosecution history of the patent, which is usually dispositive." *Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1276 (Fed. Cir. 2013). The intrinsic record takes precedence because "competitors are entitled to review the public record, apply the established rules of claim construction, ascertain the scope of the patentee's claimed invention and, thus, design around the claimed invention." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). The claims, both asserted and unasserted, can be "valuable sources of enlightenment as to the meaning of a claim term." *Phillips*, 415 F.3d at 1314. The claims are also part of the "fully integrated written instrument . . . consisting principally of [the] specification that concludes with the claims." *Id.* at 1315 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995)). For that reason, the specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* (quoting *Vitronics*, 90 F.3d at 1582).

In addition, a court can consider the patent's prosecution history, which can demonstrate "how the PTO and the inventor understood the patent." *Id.* at 1317. "Any explanation, elaboration,

or qualification presented by the inventor during patent examination is relevant, for the role of claim construction is to 'capture the scope of the actual invention' that is disclosed, described, and patented." *Fenner Invs., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1323 (Fed. Cir. 2015) (citation omitted).  Because the prosecution history "represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation," however, "it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317.

In most instances, analysis of the intrinsic evidence alone will resolve claim construction disputes. *Vitronics*, 90 F.3d at 1583; *see also Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1287 (Fed. Cir. 2021) ("If the meaning of a claim term is clear from the intrinsic evidence, there is no reason to resort to extrinsic evidence.").  But the Court may also rely on extrinsic evidence, "which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" *Phillips*, 415 F.3d at 1317 (quoting *Markman*, 52 F.3d at 980).  "Extrinsic evidence is to be used for the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims." *Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1373 (Fed. Cir. 2022) (cleaned up; quoting *Markman*, 52 F.3d at 981); *see also Phillips*, 415 F.3d at 1324 (recognizing that a court is not "barred from considering any particular [extrinsic] sources or required to analyze sources in any specific sequence, as long as those sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence").

### 3.  Analysis

The intrinsic evidence demonstrates that Eljen's interpretation of "interconnected" in the context of the '863 Patent is not supportable.  Rather, Geomatrix's view that "interconnected" is

synonymous with "connected" in the context of the Patent—though broad—is correct.  In light of this finding, no reasonable juror could find that the Accused Mantis Products do not infringe the '863 Patent, and Geomatrix is entitled to judgment as a matter of law on direct infringement.

a.   The Claims

The Court starts with the claim language, in which "interconnected" and "connected" are used synonymously.  For instance, independent claim 1 describes the absence of an "intervening intersecting infiltrative surface that *connects* the adjacent channels," '863 Patent at col. 17:10–13 (emphasis added); claim 2 similarly describes that the "separations between adjacent pairs do not include *interconnecting* infiltrative surfaces along the length of the adjacent pairs," *id.* at col. 17:21–23 (emphasis added).  The words "connects" and "interconnecting" are therefore used to describe a similar negative limitation in two different claims.  Independent claim 22 and dependent claim 28 likewise interchangeably use "connects" and "interconnected" to describe a similar negative limitation.  *See id.* at cols. 18:35–40, 19:27–30.  Although there is a presumption that different terms in a patent have different meanings, *see CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000), that presumption can be overcome where the evidence indicates the patentee used terms interchangeably, as Mr. Potts did here.  *Baran v. Med. Device Techs., Inc.*, 616 F.3d 1309, 1316 (Fed. Cir. 2010).

Eljen's proposed construction—that "interconnected" means "mutually joined for fluid interflow"—is found nowhere in the language of the claims themselves.  Instead, Eljen cobbles together this construction from various provisions, including the preamble for the claims, which generally describes a "system for wastewater."  *See* Eljen's Suppl. Br. at 8.  But that description is of the system as a whole and is not particularly instructive as to the specific meaning of "interconnected."  Eljen next claims that the prefix "'[i]nter-' evokes the concept of back-and-

forth, as one would expect of an interflow or redistribution of water." *Id.*   But the Court's construction of the term is not dependent on what concepts a term evokes; the Court must instead ground its construction in the language of the terms itself.   Nor does the clause "to each other" that follows the word "interconnected" necessarily suggest that the channels must be mutually joined for fluid interflow; there is nothing in the plain language of the claims to support the idea that the interconnection must be for this very specific purpose, as opposed to simple connection.

Perhaps Eljen's strongest argument about claim language is that each of the independent claims of the '863 Patent list the wastewater delivery conduit (the pipe) as an element separate from the element containing the "interconnected to each other" limitation.   *Id.* at 9.   In Eljen's view, this suggests that the pipe cannot be the source of the interconnectedness.   *See Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1382 (Fed. Cir. 2022) (noting that separate listing of claim elements creates a presumption that those components are distinct).   The separate placement of the distribution pipe element in the claims, however, cannot overcome the fact that the claims themselves do not speak of interconnectedness being limited to the purpose of fluid flow, whether two-way or otherwise.   And, in any event, this argument would not be relevant to the other elements that connect the Accused Mantis Products, such as the cardboard corners and black spacers.

In sum, Eljen urges the Court to adopt a narrow construction of "interconnected" that finds no grounding in the language of the claims (but, not coincidentally, would result in a finding of noninfringement).   The Court concludes that the language of the claims supports not Eljen's view, but Geomatrix's.

b.  The Specification

The specification likewise supports Geomatrix's construction, at least slightly.  The specification describes, in the section describing low aspect ratio conduits, that multiple low-aspect conduits "may be installed in spaced apart rows, or in segments which are spaced apart, all *interconnected* by suitable distribution lines."  '863 Patent at cols. 3:67–4:2 (emphasis added).  A natural reading of the phrase "interconnected" here is that the conduits can be "connected" by distribution lines.  The specification does not suggest that a more specialized purpose must be ascribed to the word "interconnected" when used in this context.  Eljen's logic is that the referenced interconnected distribution lines do "not dose wastewater from its source," because each conduit has its own dosing pipe; therefore, it claims, the distribution lines "mutually join the low aspect channels to allow fluid interflow," and that must therefore be the definition of "interconnected." Eljen's Suppl. Br. at 12.  But the Court sees no evidence in the specification that such a narrow definition of "interconnected" was intended.  In particular, the Court cannot find that the specification reveals a "special definition given to a claim term by [Mr. Potts] that differs from the meaning it would otherwise possess," such that his lexicography would govern, or that Mr. Potts intentionally disavowed the claims' scope.  *See Phillips*, 415 F.3d at 1316.  Simply put, at least in the context of the Patent's discussion of low aspect ratio conduits, the Court believes the ordinary meaning of "interconnected" is "connected."

Although the written description of high aspect ratio conduits does not use the term "interconnected," the figures provided at the beginning of the Patent allow some insight into how channels in high aspect ratio conduits may be interconnected.  At oral argument, the Court probed counsel for Geomatrix as to how Figure 16 has two channels interconnected.  ECF No. 192 at 8– 9.  Counsel explained that the channels in Figure 16 are interconnected via a geonet volume

running across the U-shaped channels, *id.*, for the purpose of water distribution and redistribution, *id.* at 19; *see also id.* at 23.  When counsel for Eljen was queried on the same figure, counsel explained that the U-shaped channels provide interconnection by allowing for water redistribution between what would otherwise be disconnected, parallel channels.  *Id.* at 89, 101–02.

The Court is mindful, however, to not read limitations from a preferred embodiment in the specification into the claim, absent a clear indication that the patentee intended the claims to be so limited.  *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004); *see also* ECF No. 192 at 9 (counsel for Geomatrix explaining that, depending on installation, a distribution pipe could interconnect according to the claims).  Thus, the Court cannot find that the specification necessarily supports Eljen's view that interconnection involves wastewater distribution and redistribution.  Rather, the specification supports Geomatrix's interpretation, slightly.

c.  Prosecution History

It is in the prosecution history that Eljen finds the most support for its reading of "interconnected."  But, as noted above, the prosecution history is less useful for claim construction purposes because it reflects ongoing negotiation about the scope of the Patent, rather than the "final product of that negotiation."  *Phillips*, 415 F.3d at 1317.

The relevant prosecution history concerns the PTO examiner's initial rejection, and then acceptance, of the claims of the '863 Patent.  By way of background, on September 8, 2013, the PTO examiner rejected Mr. Potts's claim to an invention with channels being interconnected at least at the bottom of the channels.  '863 Patent File History, ECF No. 169-25 at 311–12.  The examiner stated that Mr. Potts's claim was unpatentable in light of the Donlin '994 Patent.  *Id.* Specifically, the examiner noted that, in the Donlin '994 Patent, at least two channels were interconnected, citing the "Figures where pipe goes through the channels and positioned above the

channels; the pipe going through the channels is considered as 'interconnecting' the channels." *Id.*
at 207.  Figure 19 from the Donlin '994 Patent depicts the interconnecting pipe, which the Donlin
'994 Patent describes as "support pipe" (12).



**Fig. 19**

*See* Donlin '994 Patent, ECF No. 169-14 at 7.  The Donlin invention referred to the
channels (14) as "interconnected," *see id.* at col. 6:64–66, and its specification makes clear that the
support pipe need not be connected to the fluid source, *id.* at col. 6:12–14.  The patent examiner
thus contemplated that the support pipe (12) could interconnect the channels without necessarily
being used for fluid interflow (at least from the wastewater source).  This supports Geomatrix's
contention that channels can be interconnected *without* the need for fluid interflow.

Eljen contends that, in Mr. Potts' response to the examiner's rejection, he used the term
"interconnected" in the context of water distribution/fluid interflow.  To be sure, there are
references in Mr. Potts' submission to water distribution.  As Mr. Potts explains in his 1.131
Declaration[5] submitted to the PTO, his Invention Disclosure (Exhibit B to his Declaration)
includes figures he drew of the bottom of high aspect ratio conduits that could be "positioned along
a shared plane of reference *in order to re distribute water* among them."  Potts 1.131 Decl., ECF
No. 169-25 at 255 ¶ 19 (emphasis added).  Page one of Exhibit B states as follows:  "A wastewater

---

[5] A declaration under 37 C.F.R. § 1.131 enables a patent applicant to establish invention of the "subject matter of the
rejected claim prior to the effective date of the reference or activity on which the rejection is based."  In essence, it is
a declaration of prior invention.

distribution pipe(s) can be installed over the top of the high aspect ratio conduits for water distribution. This distribution pipe can be installed over the high aspect ratio conduit or into another low or high aspect ratio conduit that interconnects the parallel conduits. An interconnecting conduit can also be installed at the bottom of the high aspect ratio conduits *to redistribute water* to all the high aspect ratio conduits, if necessary." *Id.* at 268 (emphasis added). Mr. Potts describes Figure 3 as showing a high aspect ratio conduit that achieves wastewater redistribution via "interconnected ends." *Id.* at 255 ¶ 19; *id.* at 272. But Mr. Potts also explains in his declaration that his prototype device had "slotted pipes below to interconnect the bottoms of the mat," without any reference to the slotted pipes being used for water distribution. *Id.* at 256 ¶¶ 22–23.

The patent examiner ultimately issued the '863 Patent, of course, but without any elaboration of the meaning of the word "interconnected." The Court finds convincing Geomatrix's argument that, had Mr. Potts truly meant for "interconnected" to mean "mutually joined for fluid interflow," he could have distinguished his invention from the Donlin '994 Patent in that manner when contesting the rejection. *See* Geomatrix's Suppl. Br. at 18–19. He did not do so, suggesting that both he and the examiner treated the term "interconnected" as meaning, simply, "connected."

Nor does a single sentence in the provisional application that the '863 Patent claims the benefit of—that the infiltrative surfaces "can be interconnected . . . or fed with wastewater independently of one another"—carry the day. '863 Patent Provisional Application, ECF No. 71-11 at 4. A provisional application can be part of the intrinsic evidence to be considered for claim construction. *See MPHJ Tech. Invs., LLC v. Ricoh Ams. Corp.*, 847 F.3d 1363, 1369 (Fed. Cir. 2017) (citations omitted). But the Court agrees with Geomatrix that relying on this one line in a provisional application, by itself, is "far too slender a reed to support the judicial narrowing of a

clear claim term," Geomatrix's Suppl. Br. at 23–24 (quoting *N. Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1294 (Fed. Cir. 2000)), particularly where the sentence highlighted by Eljen does not appear in the '863 Patent.[6]

### d. Extrinsic Evidence

The Court is sufficiently convinced that the intrinsic evidence described above supports Geomatrix's reading of the claim term "interconnected." The Court therefore need not rely on extrinsic evidence. But it bears noting that the 2004 edition of the Merriam-Webster dictionary defines "interconnect" as "to connect with one another." *See* ECF No. 197-3 at 4.

### e. In Sum

Because the Accused Mantis Products meet both the "area" and "interconnected" limitations of the '863 Patent, the Court finds they infringe the '863 Patent as a matter of law. Geomatrix is therefore entitled to summary judgment on its claim of direct patent infringement.

## V.    WRITTEN DESCRIPTION

A finding of infringement does not end the Court's task, however. The Court must address both parties' invalidity arguments, which remain live. *See Pandrol USA, LP*, 320 F.3d at 1364. It begins with Eljen's contention that the '863 Patent is invalid for lack of written description of the term "oblique angle." The Court finds that a reasonable jury *could* find clear and convincing evidence that the Patent is invalid for this reason, but that such a conclusion is not appropriate for the Court to make as a matter of law, on the present record. Accordingly, the Court denies both Geomatrix's motion for summary judgment and Eljen's motion for summary judgment on the issue of whether the '863 Patent is invalid for lack of an adequate written description.

---

[6] Having concluded that the intrinsic evidence supports Geomatrix's reading, the Court need not address its prior art references.

The Patent Act requires that a patent specification contain "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same."  35 U.S.C. § 112(a).  A patentee "can lawfully claim only what he has invented and described, and if he claims more his patent is void."  *Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*, 541 F.3d 1115, 1122 (Fed. Cir. 2008).  To that end, the specification must "describe the invention sufficiently to convey to a person of skill in the art that the patentee had possession of the claimed invention at the time of the application, *i.e.*, that the patentee invented what is claimed."  *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005).  The written description doctrine "prohibits new matter from entering into claim amendments, particularly during the continuation process."  *Agilent Techs., Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1379 (Fed. Cir. 2009).  Specifically, when the scope of a claim is changed by amendment "in such a way as to justify an assertion that it is directed to a *different invention* than was the original claim," the Court should inquire "whether the newly claimed subject matter was *described* in the patent application when filed."  *In re Wright*, 866 F.2d 422, 424 (Fed. Cir. 1989).

To determine if a specification contains an adequate written description, the Court must make "an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art."  *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (*en banc*).  The written description inquiry is a question of fact.  *Id.*  Because a patent is presumed valid upon issuance, *see* 35 U.S.C. § 282, a patent challenger "bears the burden of proving the factual elements of invalidity by clear and convincing evidence."  *Pfizer, Inc. v. Apotex*, 480 F.3d 1348, 1359 (Fed. Cir. 2007).

Eljen must prove by clear and convincing evidence that the written description requirement has not been satisfied.  *See Vasudevan Software, Inc. v. MicroStrategy, Inc.*, 782 F.3d 671, 682 (Fed. Cir. 2015).  Eljen's invalidity argument centers on language in the claims requiring the "area of the conduit having the wastewater egress openings [to traverse[] a majority of the paired infiltrative surfaces *at an oblique* or perpendicular angle."  '863 Patent at col. 17:17–20 (independent claim 1).  Similar language appears in independent claims 22 and 26.  Eljen argues that there is no mention of an oblique angle in either the original patent application filed in 2006 or in the continuation application from which the '863 Patent issued and, therefore, that the Patent is invalid.  Eljen's Opening Br. at 12–13.  Geomatrix counters that (1) there is at least a genuine dispute of material fact about whether the original patent application described an oblique angle, pointing to its reference to a Z-shaped channel, its hand-drawn figures, and the fact that the PTO examiner initially had the same objection but later withdrew it following Geomatrix's appeal; and (2) going further, Eljen has failed to provide enough support that a reasonable jury could conclude, by clear and convincing evidence, that the Patent is invalid on this basis.  Geomatrix's Opening Br. at 50–53; Geomatrix's Opp'n Br. at 25–31.  The Court concludes that this issue must be decided by a jury, and therefore denies both parties' motions for summary judgment on this point.

With respect to Eljen's motion for summary judgment, the Court finds that there is a genuine dispute about whether the '917 Application's statement that the "high aspect channels may be 'Z' shaped for additional surface area" sufficiently discloses the possibility of an oblique angle.  *See* '917 Application, ECF No. 169-40 at 21.  First, there is a question whether a distribution pipe would be oriented relative to the "Z" in a way that would create an oblique angle.  *Compare* Eljen's Opening Br. at 30–31 (arguing that the sentence in the '917 Application "has nothing to do with orientation of a pipe or oblique angles" and would require a person of ordinary skill in the art to

speculate, in contravention of the written description requirement) *with* Geomatrix's Opp'n Br. at 27 (arguing that a person of ordinary skill in the art would only need to look at the figures depicting U-shaped embodiments to determine how a pipe should be oriented in the Z-shaped embodiment). Second, there is a question whether the sentence in the '917 Application is referring to a Z-shape when viewing the embodiment from the top, side, or front.  *Compare* Eljen's Opening Br. at 31–32 (asserting that even Geomatrix's expert did not know whether the Z-shaped channel would be Z-shaped when viewed from the top, side, or front) *with* Geomatrix's Opp'n Br. at 28 (asserting that because the Patent[7] describes the U-shaped embodiment from a top view, a person of ordinary skill in the art would also look at the Z-shaped embodiment from the top).  Third, there is a question whether the Z-shaped channels would be shaped like the letter Z, or like a Z-shaped bracket, which has perpendicular angles.  *Compare* Eljen's Opening Br. at 31–32 (arguing that there is no evidence that even if the Z-shaped channel were viewed from the top, it would have a slant and not right angles like a standard Z-shaped bracket) *with* Geomatrix's Opp'n Br. at 28 (arguing that Eljen has only provided arguments on how a Z-shaped channel might look, but not actual evidence).  These questions create a genuine dispute of material fact as to whether oblique angles are described in the original patent application, through its reference to Z-shaped channels.

Additionally, the Court agrees with Geomatrix that Eljen has not met the clear and convincing evidence standard as a matter of law, especially where Eljen's arguments are backed by inadequate expert evidence.  As an initial matter, Eljen relies on conclusory expert analysis that is less than a page long.  *See* Lombardo Expert Rep., ECF No. 169-17 at 59.  Mr. Lombardo concludes that "[t]here is not a single embodiment disclosed in Mr. Potts' application where even

---

[7] Although Geomatrix refers to Figures 16 and 17 of the '863 Patent as describing the U-shaped embodiments, the '917 Application also includes the same figures, albeit hand-drawn, that depict the same U-shaped embodiments.  *See* '917 Application at 46–47.

an example of an oblique angle is shown or described" after making only two (also conclusory) observations: (1) the patent application does not use the term "angle" or any similar term, and (2) the "[f]igures of the application uniformly disclose only a perpendicular angle." *Id.* ¶¶ 180–81. Only two paragraphs actually discuss the '917 Application, and neither of those paragraphs discuss the sentence about the Z-shaped embodiment that takes center stage in Eljen's motion for summary judgment. There is such little analysis of whether an "oblique angle" is described in the Application that Mr. Lombardo's recitation of the legal standards of adequate written description is substantially longer than his discussion of the '917 Application. *See id.* at 58–59. Eljen's rejoinder—that if Geomatrix had issues with Mr. Lombardo's invalidity report, it could have asked him about it during his deposition—falls flat by impermissibly shifting the burden of proof to Geomatrix. *See* Eljen's Reply, ECF No. 186 at 6. As the party asserting invalidity of the Patent due to inadequate written description, Eljen—not Geomatrix—is responsible for presenting evidence to prove its claim. *See Eli Lilly & Co. v. Barr Lab'ys, Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001) (only the party seeking to invalidate a patent at summary judgment bears the burden of proof, whereas a moving party seeking to have a patent held not invalid at summary judgment only needs to show that the nonmoving party bearing the burden of proof failed to meet its burden).

Further, Mr. Lombardo's analysis of the written description issue is based on an incomplete file history of the '863 Patent prosecution. Eljen is incorrect that Mr. Lombardo reviewed the entire file history, *see* Eljen's Reply at 6, when his "Information Reviewed In Support of My Opinions" document clearly shows that he reviewed only "USPT Office Action, dated September 13, 2013" and "Response to the September 13, 2013 Office Action, dated February 14, 2014," to the exclusion of the rest of the file history. *See* ECF No. 169-17 at 71–72. Thus, it appears Mr. Lombardo did not consider Geomatrix's patent appeal brief dated January 8, 2015, in which

Geomatrix presented arguments that persuaded the PTO examiner to reverse his written description rejection based on the purported lack of support for an "oblique angle" in the '917 Application. *See* Patent Appeal Br., ECF No. 169-25 at 71–72.  In that brief, Geomatrix asserted that:  (1) the '917 Application describes channels as comprising various materials such as stringy mats, stone, hollow flat pipes, and other materials, which would lead a person of ordinary skill in the art to understand that the pipes overlying the channels would not necessarily traverse them at 90°; (2) because the channels may be constructed in various ways, including by bending geonet into the desired shape, a person of ordinary skill in the art would understand that, in practice, a pipe would not necessarily cross each channel at exactly 90°; and (3) the hand-drawn figures in the '917 Application demonstrate oblique angles.  *Id.*  Although the PTO examiner did not articulate why he decided to overturn his original rejection on the oblique angle point, there is a possibility that at least one of Geomatrix's arguments was convincing to him.  Mr. Lombardo's report does not explain why any of these arguments fail.

With respect to Geomatrix's motion for summary judgment, the Court concludes Eljen has pointed to evidence from which a reasonable jury *could* conclude, by clear and convincing evidence, that the written description requirement was satisfied, rendering judgment as a matter of law in Geomatrix's favor inappropriate.  The parties agree that the original patent application made no explicit reference to oblique angles, which a reasonable jury could find weighs in Eljen's favor.  Geomatrix highlights that the '917 Application contains two hand-drawn figures that depict conduits traversing infiltrative surfaces at non-perpendicular angles.  *See* Geomatrix's Opening Br. at 52 (referencing Figures 16 and 19 of the '917 Application); Geomatrix's Opp'n Br. at 30 (same). Geomatrix's expert concurs these drawings show oblique angles.  ECF No. 169-11 ¶¶ 784–85; *see also* Geomatrix's Reply, ECF No. 185 at 17–18.  But, as Eljen points out, because these figures

were drawn by hand, it is not demonstrably clear whether the lines representing the infiltrative surfaces are intentionally crooked or if they are crooked simply due to the imprecision of drawing by hand. *See* Eljen's Opp'n Br. at 44–46. The Court also notes that Mr. Potts later replaced hand-drawn Figures 16 and 19 with digitally-rendered versions that appear to demonstrate wastewater distribution conduits that traverse the channels at only perpendicular angles. *Id.* at 45. From this evidence—and, depending on its resolution of the Z-shaped channel issue—a reasonable jury could conclude that there is clear and convincing evidence that the written description requirement had not been satisfied.[8]

In sum, because the evidence presented by both parties regarding the Z-shaped channel and the hand-drawn figures create a genuine dispute of material fact on whether the '863 Patent is invalid for lack of written description, the Court denies both parties' motions for summary judgment on this issue.

## VI.    INVALIDITY

Next, the Court evaluates the parties' motions for summary judgment as to Eljen's other invalidity theories of anticipation and obviousness under 35 U.S.C. §§ 102 and 103, respectively.[9]

As noted above, because the burden of establishing invalidity of a patent rests on the party asserting invalidity, 35 U.S.C. § 282, "a moving party seeking to invalidate a patent at summary

---

[8] Eljen also argues that, even if it concedes that Figures 16 and 19 describe angles that are one to two degrees off from 90°, they do not sufficiently demonstrate that Mr, Potts possessed the "full scope" of the claimed invention, *i.e.*, all oblique angles, and thus the Court must find for Eljen as a matter of law. Eljen's Opp'n Br. at 46; Eljen's Reply at 7–8. Eljen's insistence that the written description must possess the "full scope" of the invention is misplaced. Cases that require such specificity in the written description usually arise in the context of pharmaceutical patents, which naturally require particularity and precision. *See, e.g.*, *AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1301 (Fed. Cir. 2014) (upholding jury verdict of invalidity for lack of adequate written description because the pharmaceutical patents did not describe representative examples "to support the full scope of the claims"); *cf.* Eljen's Opp'n Br. at 46–47 (citing only cases in the pharmaceutical context).

[9] Sections 102 and 103 were amended by the Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, § 3, 125 Stat. 284, 285–89 (2011). Because the original application for the '863 Patent was filed in 2006, the Court applies the pre-AIA version of these statutes throughout this opinion.

judgment must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise.  Alternatively, a moving party seeking to have a patent held not invalid at summary judgment must show that the nonmoving party, who bears the burden of proof at trial, failed to produce clear and convincing evidence on an essential element of a defense upon which a reasonable jury could invalidate the patent."  *Eli Lilly*, 251 F.3d at 962.

In its Amended Invalidity Contentions, Eljen argues that the '863 Patent is invalid because there are twelve prior art references[10] that anticipate one or more of its claims, and a combination of one or more of fifteen prior art references[11] renders its claims obvious to a person of ordinary skill in the art.  Amended Invalidity Contentions, ECF No. 169-10 at 18–21.  Eljen now moves for summary judgment that the '863 Patent is invalid because 1988 In-Drains, by itself, anticipates the Patent by disclosing all the elements of its independent claims 1, 22, and 26 and renders its claims obvious to a person of ordinary skill in the art.  Eljen's Opening Br. at 32–40.  Eljen also moves for summary judgment that 1992 In-Drains, combined with 1988 In-Drains or the Glasser '333

---

[10] Only nine of the twelve references are at issue in the parties' motions for summary judgment as to anticipation:  (1) a paper authored by Dr. Rein Laak titled "Using In-Drains at Soil Clogging Infiltration Surface" for presentation at the 1988 International Summer Meeting of the American Society of Agricultural Engineers ("1988 In-Drains"); (2) a promotional publication authored by Dr. Laak in 1992 titled "In-Drains: Sand Filled 6" x 4' x 18" Long" ("1992 In-Drains"); (3) a product manual dated March 31, 1997 and written by Dr. Laak called, "Ruck L Fins"; (4) a brochure ("Mini/Max Brochure") and letters from 2003 between Eljen's agent and the Connecticut Department of Public Health regarding an Eljen product called the Mini/Max Absorption System ("Mini/Max Letters"); (5) a paper authored by Dr. Laak titled, "On-Site Wastewaster Drain Fields Using Light Weight In-Drains," for the Second International Conference on Cold Regions Environmental Engineering in 1987 ("1987 In-Drains"); (6) an undated "Eljen In-Drain" brochure ("In-Drain Brochure"); (7) a pre-1990 Eljen memorandum titled, "Procedure for Assembling a Ruck System In-Drain Unit" ("In-Drain Memo"); and (8) a paper authored by Dr. Laak titled, "Using In-Drain Geosynthetics in Soil Infiltration Systems" for presentation at the 1989 International Summer Meeting of the American and Canadian societies for agricultural engineering ("1989 In-Drains").  Geomatrix also moves for summary judgment that Eljen has not demonstrated by clear and convincing evidence that Eljen's Mini/Max product ("Mini/Max"), which was not included in Eljen's Amended Invalidity Contentions, is prior art that anticipates the '863 Patent.  Geomatrix's Opening Br. at 24.

[11] The fifteen prior art references are:  (1) the Donlin '994 Patent; (2) Ruck L Fins; (3) the Mini/Max Brochure; (4) the Mini/Max Letters; (5) 1987 In-Drains; (6) the In-Drain Brochure; (7) In-Drain Memo; (8) 1988 In-Drains; (9) 1989 In-Drains; (10) 1992 In-Drains; (11) U.S. Patent No. 4,880,333 (the "Glasser '333 Patent"); (12) U.S. Patent No. 6,048,131 (the "Laak '131 Patent"); (13) U.S. Patent No. 5,597,264 (the "Laak '264 Patent"); (14) U.S. Patent No. 4,824,287 (the "Tracy '287 Patent"); and (15) Dr. Rein Laak, *Wastewater Engineering Design for Unsewered Areas* (1st ed. 1986).

Patent, invalidates the '863 Patent by making its claims obvious to a person of ordinary skill in the art.  *Id.* at 40–44.

In turn, Geomatrix moves for summary judgment that the '863 Patent is valid because Eljen has not provided clear and convincing evidence that 1988 In-Drains, 1992 In-Drains, Ruck L Fins, the Mini/Max Brochure, the Mini/Max Letters, 1987 In-Drains, the In-Drain Brochure, the In-Drain Memo, 1989 In-Drains, and the Mini/Max are prior art references that anticipate the '863 Patent.  Geomatrix's Opening Br. at 19–31.  As to obviousness, Geomatrix argues that Eljen's Amended Invalidity Contentions are fatally deficient for untimeliness and for lacking specificity and support.  *Id.* at 32–35.

For the reasons described below, the Court denies Eljen's motion for summary judgment as to invalidity by anticipation and obviousness, grants Geomatrix's motion for summary judgment as to no invalidity by anticipation, and grants in part and denies in part Geomatrix's motion for summary judgment as to Eljen's obviousness theories.

A.  Printed Publication

The Court first holds that the two primary publications on which Eljen bases its invalidity theories—1988 In-Drains and 1992 In-Drains—are not "printed publications" such that they qualify as prior art that could render the claims of the '863 Patent anticipated or obvious.  It also agrees with Geomatrix that several other proposed prior art references are likewise not "printed publications."

*1.  Legal Standard*

Under § 102(b) of the Patent Act, a patent may not be obtained if "the invention was patented or described in a printed publication in this or a foreign country . . . more than one year prior to the date of the application for patent in the United States."  "Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility' has been

34

called the touchstone in determining whether a reference constitutes a 'printed publication' bar under 35 U.S.C. § 102(b)." *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1348 (Fed. Cir. 2016) (quoting *In re Hall*, 781 F.2d 897, 898–99 (Fed. Cir. 1986)). "A reference will be considered publicly accessible if it was 'disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it.'" *Id.* (quoting *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1350 (Fed. Cir. 2008)).

The determination of whether a document is a "printed publication" under 35 U.S.C. § 102(b) "involves a case-by-case inquiry into the facts and circumstances surrounding the reference's disclosure to members of the public." *In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004) (citations omitted). "Whether an anticipatory document qualifies as a 'printed publication' under § 102 is a legal conclusion based on underlying factual determinations." *Suffolk Techs., LLC v. AOL Inc.*, 752 F.3d 1358, 1364 (Fed. Cir. 2014) (quoting *SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186, 1192 (Fed. Cir. 2008)).

### 2. *1988 In-Drains*

The Court finds that Eljen has not demonstrated by clear and convincing evidence that 1988 In-Drains qualifies as a printed publication; thus, it does not qualify as a prior art reference and cannot invalidate the '863 Patent by anticipation or by obviousness.

The parties agree that 1988 In-Drains is a paper authored by Dr. Laak, an inventor and frequent collaborator of Eljen. 1988 In-Drains, ECF No. 168-14. The paper states on its face that it was "[w]ritten for presentation at the 1988 International Summer Meeting of the American Society of Agricultural Engineers." *Id.* at 2. In a 2016 declaration, however, Dr. Laak simply states that he authored the 1988 In-Drains paper, without reference to it being presented. Dr. Laak

2016 Decl., ECF No. 168-16 ¶ 16.  According to Eljen's expert (Mr. Lombardo), Dr. Laak presented the paper to 30 to 50 members of the Society of Agricultural Engineers.  ECF No. 169-17 ¶ 38.  Mr. Lombardo states that the paper was spiral bound, assigned a paper number, and freely distributed amongst conference-goers and anyone else who requested a copy.  *Id.*  Mr. Lombardo makes these conclusions based on "a discussion with Dr. Laak," as well as Dr. Laak's declarations and deposition testimony.  *Id.* ¶ 36.

Geomatrix (correctly) does not dispute that if 1988 In-Drains was orally presented and freely distributed as described, it would likely qualify as a printed publication.  The Federal Circuit considers various factors in evaluating whether an oral presentation and accompanying publication qualify as a printed publication.  One factor is "the size and nature of the meetings and whether they are open to people interested in the subject matter of the material disclosed." *Medtronic, Inc. v. Barry*, 891 F.3d 1368, 1382 (Fed. Cir. 2018).  "Another factor is whether there is an expectation of confidentiality." *Id.*  In assessing these factors, the Federal Circuit has found that a paper delivered orally at a conference for somewhere between 50 and 500 attendees who were persons of ordinary skill in the art, offered freely for distribution, and then distributed to at least six attendees, qualifies as a printed publication. *Mass. Inst. of Tech. v. AB Fortia*, 774 F.2d 1104, 1108–10 (Fed. Cir. 1985).  Thus, if 1988 In-Drains was actually presented and distributed at the conference as Eljen posits it was, the Court would likely conclude that it is a printed publication, such that it can be considered as a prior art reference.

But the Court agrees with Geomatrix that Eljen's evidence is insufficient to support a finding that 1988 In-Drains qualifies as a prior art reference by clear and convincing evidence.  To begin, the paper states that it was written *for presentation* at the conference, but does not confirm it was actually presented there.  The only evidence that it was actually delivered at the conference

comes from Eljen's expert, Mr. Lombardo—who lacks any personal knowledge on this subject, as he does not attest to having attended the conference at issue. Mr. Lombardo instead relies on statements of Dr. Laak, including his declarations, deposition testimony, and comments he shared with Mr. Lombardo in conversations between them. Of these records, Eljen has provided the Court with only Dr. Laak's 2016 declaration, which simply states that he "authored" the 1988 In-Drains paper, without any comment on whether, when, or how it was presented. ECF No. 168-16 ¶ 16 (1988 In-Drains is a "paper that I authored in 1988"). That leaves Mr. Lombardo's conversation with Dr. Laak as the sole source of authority for the proposition that the paper was presented and freely distributed in 1988.

This conversation, however, is inadmissible hearsay.[12] It is true that an expert may rely on inadmissible data in forming an opinion if experts in the particular field would reasonably rely on that kind of data in forming an opinion on a subject. *See* Fed. R. Evid. 703. But it is plain that an expert's reliance on such data "does not make admissible otherwise inadmissible evidence." *Wi-LAN Inc. v. Sharp Elecs. Corp.*, 992 F.3d 1366, 1374 (Fed. Cir. 2021) (quoting 4 *Weinstein's Federal Evidence* § 703.05 n.12). In other words, Eljen cannot seek to admit Dr. Laak's out-of-court statements for their truth through Mr. Lombardo, simply because Mr. Lombardo is its expert witness.

The primary case on which Eljen relies to support its argument, *MobileMedia Ideas, LLC v. Apple Inc.*, 907 F. Supp. 2d 570, 605–06 (D. Del. 2012), *rev'd in part on other grounds*, 780 F.3d 1159 (Fed. Cir. 2015), is inapposite because there, the expert relied on a copyright date on the

---

[12] Although Geomatrix did not squarely raise a hearsay objection in its opposition, it argues that Mr. Lombardo's conclusions about the paper being presented are not based on his personal knowledge, which is true. Mr. Lombardo's lack of personal knowledge as to the conditions under which the paper was presented and disseminated—and his reliance on Dr. Laak's comments in that regard—implicate the rationale underlying the inadmissibility of hearsay evidence. *See generally* 2 *McCormick on Evid.* § 245 (8th ed. 2022). Dr. Laak was not under oath during the conversations; his demeanor during the conversations cannot be assessed by the jury; and he would not be subject to cross-examination. *Id.*

publication—not an out-of-court conversation with a paper's author about events that occurred approximately twenty-eight years before the author's declaration. Here, 1988 In-Drains does not have a copyright date and, although it has a paper number and appears from the copy in the record to have been spiral-bound, there is a lack of clear and convincing evidence from which a reasonable jury could conclude that it was actually presented and disseminated at the 1988 meeting. *Cf. Stored Value Sols., Inc. v. Card Activation Techs, Inc.*, 499 F. App'x 5, 14 (Fed. Cir. 2012) (noting that a copyright date corroborates testimony about the date of a publication); *see also Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1330 (Fed. Cir. 2004) (where there is a lack of evidence that a paper has been disseminated at a meeting—even if the general practice at such meetings is to hand out papers to interested attendees—the clear and convincing standard is not met). That other of Dr. Laak's publications cite to 1988 In-Drains as a prior art reference also does not help Eljen; at most, it demonstrates the unsurprising proposition that Dr. Laak knew of his own earlier work. Finally, Eljen complains that Geomatrix declined to cross-examine Dr. Laak at his deposition on whether 1988 In-Drains or 1992 In-Drains was publicly disseminated. Eljen's Opp'n Br. at 18; Eljen's Reply at 8–9. As the party seeking to invalidate the '863 Patent, however, it was *Eljen's* responsibility to elicit testimony about public dissemination from Dr. Laak. *See Eli Lilly*, 251 F.3d at 962.

On the present record, no reasonable jury could find that Eljen could meet its burden of showing by clear and convincing evidence that 1988 In-Drains is a printed publication; therefore, on the issue of whether 1988 In-Drains anticipates or renders obvious the '863 Patent, Eljen's

summary judgment motion is denied, and Geomatrix's summary judgment motion on the issue of whether 1988 In-Drains is a printed publication is granted.[13]

### 3. *1992 In-Drains*

As with 1988 In-Drains, in arguing that 1992 In-Drains is a printed publication, Eljen relies almost exclusively on conversations Dr. Laak had with Mr. Lombardo.  *See* ECF No. 169-17 ¶¶ 36, 40.  For substantially the same reasons as discussed above, the Court finds Eljen has not demonstrated by clear and convincing evidence that this document is a prior art reference that invalidates the '863 Patent by anticipation or obviousness.  Eljen claims that 1992 In-Drains is a promotional publication that was freely distributed publicly to the relevant industry at the time.  The dissemination of promotional material intended to reach the general public can be "strong evidence" of public accessibility.  *Valve Corp. v. Ironburg Inventions Ltd.*, 8 F.4th 1364, 1374 (Fed. Cir. 2021).  As Geomatrix points out, however, the only evidence in the record that 1992 In-Drains was promotional material is from a conversation that Dr. Laak had with Mr. Lombardo—which is inadmissible for the reasons discussed above.  *See* ECF No. 169-17 ¶¶ 36, 40.  Dr. Laak's 2016 declaration labels 1992 In-Drains a "promotional publication" that he "authored," but does not explain to whom or when the promotional publication was distributed.  ECF No. 168-16 ¶ 19.  The paper itself bears no indicia of use as a promotional document.  *See* 1992 In-Drains, ECF No. 169-20; *cf. Valve Corp.*, 8 F.4th at 1374 (finding that a product review article was promotional because it made clear where the product could be purchased).  Rather, 1992 In-Drains, with its figures,

---

[13] Geomatrix also argues that, to the extent they are considered, Dr. Laak's statements require corroboration, under *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354 (Fed. Cir. 1999).  It is an open question whether the corroboration requirement applies to the present situation.  *Compare Netscape Commc'ns Corp. v. ValueClick, Inc. (Netscape III)*, 704 F. Supp. 2d 544, 553 (E.D. Va. 2010) ("Until the Federal Circuit further clarifies this issue, the safest course, in the circumstances, is to apply the *Finnigan* corroboration requirement broadly.") *with Stored Value Sols., Inc. v. Card Activation Techs., Inc.*, 796 F. Supp. 2d 520, 548 n.33 (D. Del. 2011), *aff'd* 499 F. App'x 5 (Fed. Cir. 2012) (holding that witness's testimony that prior art was publicly known by a certain date need not be corroborated under *Finnigan*).  In light of its holding above that the information relayed by Dr. Laak to Mr. Lombardo is inadmissible, the Court need not decide whether it requires corroboration.

graphs, and table of references, looks more like 1988 In-Drains, which was a paper intended for industry professionals, as opposed to a commercial promotional document. *See* ECF No. 169-20.

Because no reasonable juror could conclude that 1992 In-Drains is a printed publication, Eljen's motion for summary judgment on anticipation and obviousness based on 1992 In-Drains is denied. Geomatrix's motion for partial summary judgment on the issue of whether 1992 In-Drains is a printed publication is granted.

### 4. *Other Printed Publication Issues*

Geomatrix has also moved for partial summary judgment on the issue of whether Ruck L Fins, Mini/Max references, and several other references are printed publications. The Court concludes that they are not and, therefore, that Geomatrix is entitled to a summary judgment on these points.

Regarding Ruck L Fins, which Eljen contends is a product manual published on March 31, 1997, and "freely disseminated to the public, including engineers and installers," Eljen's Opp'n Br. at 19, Eljen again relies almost entirely on Dr. Laak's conversation with Mr. Lombardo to argue that it is a printed publication. For the reasons already discussed, Dr. Laak's comments to Mr. Lombardo are inadmissible. Accordingly, the Court finds that no reasonable juror could conclude based on the evidence in the record that Ruck L Fins is a printed publication.

Regarding the Mini/Max Brochure, ECF No. 169-22, and Mini/Max Letters, ECF No. 169-23, Eljen does not respond directly to Geomatrix's contention that these are not printed publications because their public accessibility is unknown. The Court agrees with Geomatrix that the Mini/Max Brochure bears no date or indicia of public accessibility. The Mini/Max Letters were addressed to the Connecticut Department of Public Health in December of 2003, but there is no evidence that they were ever actually sent, either on the dates in the Letters or otherwise. Mr.

Lombardo relies on conversations with Eljen's owner and former president, Mark Bram, about the public accessibility of these documents.  ECF No. 169-17 ¶ 37.  But for the same reasons that Mr. Lombardo's conversations with Dr. Laak are inadmissible hearsay, Mr. Lombardo's conversations with Mr. Bram are also inadmissible hearsay.  The Court therefore concludes that no reasonable juror could conclude that the Mini/Max Brochure or Mini/Max Letters are printed publications.

Finally, no reasonable juror could find that 1987 In-Drains, the In-Drain Brochure, the In-Drain Memo, or 1989 In-Drains are printed publications.  While Mr. Lombardo did not base his anticipation opinions directly on these documents, and while Geomatrix's arguments are, admittedly, cursory, *see* Eljen's Opp'n Br. at 20–21, Eljen has not provided a document-by-document analysis as to why each document could be considered a printed publication.  *See In re Klopfenstein*, 380 F.3d at 1350.  Eljen's passing reference to Dr. Laak's 2017 declaration is insufficient.  Eljen's Opp'n Br. at 20–21 (citing Dr. Laak 2017 Decl., ECF No. 169-34 ¶¶ 3–5).  In his declaration, Dr. Laak explains his marketing and production of the In-Drain system at a high level and in general terms.  ECF No. 169-34 ¶¶ 3–5.  But he explains none of the details from which it is possible to glean whether any of these documents are printed publications.  There is no evidence of their public accessibility through presentation, archiving, indexing, or any other form of public accessibility.

In sum, insofar as Geomatrix has sought summary judgment that 1988 In-Drains, 1992 In-Drains, Ruck L Fins, the Mini/Max Brochure and Letters, 1987 In-Drains, the In-Drain Brochure, the In-Drain Memo, or 1989 In-Drains are not printed publications, its motion is granted, and Eljen's claim that the '863 Patent is anticipated or obvious on the bases of these documents is incorrect, as a matter of law.  The Court therefore need not reach Eljen's other arguments in favor of anticipation or obviousness as to these documents.  Eljen's motion for summary judgment on

the grounds that 1988 In-Drains anticipates or renders obvious the '863 Patent and that 1992 In-Drains, in combination with other references, made invention of the '863 Patent obvious, is denied.

### B. Geomatrix's Additional Invalidity Arguments

The Court next evaluates the remaining invalidity arguments, as to which only Geomatrix moves for summary judgment. As to anticipation, Eljen has not demonstrated, by clear and convincing evidence, that the Mini/Max is a prior art reference that was in public use or on sale one year prior to the filing of the '863 Patent's original application; thus, Eljen may not rely on it to bring its anticipation defense. The Court therefore grants Geomatrix's motion in full for summary judgment as to no invalidity by anticipation. As to obviousness, the Court finds that Eljen's Amended Invalidity Contentions adequately provide notice and are sufficiently supported by Mr. Lombardo's expert report. Thus, the Court grants in part Geomatrix's motion for summary judgment to the extent that Eljen's obviousness theories rely on proposed prior art that the Court has already found not to be "prior art," but denies in part Geomatrix's motion for summary judgment to the extent that Geomatrix argues that Eljen's Amended Invalidity Contentions are lacking in specificity and support.

#### 1. Anticipation

The Court finds that Eljen may not rely on the Mini/Max as a prior art reference because there is insufficient evidence from which a reasonable juror could conclude that the Mini/Max was in public use or on sale prior to January 27, 2005, which is one year before the '863 Patent's original application was filed.

Section 102(b) creates a statutory bar to patenting if the invention was "in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." Eljen has the burden of showing by "clear and convincing evidence" that there was public use or a sale or offer to sell of a product more than one year before the relevant date, and the

product "must satisfy each claim limitation of the patent." *Scaltech, Inc. v. Retec/Tetra, LLC*, 269 F.3d 1321, 1329 (Fed. Cir. 2001); *accord Elan Corp., PLC v. Andrx Pharms., Inc.*, 366 F.3d 1336, 1340 (Fed. Cir. 2004). "Section 102(b)'s on-sale bar is triggered when a claimed invention is: (1) ready for patenting; and (2) the subject of a commercial offer for sale prior to the critical date." *Merck & Cie v. Watson Lab'ys, Inc.*, 822 F.3d 1347, 1351 (Fed. Cir. 2016) (citations omitted). "The public use bar is triggered where, before the critical date, the invention is in public use and ready for patenting." *Polara Eng'g Inc. v. Campbell Co.*, 894 F.3d 1339, 1348 (Fed. Cir. 2018) (internal quotation marks and citation omitted). Whether a patent is invalid due to the invention being in public use or on sale is a question of law, based on underlying questions of fact. *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1378 (Fed. Cir. 2005); *Robotic Vision Sys., Inc. v. View Eng'g, Inc.*, 112 F.3d 1163, 1167 (Fed. Cir. 1997).

The Court is unpersuaded by the four documents that Eljen relies on in support of its position that the Mini/Max product was in public use or on sale more than a year before January 27, 2005, the critical date. First, the Mini/Max Brochure produced by Eljen to promote the product, ECF No. 169-22, does not demonstrate sale or public use. While one could conclude from the Brochure that Eljen did in fact market the Mini/Max for sale at some point, the Brochure is undated. Geomatrix's Opening Br. at 19 n.6; *see also id.* at 25. Without a date on the Brochure, the Court cannot find that it supports Eljen's contention that the Mini/Max was offered for sale or in public use prior to January 27, 2005. Second, the Mini/Max Letters, which were dated December 2003, do not demonstrate sale or public use. ECF No. 169-23. While the Letters indicate that, by December of 2003, Eljen was working with the State of Connecticut to seek approval of the Mini/Max for sale in January of 2004, *id.* at 2, the Letters do not demonstrate that the Mini/Max was actually on sale or in public use by January 27, 2005. Third, Eljen's response

to Geomatrix's interrogatories is insufficient.  ECF No. 181-3 at 3.  In its response to Geomatrix's thirty-eighth interrogatory, Eljen explained that the first invoice for sale of a Mini/Max to a customer was dated September 16, 2004.  *Id.*  However, Eljen has not submitted the invoice itself, and it has not demonstrated under what rule of evidence its interrogatory response is admissible.  *See* Fed. R. Civ. P. 33(c) ("An answer to an interrogatory may be used to the extent allowed by the Federal Rules of Evidence.").  Finally, Eljen may not rely on the conversation that Mr. Bram had with Mr. Lombardo regarding the sale of the Mini/Max, for the reasons discussed above.

Thus, the Mini/Max is not prior art because it was on sale or in public use prior to January 27, 2005.  Geomatrix's summary judgment motion is granted on this issue.

### a.  In Sum

Because the Court agrees with Geomatrix that Eljen cannot rely on the proposed prior art references discussed above, Eljen cannot bring any anticipation defenses based on them.  Accordingly, the Court does not address the merits of those claims.  Summary judgment is granted to Geomatrix that these proposed prior art references do not invalidate the '863 Patent by anticipation.

### 2.  *Obviousness*

The Court grants in part and denies in part Geomatrix's motion for summary judgment as to Eljen's obviousness theories under 35 U.S.C. § 103.  The Court grants Geomatrix's motion to the extent Eljen's obviousness theories rely on prior art that the Court has already found cannot support any claim for invalidity.  However, the Court denies Geomatrix's motion to the extent that Geomatrix argues that summary judgment should enter because Eljen's Amended Invalidity Contentions are inadequate and Mr. Lombardo's expert report is conclusory.

a. Invalidity Contentions Disclosures

The Court finds that Eljen's "bucket" approach to its Amended Invalidity Contentions is appropriate to the extent it discloses references that the parties do not dispute qualify as prior art for invalidity purposes.

Invalidity contentions require patent infringement defendants to disclose the invalidity theories the defendant plans to assert in its defense. *See Chapco, Inc. v. Woodway USA, Inc.*, 282 F. Supp. 3d 472, 489 (D. Conn. 2017) (citing *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1364 (Fed Cir. 2006)).  Unlike many other federal district courts, the District of Connecticut has not adopted local patent rules governing the disclosure of invalidity theories. *See id.*[14]  Other districts, like the Northern District of California, have adopted rules around the disclosure of invalidity contentions. *See id.*  While the Court understands that the local patent rules from other districts are not binding, the Court finds it useful to reference them to the extent they elucidate the purposes served by invalidity contentions.  The rules "seek to balance the right to develop new information in discovery with the need for certainty as to the legal theories." *Monolithic Power Sys.*, 467 F.3d at 1366 & n.12.

Geomatrix asserts that Eljen's Amended Invalidity Contentions, ECF No. 169-10, are inadequate because Eljen has not proposed specific combinations of the five "primary" references with the three "secondary" references.  Geomatrix's Opening Br. at 32–33.  Generally, "[b]road or general disclosures are 'insufficient'" to put a patent infringement plaintiff on notice as to the legal theories upon which a defendant may rely. *Mitsubishi Elec. Corp. v. Sceptre, Inc.*, No. 2:14-cv-04994-ODW (AJWx), 2015 WL 2369557, at *2 (C.D. Cal. May 18, 2015) (applying N.D. Cal. Patent L.R. 3-3(c)).  Courts that have addressed the "bucket" approach to invalidity contentions—

---

[14] While the District has not adopted local rules for patent cases, as part of its scheduling order, this Court ordered Eljen to serve invalidity contentions by May 28, 2021.  ECF No. 55.

the approach adopted by Eljen, with one "bucket" of primary references and another of "secondary" references—have found it appropriate where the defendant "reasonably specifies" the possible combinations of prior art, including by "organiz[ing] prior art references into groups and articulat[ing] an overarching theory of obviousness that applied to 'each and every possible combination[ ]' of prior art within the groups." *0912139 B.C. Ltd. v. Rampion USA Inc.*, No. C18-1464JLR, 2019 WL 3082290, at *6 (W.D. Wash. July 15, 2019) (alteration in original) (collecting cases).

The Court finds that Eljen's Amended Invalidity Contentions are adequate to provide notice to Geomatrix of Eljen's obviousness theories. First, Eljen has proposed a relatively modest number of prior art references as the basis for its proposed combinations (five primary sources that render the '863 Patent obvious on their own, along with three secondary references that render the '863 Patent obvious in combination). This counsels in favor of finding the disclosure appropriate—it is not as if Eljen has proposed "literally billions" of possible combinations. *Avago Techs. Gen. IP PTE Ltd. v. Elan Microelectronics Corp.*, No. C04-05385 JW (HRL), 2007 WL 951818, at *4 (N.D. Cal. Mar. 28, 2007). Second, Eljen's Amended Invalidity Contentions do provide an "overarching theory of obviousness" that applies to each and every possible combination of prior art. After listing each and every prior art reference that Eljen intends to rely on, Eljen explains the reasons why a person of ordinary skill in the art would be motivated to combine the prior art—as applied to each and every reference. *See* ECF No. 169-10 at 22–24.

Third, Eljen is correct that the specific two-reference combinations in Mr. Lombardo's report were disclosed in Eljen's Amended Invalidity Contentions. *See* Eljen's Opp'n Br. at 33. Geomatrix's only example of Eljen's alleged nondisclosure of the specific two-reference combinations in Mr. Lombardo's report is the combination of Ruck L Fins as the primary reference

and "Sand Filled In Drains" as the secondary reference.  Geomatrix's Opening Br. at 36–37.

Geomatrix misses the fact that "Sand Filled In Drains" and "1992 In-Drains" are the same

reference—1992 In-Drains is clearly listed as a secondary reference in Eljen's Amended Invalidity

Contentions.  ECF No. 169-10 at 25.

Finally, Eljen included a claims chart that explained how a person of ordinary skill in the

art would use the listed reference to achieve the '863 Patent's claims limitations.  *Id.* at 21

(incorporating by reference the claims charts found in Exhibits A through D to Eljen's initial

invalidity contentions); *see also* ECF No. 169-9 at 28–204 (Exhibit A to the initial invalidity

contentions explaining how the various disclosed art references meet the claim limitations).  Courts

applying the Northern District of California's local patent rules have found that claims charts are

"sufficient where the charts contain written descriptions of each element of each asserted claim

found in the particular prior art reference."  *Avago*, 2007 WL 951818, at *2.  *But see Slot Speaker*

*Techs., Inc. v. Apple, Inc*., No. 13-CV-01161-HSG (DMR), 2017 WL 235049, at *3–4 (N.D. Cal.

Jan. 19, 2017) (finding claims chart inadequate where it left "too much to guesswork").  The claims

charts here are sufficient.

Thus, Eljen's Amended Invalidity Contentions provide adequate notice and Eljen may rely

on the disclosed combinations to the extent the Court has not otherwise found that the prior art

references cannot support an invalidity claim.[15]

---

[15] Accordingly, the Court does not address Geomatrix's argument that Eljen did not adequately disclose its theory of obviousness on 1988 In-Drains alone because the Court has already found that it is not a printed publication.  *See* Geomatrix's Opening Br. at 36.  Nor does the Court address Geomatrix's arguments that Mr. Lombardo uses a "mix-and-match" approach that Eljen did not disclose the various combinations that Mr. Lombardo would rely on.  *Id.* at 36–37.  As the Court has already explained, Eljen was not required to explain each and every obviousness theory and combination.  Mr. Lombardo properly relied on various combinations within the "buckets" that Eljen has already adequately disclosed.

b.  Mr. Lombardo's Expert Report

The Court also finds that Mr. Lombardo's expert report adequately disclosed Eljen's obviousness theories, such that these sections of his report should not be excluded.[16]  The Court disagrees with Geomatrix's basic argument against Mr. Lombardo's report.  This argument takes many forms, but remains consistent in theme across its permutations:  Mr. Lombardo's report analyzing obviousness is conclusory, so it must be excluded.

As both parties recognize, in conducting an obviousness analysis that relies on the combination of two or more references, "[t]here must be some suggestion or motivation to combine the references."  *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1368 (Fed. Cir. 2016) (citations and internal quotation marks omitted).  The motivation of a person of ordinary skill in the art to combine references "may be found in many different places and forms."  *PAR Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1197 (Fed. Cir. 2014) (quoting *Allergan, Inc. v. Sandoz, Inc.*, 726 F.3d 1286, 1292 (Fed. Cir. 2013)).  For instance, the art itself may teach the motivation.  Also, "it often may be the case that market demand, rather than scientific literature, will drive design trends."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 419 (2007).  As for the reasonable expectation of success, the law does not require "conclusive proof of efficacy."  *Acorda Therapeutics, Inc. v. Roxane Lab'ys, Inc.*, 903 F.3d 1310, 1333 (Fed. Cir. 2018).  But cautious optimism is not sufficient, *Sanofi v. Watson Lab'ys Inc.*, 875 F.3d 636, 650 (Fed Cir. 2017), nor is mere "hope," *OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1385 (Fed. Cir. 2019).

---

[16] To the extent that Geomatrix also initially moved to exclude Mr. Lombardo's report because it did not contain claims charts for the Glasser '333 Patent, the Laak '264 Patent, or the Donlin '994 Patent,  Geomatrix's Opening Br. at 43–44, Geomatrix's reply brief recognizes that claims charts are not legal requirements, Geomatrix's Reply at 16 n.3 (citing *Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1373 (Fed. Cir. 2005)).  Thus, the Court does not address this argument as it is not a valid basis on which to exclude Mr. Lombardo's report.

Mr. Lombardo's report sufficiently discusses motivation and reasonable expectations of success. For example, Mr. Lombardo explains that a person of ordinary skill in the art would be motivated to limit the space between channel separations because the prior art teaches that it can be advantageous to fit a leach field into a smaller area of land. ECF No. 169-17 ¶ 122(d). A person of ordinary skill in the art would have reasonable expectations of success because the prior art successfully tested those channel separations. *Id.* Similarly, Mr. Lombardo explains that a person of ordinary skill in the art would be motivated to modify and experiment the prior art so as to use majority-void spacers to make the separations between channels because of the costs-savings associated with using less backfill. *Id.* ¶ 123(a). A person of ordinary skill in the art would have reasonable expectations of success because the prior art successfully used those channel spacers. *Id.* Mr. Lombardo's analysis that the prior art teaches various cost and land saving measures certainly provides more than mere conclusory opinion that a person of ordinary skill in the art would have reason or motivation to combine the various prior art references and would have a reasonable expectation of success in doing so. *See Elbrus Int'l Ltd. v. Samsung Elecs. Co.*, 738 F. App'x 694, 699–700 (Fed. Cir. 2018) (affirming Patent Trial and Appeal Board finding that a space saving feature is a reason to combine prior art).

Geomatrix's reference to *InTouch Technologies, Inc. v. VGO Communications, Inc.* is misplaced. Geomatrix's Opening Br. at 39 (citing 751 F.3d 1327, 1353–54 (Fed. Cir. 2014)). This case does not stand for the proposition that a district court must exclude expert testimony that fails to address motivation to combine—which Mr. Lombardo's report does in fact address. Rather, the Federal Circuit reversed a jury verdict based on expert testimony that an inventor *could* combine prior art without explaining *why*. An opinion discussing the weight and persuasiveness of evidentiary support is qualitatively different than an opinion standing for the proposition that a

court must exclude expert testimony that is not as fulsome as a theoretically perfect expert report. In any event, as the Court has explained, Mr. Lombardo's report in fact explains why a person of ordinary skill in the art would be motivated to combine prior art and would have a reasonable expectation of success in doing so.

Thus, the Court finds that Mr. Lombardo's expert report should not be excluded.

### c.  In Sum

The Court finds that Eljen's "bucket" approach to its Amended Invalidity Contentions appropriately discloses reference combinations and that Mr. Lombardo's expert report should not be excluded.  Accordingly, the Court denies Geomatrix's motion for summary judgment to the extent that Geomatrix argues that Eljen's Amended Invalidity Contentions are lacking in specificity and support.

## VII.    PRIORITY:  ACTUAL AND CONSTRUCTIVE REDUCTION TO PRACTICE

Next, the Court denies Geomatrix's motion for summary judgment of no invalidity by obviousness to the extent it seeks a finding, as a matter of law, that Mr. Donlin did not reduce his invention to practice prior to Mr. Potts.  Eljen does not move for summary judgment that the Donlin '944 Patent has priority over the '863 Patent in its own motion.

A person is entitled to a patent unless "before such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it."  35 U.S.C. § 102(g)(2).  In determining priority, the Court must consider "not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other."  35 U.S.C. § 102(g).  Thus, priority of invention "goes to the first party to reduce an invention to practice unless the other party can show that it was the first to conceive

of the invention and that it exercised reasonable diligence in later reducing that invention to practice." *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir. 1998). "A reduction to practice can be either a constructive reduction to practice, which occurs when a patent application is filed, or an actual reduction to practice." *Id.* "Priority of invention is a question of law, based on findings of evidentiary fact directed to conception, reduction to practice, and diligence." *Scott v. Koyama*, 281 F.3d 1243, 1246 (Fed. Cir. 2002).

For the reasons that follow, the Court finds that summary judgment in Geomatrix's favor is not warranted as to Eljen's priority defenses of actual and constructive reduction to practice.

### A. Actual Reduction to Practice

The Court finds that there are disputed issues of material fact concerning Eljen's theory of actual reduction to practice, which is based on Mr. Donlin building prototypes before Mr. Potts. Thus, summary judgment in Geomatrix's favor is inappropriate as to this theory.

"In order to establish an actual reduction to practice, the inventor must prove that: (1) he [or she] constructed an embodiment or performed a process that met all the limitations of the interference count; and (2) he [or she] determined that the invention would work for its intended purpose." *Cooper*, 154 F.3d at 1327. An inventor must also show "(3) the existence of sufficient evidence to corroborate inventor testimony regarding these events." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1169 (Fed. Cir. 2006) (citing *id.* at 1330). The corroborative evidence may take the form of "[d]ocumentary or physical evidence that is made contemporaneously with the inventive process," which is the "most reliable proof," or post-invention oral testimony of someone other than the alleged inventor—though the latter category is "more suspect, as there is more of a risk that the witness may have a litigation-inspired motive to corroborate the inventor's testimony, and that the testimony may be inaccurate." *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350–51 (Fed. Cir. 2001). An inventor may also introduce circumstantial evidence

about the inventive process.  *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1461 (Fed. Cir. 1998).

As both parties agree, Mr. Donlin's health precludes him as a testimonial witness.  *See* Geomatrix's Opening Br. at 48 n.21; Eljen's Opp'n Br. at 39 n.10.  Thus, the parties dispute the sufficiency of non-inventor testimony offered by Eljen to support its view that Mr. Donlin reduced the invention to practice before Mr. Potts, by making prototypes in the weeks after he (Mr. Donlin) recorded his conception of the idea in his laboratory notebook on July 8, 2004.  Specifically, Eljen offers testimony of two longtime Eljen employees:  Linette Streete, an Eljen plant manager who served as the witness on Mr. Donlin's laboratory notebook and who Eljen says was engaged to make the prototypes, and Zijada Hamzabegovic, whom Eljen represents was made the "Mantis team leader" to help commercialize the product after her prototyping work.  *See* Eljen Opp'n Br. at 38.  Both witnesses can be considered "interested" witnesses, in the sense that they may stand to gain if Mr. Donlin's invention is found to have priority over the '863 Patent's claims.  *See Thomson, S.A. v. Quixote Corp.*, 166 F.3d 1172, 1176 (Fed. Cir. 1999).  As corroboration, Eljen offers indicia of credibility of the witnesses' testimony and documentary evidence in the form of Ms. Streete's signature as a witness on Mr. Donlin's laboratory notebook pages from July 2004 and a fax from Mr. Donlin to his patent attorney in August of 2004 containing the relevant laboratory notebook pages.  Eljen's L.R. 56(a)2 St., ECF No. 181 ¶ 40 (first citing Signed Laboratory Notebook Pages, ECF No. 181-5; and then citing Fax, ECF No. 181-6).  Thus, Eljen has proffered, at the very least, *some* documentary evidence tending to corroborate the testimony of the two interested witnesses.  Geomatrix counters by asserting that the witnesses are longtime employees of Eljen, suggesting that they may have a motive to testify in favor of Mr. Donlin's invention having priority.  The probative value of the corroborating evidence and the credibility of

interested witnesses (and the extent to which their interest even raises the specter of incredibility), are issues for the jury, not the Court on summary judgment.  *See TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1159 & n.8 (Fed. Cir. 2004).

Thus, summary judgment as to Eljen's claim of actual reduction to practice is inappropriate.

### B.  Constructive Reduction to Practice

As an alternative ground, Eljen argues that Mr. Donlin's filing of a patent application on February 28, 2005, serves as a constructive reduction to practice that demonstrates Mr. Donlin invented before Mr. Potts.  For the moment, the Court puts aside the parties' dispute as to the date that Mr. Potts reduced to practice a prototype of the '863 Patent; the Court addresses these arguments in the inequitable conduct section below.  The Court only addresses the parties' dispute as to whether the filing of Mr. Donlin's patent application on February 28, 2005, serves as a constructive reduction to practice that gives him priority.  The Court finds that there are disputed issues of material fact and issues related to witness credibility on this issue, such that Geomatrix's motion for summary judgment should be denied.

As noted above, "priority of invention goes to the first party to reduce an invention to practice unless the other party can show that it was the first to conceive the invention and that it exercised reasonable diligence in later reducing that invention to practice."  *Monsanto Co. v. Mycogen Plant Sci., Inc.*, 261 F.3d 1356, 1362 (Fed. Cir. 2001).  A showing of diligence "is necessary for a party who was first to conceive but the second to reduce to practice."  *Id.* at 1362–63.  The party alleging prior invention must be able to show diligence during the "critical period," which is between the "date just prior to the other party's conception to the date of reduction to practice by the party first to conceive."  *Id.* at 1363 (cleaned up).

Assuming for purposes of this discussion that Mr. Donlin was the first to conceive of the invention, the parties only dispute whether Mr. Donlin was reasonably diligent in reducing his

conception to a patent during the critical period between August 15, 2004, when Mr. Potts allegedly conceived of his invention, and February 28, 2005, when Mr. Donlin filed the patent application directed to his invention that eventually became the Mantis product. Geomatrix's Opening Br. at 49. "Reasonable diligence" is "*reasonably continuous* diligence." *Perfect Surgical Techs., Inc. v. Olympus Am., Inc.*, 841 F.3d 1004, 1009 (Fed. Cir. 2016). "Under this standard, an inventor is not required to work on reducing his invention to practice every day during the critical period. . . . And periods of inactivity within the critical period do not automatically vanquish a patent owner's claim of reasonable diligence." *Id.* (citing *Monsanto*, 261 F.3d at 1369). Furthermore, there is no rule requiring a specific type of activity to determine whether the applicant was reasonably diligent in proceeding toward a constructive reduction to practice from the date of conception. *See Brown v. Barbacid*, 436 F.3d 1376, 1380 (Fed. Cir. 2006) ("[D]iligence and its corroboration may be shown by a variety of activities."). "[T]he point of the diligence analysis . . . is to assure that, in light of the evidence as a whole, 'the invention was not abandoned or unreasonably delayed.'" *Perfect Surgical Techs.*, 841 F.3d at 1009 (quoting *Barbacid*, 436 F.3d at 1379).

There are two disputed periods of "inactivity." The first is from August 4, 2004, when Mr. Donlin faxed his invention disclosure to Attorney Jim Piotrowski, to January 7, 2005, when Eljen completed the Design and Installation Guidelines for the Mantis product. Geomatrix's Opening Br. at 49–50. The second is from the completion of the guidelines on January 7, 2005, to Eljen's filing of U.S. Patent Application No. 60/657,308 on February 28, 2005. *Id.*

Summary judgment is inappropriate on the question of Mr. Donlin's diligence because assessing his diligence during this period requires making findings as to witness credibility that the Court cannot make on summary judgment. For both periods, the key witness testimony comes from Ms. Hamzabegovic, who was team lead for designing and testing Mantis products during the

critical period of its development from Mr. Donlin's conception to the first sale of the Mantis product.   Hamzabegovic Dep., ECF No. 181-11 at 18–22.   During her deposition, Ms. Hamzabegovic stated that during this critical period, she made many sample products at Mr. Donlin's request and that the samples were of various designs and sizes. *Id.* at 20–22.  During this same period, Mr. Donlin put together a detailed Design and Installation Guidelines for this developing product. *See* ECF No. 181-7.  While the parties agree that the document was completed on January 7, 2005, the parties dispute what, if any, effort Mr. Donlin exerted before that date to finalize the guidelines.   Relying on Ms. Hamzabegovic's testimony and the corroborating guidelines, a reasonable juror could conclude that during the critical period, Mr. Donlin directed Ms. Hamzabegovic to test various versions of the Mantis product, the results of which informed the creation of the Design and Installation Guidelines.  Similarly, in a letter dated March 18, 2005, Mr. Donlin wrote to the Connecticut Department of Public Health to discuss the Mantis product's design and Mr. Donlin's calculations of the product based on the designs.  ECF No. 181-10 at 2–5.  A reasonable juror could infer that the calculations in Mr. Donlin's letter were a direct result of the sample products Ms. Hamzabegovic produced during the critical time period—whether through testing or production.  Eljen need not demonstrate the day-to-day activities that took place during the critical period. *See ATI Techs. ULC v. Iancu*, 920 F.3d 1362, 1369–70 (Fed. Cir. 2019). A reasonable juror could take the evidence presented on the whole and conclude that Mr. Donlin was reasonably diligent in proceeding towards a constructive reduction to practice.

Thus, the Court denies Geomtarix's motion for summary judgment as to Eljen's defense of priority through constructive reduction to practice.

## VIII.    INEQUITABLE CONDUCT

Finally, the Court denies Geomatrix's motion for summary judgment as to Eljen's claims that Mr. Potts committed inequitable conduct during the prosecution of the '863 Patent. Eljen does not move for summary judgment on inequitable conduct in its own motion.

Applicants for patents are required to prosecute patent applications in the PTO with candor, good faith, and honesty." *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995) (internal footnote omitted). "Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011) (collecting cases). It derives from Supreme Court cases that applied the doctrine of unclean hands to dismiss patent cases involving egregious misconduct. *Id.* The remedy for inequitable conduct has been deemed the "'atomic bomb' of patent law," because inequitable conduct as to any individual claim renders the entire patent unenforceable. *Id.* at 1288 (quoting *Aventis Pharma S.A. v. Amphastar Pharms., Inc.*, 525 F.3d 1334, 1349 (Fed. Cir. 2008) (Rader, J., dissenting)).

Eljen's theory is two-fold. First, Eljen argues that Mr. Potts intended to deceive the PTO in his description of the prototype he constructed, to prove that Mr. Potts invented before Mr. Donlin. Eljen's Opp'n Br. at 52. It is Eljen's position that Mr. Potts falsely swore that a device shown in photographs submitted to the PTO was "an example of a wastewater leaching system," a "leach field system," and/or "worked as a wastewater treatment system" and that the PVC pipes above the device did not "serve[] as the dosing pipe." *Id.*; *see also* ECF No. 169-25 at 253 ¶¶ 5–8; *id* at 256 ¶¶ 22–24. Second, Eljen argues that Mr. Potts lied when he stated in his declaration to the PTO that the photographs of his prototype were taken before February 28, 2005. Eljen's Opp'n Br. at 55; *see also* ECF No. 169-25 at 253 ¶ 9 (describing metadata showing date before February

28, 2005); Hochman Rep., ECF No. 169-47 at 8 ¶ 20 (stating that the photographs were taken on October 26, 2004, and copied to a Windows computer system on October 28, 2004).

For the reasons that follow, the Court denies Geomatrix's motion for summary judgment as to both theories.

### A.  Legal Standard

"Inequitable conduct includes affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Bd. of Educ. ex rel. Bd. of Trs. of Fla. State Univ. v. Am. Bioscience, Inc.*, 333 F.3d 1330, 1343 (Fed. Cir. 2003) (citing *Molins*, 48 F.3d at 1178).  The standard for establishing inequitable conduct is a demanding one.  "To prevail on the defense of inequitable conduct, the accused infringer must prove that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO." *Therasense*, 649 F.3d at 1290.  "The accused infringer must prove both elements—intent and materiality—by clear and convincing evidence." *Id.* at 1287.

"Information is 'material' when there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent." *Molins*, 48 F.3d at 1179.  In *Therasense*, the Supreme Court held that in making the materiality determination, "the court should apply the preponderance of the evidence standard and give claims their broadest reasonable construction."  649 F.3d at 1291–92.  *Therasense* held further that "but-for materiality generally must be proved to satisfy the materiality prong of inequitable conduct," although there is an exception for "cases of affirmative egregious misconduct," which do not require such proof.  *Id.* at 1292.  Thus, "[w]hen the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit," the misconduct is unquestionably material.  *Id.*

To bring an inequitable conduct defense, the accused infringer must also show the plaintiff had the specific intent to mislead or deceive the PTO. *Molins*, 48 F.3d at 1181. In a misrepresentation or omission case, a "gross negligence" or "should have known" standard does not satisfy the requirement; instead, an accused infringer must show the patentee "*made a deliberate decision* to withhold a *known* material reference." *Therasense*, 649 F.3d at 1290 (quoting *Molins*, 48 F.3d at 1181). "Because direct evidence of deceptive intent is rare, [the Court] may infer intent from indirect and circumstantial evidence. . . . However, to meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" *Id.* (citations omitted) (quoting *Star Sci. Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed Cir. 2008)).

Because this is Geomatrix's motion, Eljen need only demonstrate that there are disputed issues of material facts that preclude summary judgment.

## B. Description of Device

The Court cannot enter summary judgment in favor of Geomatrix as to Eljen's theory that Mr. Potts' description of his reduction to practice constituted inequitable conduct, because there are disputed issues of fact as to whether the prototype could in fact function as Mr. Potts described.

The two experts, Mr. Lombardo and Mr. Dickson, disagree as to whether the prototype that Mr. Potts produced could function as "an example of a wastewater leaching system," or a "leach field system," and/or "worked as a wastewater treatment system" and that the PVC pipes above the device "served as the dosing pipe." *See* Geomatrix's Opening Br. at 63–64; Eljen's Opp'n Br. at 52–53. Mr. Dickson created a prototype reconstruction of Mr. Potts' prototype in the photographs he submitted to the PTO and determined that the prototype using these materials would function as a wastewater system. ECF No. 169-11 ¶¶ 714–18, 731–41. In Mr. Lombardo's opinion, on the other hand, a person of ordinary skill in the art would understand the Mr. Potts'

prototype could not work as explained for two reasons. First, the pipes could not be used as a dosing pipe for the dispersion of water, but were simply intended for use as support in holding the channels in place. ECF No. 169-17 ¶¶ 149–50. Second, a person of ordinary skill in the art would understand that the prototype could not work as described because the filament mats used in the test were inserted halfway through the pipe, meaning that water would flow directly into the soil, rather than into the mat for treatment. *Id.* ¶ 151.

It is not appropriate through this motion for the Court to resolve the expert dispute over whether in fact Mr. Potts' prototype could operate as described. Where the factual record supports opposing expert views, as it does here, then summary judgment is inappropriate because there is a disputed issue of material fact. *See Optical Disc Corp. v. Del Mar Avionics*, 208 F.3d 1324, 1338–39 (Fed. Cir. 2000) (overturning grant of summary judgment due to conflicting expert testimony that was supported by the factual record); *Edwards Sys. Tech., Inc. v. Digit. Control Sys., Inc.*, 99 F. App'x 911, 921–22 (reversing grant of summary judgment because "a classic battle of the experts . . . creates a genuine issue of material fact"). The Court finds that there is a genuine dispute of material fact, as the evidence in the record appears to support both Mr. Lombardo and Mr. Dickson's opinions.

Thus, the Court cannot enter summary judgment as to this theory.

C.  The Metadata

Finally, the Court denies Geomatrix's motion for summary judgment as to Eljen's theory of inequitable conduct based on the metadata issue because there remain issues related to Mr. Potts' memory and credibility that requires resolution by the trier of fact.

The Court reiterates that because this is Geomatrix's motion, the Court does not consider whether Eljen has met its burden of proof in demonstrating that, by clear and convincing evidence, that Mr. Potts committed inequitable conduct in his declaration to the PTO that the metadata of the

photographs and computer files showed that the photographs were taken before February 28, 2005. Rather, the Court only assesses whether there is a genuine issue of disputed fact that should preclude granting the motion.

The Court finds that Mr. Potts' credibility is at the heart of Eljen's theory of inequitable conduct based on the metadata, and that the issue is therefore inappropriate for summary judgment. *See, e.g.*, *TypeRight Keyboard Corp.*, 374 F.3d at 1158 ("[S]ummary judgment was improper because genuine issues remain as to the credibility of [defendant's] witnesses."); *Mosaic Brands, Inc. v. Ridge Wallet LLC*, 55 F.4th 1354, 1365 (Fed. Cir. 2022) ("Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." (quoting Fed. R. Civ. P. 56 Notes of Advisory Committee on Rules to 1963 Amend.)).

Mr. Potts' contemporaneous and subsequent recounting of when the photographs were taken are contradictory and must be weighed for credibility by the trier of fact. On December 17, 2013, Mr. Potts emailed his patent attorney, Attorney Fred Grasso, that he had taken photos of a prototype he created in "March" without noting the year. Email from D. Potts, ECF No. 181-18 at 2. Starting in "December" of that unidentified year, Mr. Potts writes, he was testing the performance of the high aspect ratio systems with standard systems. *Id.* A draft of Mr. Potts' 1.131 declaration says that he reduced his invention to practice "no later than March ___, 2005" and that he was "diligent from before February 28, 2005 until the reduction to practice shown in [the attached photograph]." Potts 1.131 Decl. Draft, ECF No. 181-22 at 3.

Then, in the actual declaration that was filed with the PTO, Mr. Potts explained that the "[t]he metadata of the photograph as well as the computer file it was stored to confirm that the photo was taken before February 28, 2005, which is consistent with [his] recollection that [he]

built the example shown in the photograph before February 28, 2005." ECF No. 169-25 at 253 ¶ 7. In his deposition, Attorney Grasso explained that Mr. Potts' statement in his email that the photographs were from "March" (presumably of 2005) was merely an oversight or misremembering of the facts. Grasso Dep., ECF No. 181-23 at 10–11. A trier of fact could believe Attorney Grasso's explanation as for the date discrepancy, or, alternatively, could believe that Mr. Potts did not accurately recount to the PTO when the photo was taken. This question goes squarely to whether Mr. Potts intended to deceive the PTO.

The report by Geomatrix's computer science expert Jonathan Hochman does not change the Court's conclusion that disputed facts remain. Mr. Hochman opined that the photograph was taken on October 26, 2004, and copied to a Windows computer system on October 28, 2004. ECF No. 169-47 ¶ 20. However, as Eljen points out, Mr. Hochman's expert analysis is undercut by the fact that he based his opinion on a screenshot of the photograph and computer file, not the actual, native database file. Eljen's Opp'n Br. at 59. In fact, neither Mr. Potts nor his wife, Elizabeth Potts, can account for the origin of the screenshot with which Mr. Potts based his declaration of when the photograph of the prototype was taken. *Id.* Despite considering filing suit based on this Patent as early as 2008, Mr. Potts disposed of the camera, memory card, and computer. *Id.* at 58.

Given these genuine and material factual disputes and issues of credibility, summary judgment must be denied, and this issue must be presented to the jury.

## IX.    CONCLUSION

For the reasons discussed herein, Eljen's motion for summary judgment is DENIED in its entirety, and Geomatrix's motion for summary judgment is GRANTED in part and DENIED in part.

The Court will convene a status conference to set a date for pre-trial submissions and trial.

**SO ORDERED** at Hartford, Connecticut, this 12th day of November, 2024.


      _/s/ Sarala V. Nagala_____
      SARALA V. NAGALA
      UNITED STATES DISTRICT JUDGE