# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GEOMATRIX SYSTEMS, LLC, | ) | 3:20-CV-1900 (SVN) |
| *Plaintiff and Counterclaim Defendant*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ELJEN CORPORATION, | ) | |
| *Defendant and Counterclaim Plaintiff.* | ) | March 11, 2025 |

## AMENDED ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT[1]

Sarala V. Nagala, United States District Judge.

Plaintiff and Counterclaim Defendant Geomatrix Systems, LLC ("Geomatrix"), a Connecticut-based company specializing in designing and selling wastewater treatment systems, alleges that one of its competitors, Defendant and Counterclaim Plaintiff Eljen Corporation ("Eljen"), has infringed Geomatrix's U.S. Patent No. 9,174,863 (the "'863 Patent") relating to a technology used in septic leach fields. Specifically, Geomatrix alleges that certain of Eljen's "Mantis" line products infringe various claims of the '863 Patent. In response, Eljen counters that it has not infringed the '863 Patent and counterclaims that the '863 Patent is invalid. Both parties have moved for summary judgment on various issues.

For the reasons described below, the Court DENIES Eljen's motion for summary judgment, and GRANTS in part and DENIES in part Geomatrix's motion for summary judgment. Specifically, as to infringement, the Court concludes that Geomatrix is entitled to judgment as a matter of law. As to invalidity, the Court denies Eljen's summary judgment motion seeking a determination of invalidity by anticipation and obviousness, grants in part and denies in part

---

[1] Because the Court has granted Eljen's motion for reconsideration of the Court's order that certain references Eljen relied on for its invalidity defenses were not "printed publications" or in "public use or on sale" prior to the critical date, *see* ECF No. 220, the original ruling has been vacated and this amended ruling is being entered in its place.

Geomatrix's motion for summary judgment as to no invalidity by anticipation, and grants in part and denies in part Geomatrix's motion for summary judgment as to Eljen's obviousness theories. Summary judgment in favor of Geomatrix regarding its reduction to practice arguments is denied due to disputed issues of material fact and issues related to witness credibility. Finally, as to inequitable conduct, the Court determines that there is a genuine dispute of material fact that precludes entry of summary judgment in favor of either party.

## I. BACKGROUND

### A. General Background

This patent case is about competing designs for wastewater leaching field technology for residential homes. Approximately thirty percent of Connecticut's population has no sewer connection and must treat wastewater onsite. Geomatrix's Opening Br., ECF No. 169-1 at 12. Leach fields are one component of an onsite wastewater treatment system used to collect and dispose of sewer waste. *Id.* at 13. A septic tank collects solid waste, while the liquid waste, or effluent, leaves the septic tank via an outlet pipe to a leach field buried underground. *Id.* The leach field is designed to treat the wastewater by dispersing it from the outlet pipe into the soil, where microbes can break down the effluent before it percolates to the water table. *Id.*

### B. Geomatrix's Invention

David Potts is the founder and owner of Geomatrix. *Id.* at 12. On January 27, 2006, Mr. Potts filed his original patent application, U.S. Patent Application No. 11/340,917 (the "'917 Application"), on the subject matter of the '863 Patent. Geomatrix's L.R. 56(a)2 St., ECF No. 179 ¶ 5. As the '863 Patent explains, "[g]enerally, it is an aim to have aerobic treatment" of wastewater in soil. '863 Patent, ECF No. 169-4 at col. 2:1–2. The '863 Patent described that prior art conduits had limitations in aerobic treatment because their bottom surfaces typically fell well below the soil surface, where anaerobic conditions exist, and "a biomat" often formed on the bottom and sides of

2

the conduit, lessening its effectiveness at properly infiltrating wastewater into soil.  *Id.* at cols. 1:51–56, 2:6–10.  Therefore, Mr. Potts set out to design (and patent) a wastewater system "that provides for greater aerobic conditions in leaching conduits, thereby allowing for greater processing of the wastewater prior and during absorption into the soil."  *Id.* at col. 2:16–19.  In its most basic terms, the '863 Patent discloses a leach field wherein wastewater is delivered from the homeowner's septic tank into an area under their lawn through a pipe perforated with holes for dispersion of the wastewater into specially-designed channels, which are sometimes referred to as "geonets."  Geomatrix's Opening Br. at 13.  Between the channels are voids, or separations, that promote oxygen infiltration and, as a result, aerobic conditions to treat the wastewater.  Hearing Tr., ECF No. 192 at 28.

The '863 Patent discloses a high aspect ratio conduit, meaning that the channels into which the wastewater is dispersed have an aspect ratio—height divided by width—between 3 and 96. *See* Dickson Expert Rep., ECF No. 169-41 ¶ 48.  A high aspect ratio system has two commercial advantages.  First, by utilizing volumes with a high height and short width, the '863 Patent maximizes the amount of oxygen to which the wastewater is exposed, resulting in efficiencies in wastewater treatment.  Geomatrix's Opening Br. at 13.  Second, a high aspect ratio system can be more compact, requiring less land for installation in a homeowner's yard.  ECF No. 169-41 ¶ 48. A drawing from the '863 Patent (Figure 16) is reproduced below.



### C.  Eljen's Invention

Eljen's Accused Mantis Products[2] operate on the same basic principles as Geomatrix's '863 Patent.  The Accused Mantis Products include a series of "Filter Support Modules" that are designed to accept wastewater from a mounted pipe called the "Support Distribution Pipe."  Eljen's Opening Br., ECF No. 167-1 at 11.  The Support Distribution Pipe has three one-inch holes positioned within each Filter Support Module to enable wastewater distribution.  *Id.*  Just like the Geomatrix patent, the Accused Mantis Products have a high aspect ratio design, allowing for highly efficient and compact leach fields.  A diagram of a representative Accused Mantis Product from Eljen's brief is reproduced below.  *Id.*

---

[2] The allegedly infringing Mantis products are the Mantis 536-8, the Mantis Double-Wide, and the Mantis M5 (the "Accused Mantis Products").  Geomatrix's L.R. 56(a)2 St. ¶ 11.



**FIGURE 1: MANTIS 536-8 SERIES COMPONENTS**

**Porous Top of Mantis**
Allows for evapotranspiration and oxygen exchange for better performance.

**Filter Support Module**
Provides storage and surface area for fixed biological growth within the cuspated core. The Filter Support Modules act as individual 3-D Mini-Trenches™ within the system's footprint.

**Module Spacer**
Keeps the Filter Support Module spaced evenly along the Support Distribution Pipe.

**Support Distribution Pipe**
Perforated Support Distribution Pipe is centered within the Mantis and provides internal distribution of septic tank effluent while securing the eight Filter Support Modules in place.

**Native Soil or Approved Fill**
Provides final filtration while supporting unsaturated flow.

**Cuspated Plastic Core**
Maintains structural integrity and storage capacity within the Filter Support Module. Construction allows for effluent movement and oxygen transfer within the Filter Support Module. Provides surface area for fixed biological growth.

**Bio-Matt™ Geotextile Fabric**
Provides initial filtration. Supports and promotes fixed aerobic bacterial growth on the Bio-Matt™ geotextile fabric and Specified Sand interface.

**Septic Tank Effluent**

**Primary Filtration Zone**
Provides initial filtration of effluent

**Specified Sand Layer**
Provides additional filtration

**Secondary Filtration Zone**
Secondary clarifying zone further filters effluent while maintaining the native soils structure and long term acceptance rate.

**Clarified Effluent**

D.  The Disputed Claims

The '863 Patent contains three independent claims, numbered 1, 22, and 26. Because similar language is shared across all three independent claims, the Court reproduces only a representative example below, with the language relevant to the parties' present motions bolded:

1.  A system for wastewater comprising:

a plurality of channels, where the channels each have a height to width aspect ratio in a range of as high as 96 and as low as 3, each have an uppermost surface and each include a pair of upright infiltrative surfaces,

where the paired upright infiltrative surfaces of each channel are substantially parallel to each other along a majority of their length, and have a length of substantially one foot or more,

**where adjacent channels are separated along a majority of their length by two or more inches**, the separations comprising sand, or a granular material, or a void comprising the majority or all of the volume of the separation,

the separations having a spacing of one foot or more along their length without an intervening intersecting infiltrative surface that connects the adjacent channels within the spacing,

at least two channels being **interconnected to each other below their uppermost surface**, and

a first wastewater delivery conduit with wastewater egress openings positioned such that **the area of the conduit having the wastewater egress openings traverses a majority of the paired infiltrative surfaces at an oblique or perpendicular angle**.

E. Procedural History

Geomatrix filed its first infringement action against Eljen in 2016, accusing Eljen of infringing on the '863 Patent. Geomatrix's L.R. 56(a)2 St. ¶ 1; *see also Geomatrix Sys., LLC v. Eljen Corp.*, No. 3:16-cv-00734-JBA (D. Conn.). After voluntarily dismissing the 2016 action, Geomatrix obtained three additional patents: U.S. Patent Nos. 9,650,271 (the "'271 Patent"); 10,065,875 (the "'875 Patent"); and 10,392,278 (the "'278 Patent"). Geomatrix's L.R. 56(a)2 St. ¶ 3.

In 2020, Geomatrix brought the instant action against Eljen, asserting that Eljen infringed on sixty-three claims across the four patents. Geomatrix's L.R. 56(a)2 St. ¶ 3. Following Geomatrix's submission of an amended complaint, ECF No. 56, Eljen brought counterclaims of non-infringement and invalidity of the four patents against Geomatrix. *See* Eljen's Answer & Countercl., ECF No. 61. Following proceedings under *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), in which the Court (Arterton, J.) resolved seven disputed categories of terms, *see Markman* Order, ECF No. 131, and the Court's decision denying in part Geomatrix's motion for leave to supplement its infringement contentions, *see* Order, ECF No. 146, Geomatrix decided not to proceed with its '278 Patent, '875 Patent, and '278 Patent infringement claims against Eljen. *See* Geomatrix's L.R. 56(a)2 St. ¶ 4 & n.1.

Accordingly, only the following claims and counterclaims related to the '863 Patent remain in this action: Geomatrix's claims that (1) Eljen has directly infringed and is directly infringing the '863 Patent by making, using, offering for sale, and selling, in the United States, the Accused Mantis Products (Counts One and Two); (2) Eljen contributes to the infringement of the '863 Patent by instructing others to infringe claims 1 and 22 of the '863 Patent (Count Sixteen); and (3) Eljen

induces infringement of the '863 Patent by inducing others to use the Accused Mantis Products in a manner that directly infringes claims 1 and 22 of the '863 Patent (Count Seventeen); and Eljen's counterclaims for declaratory judgment that (1) Eljen has not and is not now infringing any claim of the '863 Patent under any legal or equitable theory or under any provision of 35 U.S.C. § 271 (Counterclaim Count One); (2) the claims of the '863 Patent are invalid because the alleged inventions fail to satisfy the conditions for patentability specified in 35 U.S.C. § 100 *et seq.* (Counterclaim Count Five); and (3) the '863 Patent is unenforceable due to Mr. Potts' inequitable conduct (Counterclaim Count Nine).  *See* ECF Nos. 56, 61.

The parties have filed cross motions for summary judgment.  Eljen's motion argues that it is entitled to judgment as a matter of law for four reasons, any one of which it contends would independently support judgment in its favor:  (1) Eljen's Accused Mantis Products do not infringe the '863 Patent; (2) the '863 Patent is invalid for lack of an adequate written description; (3) the '863 Patent is invalid because it was anticipated by prior art; and (4) the invention described in the '863 Patent was obvious from prior art.  *See* Eljen's Opening Br. at 12–14.  Geomatrix, unsurprisingly, disputes each of Eljen's contentions.  It seeks summary judgment in its favor on its claim for infringement and the issues of invalidity by anticipation and obviousness.  Geomatrix's Opening Br. at 9–10.  Further, it seeks summary judgment on Eljen's counterclaim alleging that the '863 Patent is unenforceable because Geomatrix committed inequitable conduct before the Patent and Trademark Office ("PTO").  *Id.* at 10.

As noted above, following the granting of Eljen's motion for reconsideration of the Court's original decision on the cross motions for summary judgment insofar as it found in favor of Geomatrix as to the public accessibility of certain proposed prior art references, the Court issues this amended ruling on the parties' cross motions for summary judgment.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A disputed fact is material only where the determination of the fact might affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  With respect to genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  A movant, however, "need not prove a negative when it moves for summary judgment on an issue that the [non-movant] must prove at trial.  It need only point to an absence of proof on [the non-movant's] part, and, at that point, [the non-movant] must 'designate specific facts showing that there is a genuine issue for trial.'"  *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at 324).  The non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his or her favor.  *Anderson*, 477 U.S. at 249.  If the non-movant fails "to make a sufficient showing on an essential element of [their] case with

respect to which [they have] the burden of proof," then the movant will be entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citation and internal quotation marks omitted). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Anderson*, 477 U.S. at 250–51).

In a patent action, non-infringement and invalidity are separate and independent responses to a suit for infringement. *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 643 (2015). Accordingly, "an accused infringer 'may prevail either by successfully attacking the validity of the patent or by successfully defending the charge of infringement.'" *Id.* (quoting *Deposit Guaranty Nat'l Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 334 (1980)).

## III.    SUMMARY OF HOLDINGS

The Court first addresses the question of whether the Accused Mantis Products directly infringe the '863 Patent, and concludes, as a matter of law, that they do infringe.

The Court then turns to the questions of patent invalidity because "a finding that a patent is not infringed does not render the counterclaim for patent invalidity moot." *Pandrol USA, LP v. Airboss Ry. Prods., Inc.*, 320 F.3d 1354, 1364 (Fed. Cir. 2003) (citing *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 102–03 (1993)).

First, the Court determines that neither party is entitled to summary judgment on the question of whether the '863 Patent is invalid for lack of written description of an "oblique angle."

9

Second, with respect to Eljen's claims of invalidity by anticipation and obviousness, the Court concludes that the '863 Patent was not anticipated by a reference that is referred to herein as 1988 In-Drains. Eljen may not advance its anticipation or obviousness theories as to certain references, explained below. As fact questions remain about whether certain other references qualify as prior art, Geomatrix is not entitled to summary judgment as to no invalidity by anticipation or obviousness regarding these other references, however. With respect to obviousness, the Court concludes the invention described in the '863 Patent was not obvious from the teachings of 1988 In-Drains alone. The jury must decide, however, whether Eljen's other obviousness theories rendered the patent invalid as obvious.

Third, the Court finds that there are disputed issues of material fact concerning Eljen's theory that U.S. Patent No. 8,104,994 (the "Donlin '994 Patent")[3] had priority over the '863 Patent.

Following the Court's analysis of patent invalidity, the Court finds that questions of fact also preclude entry of summary judgment as to whether Mr. Potts committed inequitable conduct in his dealings with the PTO.

## IV.    DIRECT INFRINGEMENT

For the reasons that follow, the Court finds that the Accused Mantis Products directly infringe the '863 Patent, and thus grants Geomatrix's motion for summary judgment as to patent infringement.

### A.    Legal Standard

"Summary judgment on the issue of infringement is proper when no reasonable jury could find that every limitation recited in a properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents." *PC Connector Sols. LLC v.*

---

[3] "Donlin" refers to James Donlin, the inventor of the Accused Mantis Products.

*SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005) (citation omitted). Only literal infringement is at issue here.

Determining patent infringement is a two-step process. *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1350 (Fed. Cir. 2022). First, the Court "determines the scope and meaning of the claims asserted, and then the properly construed claims are compared to the allegedly infringing device." *Id.* While claim construction is a question of law, *Mas-Hamilton Grp. v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998), the determination of whether an accused device infringes a patent claim is a question of fact. *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1429 (Fed. Cir. 2000). "To prove literal infringement, the patentee must show that the accused device contains every limitation in the asserted claims. . . . If even one limitation is missing or not met as claimed, there is no literal infringement." *Mas-Hamilton Grp.*, 156 F.3d at 1211.

Because the ultimate burden of proving infringement rests with the patentee, an accused infringer may establish that summary judgment as to noninfringement is proper "either by providing evidence that would preclude a finding of infringement, or by showing that the evidence on file fails to establish a material issue of fact essential to the patentee's case." *Novartis Corp. v. Ben Venue Lab'ys, Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001) (citation omitted). If the moving party meets this initial requirement, the burden shifts to the party asserting infringement to set forth, by declaration or as otherwise permitted under Fed. R. Civ. P. 56, "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248–49. Summary judgment of noninfringement may only be granted "if, after viewing the alleged facts in the light most favorable to the nonmovant and drawing all justifiable inferences in the nonmovant's favor, there is no

genuine issue whether the accused device is encompassed by the patent claims." *Novartis Corp.*, 271 F.3d at 1046.

The parties agree there are three "independent" claims contained in the '863 Patent—claims 1, 22, and 26. Geomatrix's L.R. 56(a)2 St. ¶ 15. Although worded slightly differently in each claim, two of the essential requirements of all of these claims are that (1) the "area" of the conduit having the wastewater egress openings traverses a majority of the paired infiltrative surfaces at an oblique or perpendicular angle; and (2) at least two channels are "interconnected" to each other below their uppermost surface. The parties' dispute about whether the Accused Mantis Products meet these two requirements turns on the meaning of the terms "area" and "interconnected." The Court concludes that the Accused Mantis Products contain both the "area" limitation and the "interconnected" limitation. A judgment of infringement as a matter of law in Geomatrix's favor is therefore appropriate.

   B.  <u>"Area"</u>

While the wording varies slightly, each of the disputed claims requires a wastewater distribution or delivery conduct positioned such that the "area" of the conduit having the wastewater egress openings traverses, in the words of the two more narrowly-worded claims (Claims 22 and 26), the separations between adjacent channels or the opposing infiltrative surfaces. *Id.* ¶¶ 17–18. The Court concludes that the conduit of the Accused Mantis Products is positioned such that the area that has the wastewater openings does traverse the separations. The Accused Mantis Products therefore contain this limitation of the '863 Patent.

As noted above, both the '863 Patent and the Accused Mantis Products use a support distribution pipe to feed wastewater to the channels where the effluent is treated. The parties agree that, in the Accused Mantis Products, the holes in the pipe (to use the '863 Patent's language, the "wastewater egress openings") exist solely within the channels themselves; there are no openings

for wastewater to be dispersed in the voids/separations between the channels. *Id.* ¶¶ 14, 25. Eljen contends that, to satisfy the relevant limitation of the '863 Patent, the "area" having the holes must traverse out of the channels and into the separations between the channels. Eljen's Opening Br. at 18–19. Geomatrix, on the other hand, argues that the area of the conduit with water egress openings is measured from the first to last hole on the water distribution pipe, regardless of whether such openings allow wastewater to be fed both within and outside of the channels. *See* Geomatrix's Opp'n Br., ECF No. 178 at 14–17. The Court agrees with Geomatrix.

First, the Court rejects Eljen's attempt to resurrect its claim construction argument that the claims *require* the openings to traverse both the channels and the separations. The central question in that claim construction dispute was "whether at least some of the water egress openings *need* to cross into the separations between the channels or if they can be confined to the channels themselves." *See* ECF No. 131 at 23 (emphasis added). Rather than answering the question directly, Judge Arterton held that because the claims do not say that wastewater egress openings are required over the separations between the channels, "they will not limit the claimed system to require them." *Id.* This leaves open the possibility that these egress openings may traverse only the channels *or* traverse both the channels and the separations. *See id.* (noting that Eljen conceded in its *Markman* briefing that "there are probably numerous ways to adequately construe various terms within this claim element"). Although not explicitly stated in the *Markman* order, it appears Judge Arterton sided with Geomatrix that the term "area" need not be construed and should be interpreted according to its plain and ordinary meaning, given that she declined to construe any of the relevant terms in this group of claims. *Id.*; *see also* Joint Claim Construction Statement, ECF No. 80 at 15–16 (Geomatrix arguing that no construction is necessary for the term "area"). In so holding, the Court declined to adopt Eljen's specialized construction requiring the openings to

cross into the separations between the channels.  *See* ECF No. 131 at 22–23.  Insofar as Eljen once again asks the Court to endorse the specialized meaning that was already rejected, the Court declines its request.

Further, the Court holds that the "area" claim limitation is met in the Accused Mantis Products.  Both parties' experts—Bonneau Dickson for Geomatrix and Pio Lombardo for Eljen—appear to agree that the area having the openings is the entire length of the pipe from the first opening to the last opening, regardless of where the openings themselves are positioned.  It is unsurprising that Mr. Dickson, as Geomatrix's expert, takes this position; but Mr. Lombardo also characterized the "area" having the openings this way in his deposition.  *See* Dickson Dep., ECF No. 169-44 at 4–5; Lombardo Dep., ECF No. 169-8 at 45 (discussing drawing providing that "L" is the area of the pipe having egress openings).  Mr. Lombardo's drawing, identifying "L" as the area of the pipe having egress openings, is reproduced below.



*See* Geomatrix's Opp'n Br. at 17.

Eljen tries to overcome its own expert's view by arguing that the drawing was abstract and untethered from the actual technology at issue.  *See* Eljen's Opp'n Br., ECF No. 180 at 50.  But its strained efforts fail, and it takes too narrow a reading of the term "area" in this context.  The Court concludes that there is no genuine dispute that the area of the Accused Mantis Products' Support Distribution Pipe having wastewater egress openings traverses both the channels and the separations, in that it includes the area from the first opening in the pipe to the last opening, and

not simply the small one-inch openings inside each channel.  Therefore, the Accused Mantis Products infringe the "area" limitation in the disputed claims.

C.  "Interconnected"

Because literal infringement requires proving that the accused device contains *every* limitation from a claim, *see Mas-Hamilton Grp.*, 156 F.3d at 1211, the Court proceeds to consider whether at least two channels of the Accused Mantis Products are "interconnected to each other below their uppermost surface."  It concludes they are.

The central dispute is the meaning of the word "interconnected."  Three parts of the Accused Mantis Products are at issue:  (1) cardboard corners, which appear at both the top and bottom of the Products; (2) black plastic spacers[4]; and (3) the Support Distribution Pipe itself.  A diagram from Eljen's briefing is once again helpful for context:



GEOMATRIX_00000001.

---

[4] The black plastic spacers were used in what the parties refer to as the "prior" versions of the Accused Mantis Products, but are not used in the "current" versions of the Products.  *See* Eljen's Opening Br. at 11–12 n.2.

Eljen's Opening Br. at 24. Geomatrix argues that "interconnected" in the context of the '863 Patent is synonymous with "connected" in a broad sense, regardless of the purpose of the items that join the channels. *See* Geomatrix's Suppl. Br., ECF No. 197 at 8–9.[5] Thus, in Geomatrix's view, anything in the Accused Mantis Products that connects the channels together beneath their uppermost surface—including the vertical leg of the top cardboard corners, the bottom cardboard corners, the black spacers, and the distribution pipe—is considered a part that "interconnects" the channels to each other. *See* Geomatrix's Opening Br. at 55. Eljen concedes that the vertical leg of the top cardboard corners, the bottom cardboard corners, the black spacers, and Support Distribution Pipe *connect* the channels below their uppermost surface, but contends they do not *interconnect* the channels *to each other*, as required by the claim limitation. *See* Eljen's Opening Br. at 25–26. Eljen argues that Geomatrix's interpretation is divorced from the context of the '863 Patent, and asserts that "interconnected" means, in the context of the Patent and its prosecution history, that the channels must be "mutually joined for fluid interflow." *See* Eljen's Suppl. Br., ECF No. 196 at 8. Eljen's definition would not include the Support Distribution Pipe, black spacers, and cardboard corners as parts that "interconnect" the Filter Support Modules to each other. *See* Eljen's Opening Br. at 25–26.

### 1. A Return to Claim Construction

During claim construction, Judge Arterton rejected Eljen's argument that "interconnected" means "contiguously shaped" to enable "contiguous flow between the channels apart from the main wastewater distribution pipe." ECF No. 131 at 24–26. Instead, she declined to construe the term "interconnected." *Id.* at 26. As is now clear, the parties continue to dispute the scope and meaning of the term.

---

[5] The Court required the parties to submit supplemental briefing on the meaning of the word "interconnected" within the context of the '863 Patent. Order, ECF No. 193.

"When the parties raise an actual dispute regarding the proper scope of . . . claims, the court, not the jury, must resolve that dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (citation omitted). Specifically, where "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning'" is "inadequate" and "does not resolve the parties' dispute[,]" then "claim construction requires the court to determine what claim scope is appropriate in the context of the patents-in-suit." *Id.* at 1361 (citations omitted). Thus, even where a court has determined that a claim's terms have "common meaning[s]," if the parties "proceed[] to dispute the scope of that claim term," additional claim construction may be necessary. *Id.* In these instances, "[d]istrict courts may engage in a rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves." *Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002); *see also In re Papst Licensing Digit. Camera Pat. Litig.*, 778 F.3d 1255, 1261 (Fed. Cir. 2015) ("[A] district court may (and sometimes must) revisit, alter, or supplement its claim constructions (subject to controlling appellate mandates) to the extent necessary to ensure that final constructions serve their purpose of genuinely clarifying the scope of claims for the finder of fact."); *Conoco, Inc. v. Energy & Env't Int'l, L.C.*, 460 F.3d 1349, 1359 (Fed. Cir. 2006) ("[A] district court may engage in claim construction during various phases of litigation, not just in a *Markman* order.").

Here, the parties continue to dispute the scope of the word "interconnected" in the '863 Patent's disputed claims. Accordingly, the Court must revisit claim construction to resolve the parties' dispute as to the plain and ordinary meaning of "interconnected" in the context of the '863 Patent's independent claims.

### 2. Legal Standard

"The patent system is based on the proposition that claims cover only the invented subject matter.  As the Supreme Court has stated, '[i]t seems to us that nothing can be more just and fair, both to the patentee and the public, than that the former should understand, and correctly describe, just what he has invented, and for what he claims a patent.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed Cir. 2005) (*en banc*) (alteration in original) (quoting *Merrill v. Yeomans*, 94 U.S. 568, 573–74 (1876)).  Ultimately, the purpose of claim construction is to "capture the scope of the actual invention."  *Id.* at 1324.

"There is a heavy presumption that claim terms are to be given their ordinary and customary meaning."  *Aventis Pharms. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013).  The ordinary meaning of a claim term is not "the meaning of the term in the abstract," but, rather, "its meaning to the ordinary artisan after reading the entire patent."  *Phillips*, 415 F.3d at 1321.  Ordinary meaning is not determined "in a vacuum."  *Eon Corp. IP Holdings v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1320 (Fed. Cir. 2016) (quoting *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005)).  Rather, "[d]etermining the limits of a patent claim requires understanding its terms in the context in which they were used by the inventor, considered by the examiner, and understood in the field of the invention."  *Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1299 (Fed. Cir. 1999).

"When construing claim terms [courts] first look to, and primarily rely on, the intrinsic evidence, including the claims themselves, the specification, and the prosecution history of the patent, which is usually dispositive."  *Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1276 (Fed. Cir. 2013).  The intrinsic record takes precedence because "competitors are entitled to review the public record, apply the established rules of claim construction, ascertain the

scope of the patentee's claimed invention and, thus, design around the claimed invention." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). The claims, both asserted and unasserted, can be "valuable sources of enlightenment as to the meaning of a claim term." *Phillips*, 415 F.3d at 1314. The claims are also part of the "fully integrated written instrument . . . consisting principally of [the] specification that concludes with the claims." *Id.* at 1315 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995)). For that reason, the specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* (quoting *Vitronics*, 90 F.3d at 1582).

In addition, a court can consider the patent's prosecution history, which can demonstrate "how the PTO and the inventor understood the patent." *Id.* at 1317. "Any explanation, elaboration, or qualification presented by the inventor during patent examination is relevant, for the role of claim construction is to 'capture the scope of the actual invention' that is disclosed, described, and patented." *Fenner Invs., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1323 (Fed. Cir. 2015) (citation omitted). Because the prosecution history "represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation," however, "it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317.

In most instances, analysis of the intrinsic evidence alone will resolve claim construction disputes. *Vitronics*, 90 F.3d at 1583; *see also Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1287 (Fed. Cir. 2021) ("If the meaning of a claim term is clear from the intrinsic evidence, there is no reason to resort to extrinsic evidence."). But the Court may also rely on extrinsic evidence, "which 'consists of all evidence external to the patent and prosecution history,

including expert and inventor testimony, dictionaries, and learned treatises.'" *Phillips*, 415 F.3d at 1317 (quoting *Markman*, 52 F.3d at 980). "Extrinsic evidence is to be used for the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims." *Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1373 (Fed. Cir. 2022) (cleaned up; quoting *Markman*, 52 F.3d at 981); *see also Phillips*, 415 F.3d at 1324 (recognizing that a court is not "barred from considering any particular [extrinsic] sources or required to analyze sources in any specific sequence, as long as those sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence").

### 3.  Analysis

The intrinsic evidence demonstrates that Eljen's interpretation of "interconnected" in the context of the '863 Patent is not supportable. Rather, Geomatrix's view that "interconnected" is synonymous with "connected" in the context of the Patent—though broad—is correct. In light of this finding, no reasonable juror could find that the Accused Mantis Products do not infringe the '863 Patent, and Geomatrix is entitled to judgment as a matter of law on direct infringement.

### a.  The Claims

The Court starts with the claim language, in which "interconnected" and "connected" are used synonymously. For instance, independent claim 1 describes the absence of an "intervening intersecting infiltrative surface that *connects* the adjacent channels," '863 Patent at col. 17:10–13 (emphasis added); claim 2 similarly describes that the "separations between adjacent pairs do not include *interconnecting* infiltrative surfaces along the length of the adjacent pairs," *id.* at col. 17:21–23 (emphasis added). The words "connects" and "interconnecting" are therefore used to describe a similar negative limitation in two different claims. Independent claim 22 and dependent claim 28 likewise interchangeably use "connects" and "interconnected" to describe a similar

negative limitation.  *See id.* at cols. 18:35–40, 19:27–30.  Although there is a presumption that

different terms in a patent have different meanings, *see CAE Screenplates Inc. v. Heinrich Fiedler

GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000), that presumption can be overcome where

the evidence indicates the patentee used terms interchangeably, as Mr. Potts did here.  *Baran v.

Med. Device Techs., Inc.*, 616 F.3d 1309, 1316 (Fed. Cir. 2010).

Eljen's proposed construction—that "interconnected" means "mutually joined for fluid

interflow"—is found nowhere in the language of the claims themselves.  Instead, Eljen cobbles

together this construction from various provisions, including the preamble for the claims, which

generally describes a "system for wastewater."  *See* Eljen's Suppl. Br. at 8.  But that description is

of the system as a whole and is not particularly instructive as to the specific meaning of

"interconnected."  Eljen next claims that the prefix "'[i]nter-' evokes the concept of back-and-

forth, as one would expect of an interflow or redistribution of water."  *Id.*  But the Court's

construction of the term is not dependent on what concepts a term evokes; the Court must instead

ground its construction in the language of the terms itself.  Nor does the clause "to each other" that

follows the word "interconnected" necessarily suggest that the channels must be mutually joined

for fluid interflow; there is nothing in the plain language of the claims to support the idea that the

interconnection must be for this very specific purpose, as opposed to simple connection.

Perhaps Eljen's strongest argument about claim language is that each of the independent

claims of the '863 Patent list the wastewater delivery conduit (the pipe) as an element separate

from the element containing the "interconnected to each other" limitation.  *Id.* at 9.  In Eljen's

view, this suggests that the pipe cannot be the source of the interconnectedness.  *See Kyocera

Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1382 (Fed. Cir. 2022) (noting that

separate listing of claim elements creates a presumption that those components are distinct).  The

separate placement of the distribution pipe element in the claims, however, cannot overcome the fact that the claims themselves do not speak of interconnectedness being limited to the purpose of fluid flow, whether two-way or otherwise. And, in any event, this argument would not be relevant to the other elements that connect the Accused Mantis Products, such as the cardboard corners and black spacers.

In sum, Eljen urges the Court to adopt a narrow construction of "interconnected" that finds no grounding in the language of the claims (but, not coincidentally, would result in a finding of noninfringement). The Court concludes that the language of the claims supports not Eljen's view, but Geomatrix's.

### b. The Specification

The specification likewise supports Geomatrix's construction, at least slightly. The specification describes, in the section describing low aspect ratio conduits, that multiple low aspect conduits "may be installed in spaced apart rows, or in segments which are spaced apart, all *interconnected* by suitable distribution lines." '863 Patent at cols. 3:67–4:2 (emphasis added). A natural reading of the phrase "interconnected" here is that the conduits can be "connected" by distribution lines. The specification does not suggest that a more specialized purpose must be ascribed to the word "interconnected" when used in this context. Eljen's logic is that the referenced interconnected distribution lines do "not dose wastewater from its source," because each conduit has its own dosing pipe; therefore, it claims, the distribution lines "mutually join the low aspect channels to allow fluid interflow," and that must therefore be the definition of "interconnected." Eljen's Suppl. Br. at 12. But the Court sees no evidence in the specification that such a narrow definition of "interconnected" was intended. In particular, the Court cannot find that the specification reveals a "special definition given to a claim term by [Mr. Potts] that differs from the

22

meaning it would otherwise possess," such that his lexicography would govern, or that Mr. Potts intentionally disavowed the claims' scope. *See Phillips*, 415 F.3d at 1316. Simply put, at least in the context of the Patent's discussion of low aspect ratio conduits, the Court believes the ordinary meaning of "interconnected" is "connected."

Although the written description of high aspect ratio conduits does not use the term "interconnected," the figures provided at the beginning of the Patent allow some insight into how channels in high aspect ratio conduits may be interconnected. At oral argument, the Court probed counsel for Geomatrix as to how Figure 16 has two channels interconnected. ECF No. 192 at 8–9. Counsel explained that the channels in Figure 16 are interconnected via a geonet volume running across the U-shaped channels, *id.*, for the purpose of water distribution and redistribution, *id.* at 19; *see also id.* at 23. When counsel for Eljen was queried on the same figure, counsel explained that the U-shaped channels provide interconnection by allowing for water redistribution between what would otherwise be disconnected, parallel channels. *Id.* at 89, 101–02.

The Court is mindful, however, to not read limitations from a preferred embodiment in the specification into the claim, absent a clear indication that the patentee intended the claims to be so limited. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004); *see also* ECF No. 192 at 9 (counsel for Geomatrix explaining that, depending on installation, a distribution pipe could interconnect according to the claims). Thus, the Court cannot find that the specification necessarily supports Eljen's view that interconnection involves wastewater distribution and redistribution. Rather, the specification supports Geomatrix's interpretation, slightly.

### c. Prosecution History

It is in the prosecution history that Eljen finds the most support for its reading of "interconnected." But, as noted above, the prosecution history is less useful for claim construction

purposes because it reflects ongoing negotiation about the scope of the Patent, rather than the "final product of that negotiation." *Phillips*, 415 F.3d at 1317.

The relevant prosecution history concerns the PTO examiner's initial rejection, and then acceptance, of the claims of the '863 Patent. By way of background, on September 8, 2013, the PTO examiner rejected Mr. Potts's claim to an invention with channels being interconnected at least at the bottom of the channels. '863 Patent File History, ECF No. 169-25 at 311–12. The examiner stated that Mr. Potts's claim was unpatentable in light of the Donlin '994 Patent. *Id.* Specifically, the examiner noted that, in the Donlin '994 Patent, at least two channels were interconnected, citing the "Figures where pipe goes through the channels and positioned above the channels; the pipe going through the channels is considered as 'interconnecting' the channels." *Id.* at 207. Figure 19 from the Donlin '994 Patent depicts the interconnecting pipe, which the Donlin '994 Patent describes as "support pipe" (12).



**Fig. 19**

*See* Donlin '994 Patent, ECF No. 169-14 at 7. The Donlin invention referred to the channels (14) as "interconnected," *see id.* at col. 6:64–66, and its specification makes clear that the support pipe need not be connected to the fluid source, *id.* at col. 6:12–14. The patent examiner thus contemplated that the support pipe (12) could interconnect the channels without necessarily being used for fluid interflow (at least from the wastewater source). This supports Geomatrix's contention that channels can be interconnected *without* the need for fluid interflow.

Eljen contends that, in Mr. Potts' response to the examiner's rejection, he used the term "interconnected" in the context of water distribution/fluid interflow. To be sure, there are references in Mr. Potts' submission to water distribution. As Mr. Potts explains in his 1.131 Declaration[6] submitted to the PTO, his Invention Disclosure (Exhibit B to his Declaration) includes figures he drew of the bottom of high aspect ratio conduits that could be "positioned along a shared plane of reference *in order to re distribute water* among them." Potts 1.131 Decl., ECF No. 169-25 at 255 ¶ 19 (emphasis added). Page one of Exhibit B states as follows: "A wastewater distribution pipe(s) can be installed over the top of the high aspect ratio conduits for water distribution. This distribution pipe can be installed over the high aspect ratio conduit or into another low or high aspect ratio conduit that interconnects the parallel conduits. An interconnecting conduit can also be installed at the bottom of the high aspect ratio conduits *to redistribute water* to all the high aspect ratio conduits, if necessary." *Id.* at 268 (emphasis added). Mr. Potts describes Figure 3 as showing a high aspect ratio conduit that achieves wastewater redistribution via "interconnected ends." *Id.* at 255 ¶ 19; *id.* at 272. But Mr. Potts also explains in his declaration that his prototype device had "slotted pipes below to interconnect the bottoms of the mat," without any reference to the slotted pipes being used for water distribution. *Id.* at 256 ¶¶ 22–23.

The patent examiner ultimately issued the '863 Patent, of course, but without any elaboration of the meaning of the word "interconnected." The Court finds convincing Geomatrix's argument that, had Mr. Potts truly meant for "interconnected" to mean "mutually joined for fluid interflow," he could have distinguished his invention from the Donlin '994 Patent in that manner

---

[6] A declaration under 37 C.F.R. § 1.131 enables a patent applicant to establish invention of the "subject matter of the rejected claim prior to the effective date of the reference or activity on which the rejection is based." In essence, it is a declaration of prior invention.

when contesting the rejection.  *See* Geomatrix's Suppl. Br. at 18–19.  He did not do so, suggesting that both he and the examiner treated the term "interconnected" as meaning, simply, "connected."

Nor does a single sentence in the provisional application that the '863 Patent claims the benefit of—that the infiltrative surfaces "can be interconnected . . . or fed with wastewater independently of one another"—carry the day.  '863 Patent Provisional Application, ECF No. 71-11 at 4.  A provisional application can be part of the intrinsic evidence to be considered for claim construction.  *See MPHJ Tech. Invs., LLC v. Ricoh Ams. Corp.*, 847 F.3d 1363, 1369 (Fed. Cir. 2017) (citations omitted).  But the Court agrees with Geomatrix that relying on this one line in a provisional application, by itself, is "far too slender a reed to support the judicial narrowing of a clear claim term," Geomatrix's Suppl. Br. at 23–24 (quoting *N. Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1294 (Fed. Cir. 2000)), particularly where the sentence highlighted by Eljen does not appear in the '863 Patent.[7]

### d.  Extrinsic Evidence

The Court is sufficiently convinced that the intrinsic evidence described above supports Geomatrix's reading of the claim term "interconnected."  The Court therefore need not rely on extrinsic evidence.  But it bears noting that the 2004 edition of the Merriam-Webster dictionary defines "interconnect" as "to connect with one another."  *See* ECF No. 197-3 at 4.

### e.  In Sum

Because the Accused Mantis Products meet both the "area" and "interconnected" limitations of the '863 Patent, the Court finds they infringe the '863 Patent as a matter of law.  Geomatrix is therefore entitled to summary judgment on its claim of direct patent infringement.

---

[7] Having concluded that the intrinsic evidence supports Geomatrix's reading, the Court need not address its prior art references.

## V.    WRITTEN DESCRIPTION

A finding of infringement does not end the Court's task, however.  The Court must address both parties' invalidity arguments, which remain live.  *See Pandrol USA, LP*, 320 F.3d at 1364.  It begins with Eljen's contention that the '863 Patent is invalid for lack of written description of the term "oblique angle."  The Court finds that a reasonable jury *could* find clear and convincing evidence that the Patent is invalid for this reason, but that such a conclusion is not appropriate for the Court to make as a matter of law, on the present record.  Accordingly, the Court denies both Geomatrix's motion for summary judgment and Eljen's motion for summary judgment on the issue of whether the '863 Patent is invalid for lack of an adequate written description.

The Patent Act requires that a patent specification contain "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same."  35 U.S.C. § 112(a).  A patentee "can lawfully claim only what he has invented and described, and if he claims more his patent is void."  *Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*, 541 F.3d 1115, 1122 (Fed. Cir. 2008).  To that end, the specification must "describe the invention sufficiently to convey to a person of skill in the art that the patentee had possession of the claimed invention at the time of the application, *i.e.*, that the patentee invented what is claimed."  *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005).  The written description doctrine "prohibits new matter from entering into claim amendments, particularly during the continuation process."  *Agilent Techs., Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1379 (Fed. Cir. 2009).  Specifically, when the scope of a claim is changed by amendment "in such a way as to justify an assertion that it is directed to a *different invention* than was the

original claim," the Court should inquire "whether the newly claimed subject matter was *described* in the patent application when filed." *In re Wright*, 866 F.2d 422, 424 (Fed. Cir. 1989).

To determine if a specification contains an adequate written description, the Court must make "an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (*en banc*). The written description inquiry is a question of fact. *Id.* Because a patent is presumed valid upon issuance, *see* 35 U.S.C. § 282, a patent challenger "bears the burden of proving the factual elements of invalidity by clear and convincing evidence." *Pfizer, Inc. v. Apotex*, 480 F.3d 1348, 1359 (Fed. Cir. 2007).

Eljen must prove by clear and convincing evidence that the written description requirement has not been satisfied. *See Vasudevan Software, Inc. v. MicroStrategy, Inc.*, 782 F.3d 671, 682 (Fed. Cir. 2015). Eljen's invalidity argument centers on language in the claims requiring the "area of the conduit having the wastewater egress openings [to] traverse[] a majority of the paired infiltrative surfaces *at an oblique* or perpendicular angle." '863 Patent at col. 17:17–20 (emphasis added) (independent claim 1). Similar language appears in independent claims 22 and 26. Eljen argues that there is no mention of an oblique angle in either the original patent application filed in 2006 or in the continuation application from which the '863 Patent issued and, therefore, that the Patent is invalid. Eljen's Opening Br. at 12–13. Geomatrix counters that (1) there is at least a genuine dispute of material fact about whether the original patent application described an oblique angle, pointing to its reference to a Z-shaped channel, its hand-drawn figures, and the fact that the PTO examiner initially had the same objection but later withdrew it following Geomatrix's appeal; and (2) going further, Eljen has failed to provide enough support that a reasonable jury could conclude, by clear and convincing evidence, that the Patent is invalid on this basis. Geomatrix's

Opening Br. at 50–53; Geomatrix's Opp'n Br. at 25–31. The Court concludes that this issue must be decided by a jury, and therefore denies both parties' motions for summary judgment on this point.

With respect to Eljen's motion for summary judgment, the Court finds that there is a genuine dispute about whether the '917 Application's statement that the "high aspect channels may be 'Z' shaped for additional surface area" sufficiently discloses the possibility of an oblique angle. *See* '917 Application, ECF No. 169-40 at 21. First, there is a question whether a distribution pipe would be oriented relative to the "Z" in a way that would create an oblique angle. *Compare* Eljen's Opening Br. at 30–31 (arguing that the sentence in the '917 Application "has nothing to do with orientation of a pipe or oblique angles" and would require a person of ordinary skill in the art to speculate, in contravention of the written description requirement) *with* Geomatrix's Opp'n Br. at 27 (arguing that a person of ordinary skill in the art would only need to look at the figures depicting U-shaped embodiments to determine how a pipe should be oriented in the Z-shaped embodiment). Second, there is a question whether the sentence in the '917 Application is referring to a Z-shape when viewing the embodiment from the top, side, or front. *Compare* Eljen's Opening Br. at 31–32 (asserting that even Geomatrix's expert did not know whether the Z-shaped channel would be Z-shaped when viewed from the top, side, or front) *with* Geomatrix's Opp'n Br. at 28 (asserting that because the Patent[8] describes the U-shaped embodiment from a top view, a person of ordinary skill in the art would also look at the Z-shaped embodiment from the top). Third, there is a question whether the Z-shaped channels would be shaped like the letter Z, or like a Z-shaped bracket, which has perpendicular angles. *Compare* Eljen's Opening Br. at 31–32 (arguing that there is no evidence

_____

[8] Although Geomatrix refers to Figures 16 and 17 of the '863 Patent as describing the U-shaped embodiments, the '917 Application also includes the same figures, albeit hand-drawn, that depict the same U-shaped embodiments. *See* '917 Application at 46–47.

that even if the Z-shaped channel were viewed from the top, it would have a slant and not right angles like a standard Z-shaped bracket) *with* Geomatrix's Opp'n Br. at 28 (arguing that Eljen has only provided arguments on how a Z-shaped channel might look, but not actual evidence). These questions create a genuine dispute of material fact as to whether oblique angles are described in the original patent application, through its reference to Z-shaped channels.

Additionally, the Court agrees with Geomatrix that Eljen has not met the clear and convincing evidence standard as a matter of law, especially where Eljen's arguments are backed by inadequate expert evidence. As an initial matter, Eljen relies on conclusory expert analysis that is less than a page long. *See* Lombardo Expert Rep., ECF No. 169-17 at 59. Mr. Lombardo concludes that "[t]here is not a single embodiment disclosed in Mr. Potts' application where even an example of an oblique angle is shown or described" after making only two (also conclusory) observations: (1) the patent application does not use the term "angle" or any similar term, and (2) the "[f]igures of the application uniformly disclose only a perpendicular angle." *Id.* ¶¶ 180–81. Only two paragraphs actually discuss the '917 Application, and neither of those paragraphs discuss the sentence about the Z-shaped embodiment that takes center stage in Eljen's motion for summary judgment. There is such little analysis of whether an "oblique angle" is described in the Application that Mr. Lombardo's recitation of the legal standards of adequate written description is substantially longer than his discussion of the '917 Application. *See id.* at 58–59. Eljen's rejoinder—that if Geomatrix had issues with Mr. Lombardo's invalidity report, it could have asked him about it during his deposition—falls flat by impermissibly shifting the burden of proof to Geomatrix. *See* Eljen's Reply, ECF No. 186 at 6. As the party asserting invalidity of the Patent due to inadequate written description, Eljen—not Geomatrix—is responsible for presenting evidence to prove its claim. *See Eli Lilly & Co. v. Barr Lab'ys, Inc.*, 251 F.3d 955, 962 (Fed. Cir.

2001) (only the party seeking to invalidate a patent at summary judgment bears the burden of proof, whereas a moving party seeking to have a patent held not invalid at summary judgment only needs to show that the nonmoving party bearing the burden of proof failed to meet its burden).

Further, Mr. Lombardo's analysis of the written description issue is based on an incomplete file history of the '863 Patent prosecution.  Eljen is incorrect that Mr. Lombardo reviewed the entire file history, *see* Eljen's Reply at 6, when his "Information Reviewed In Support of My Opinions" document clearly shows that he reviewed only "USPT Office Action, dated September 13, 2013" and "Response to the September 13, 2013 Office Action, dated February 14, 2014," to the exclusion of the rest of the file history.  *See* ECF No. 169-17 at 71–72.  Thus, it appears Mr. Lombardo did not consider Geomatrix's patent appeal brief dated January 8, 2015, in which Geomatrix presented arguments that persuaded the PTO examiner to reverse his written description rejection based on the purported lack of support for an "oblique angle" in the '917 Application. *See* Patent Appeal Br., ECF No. 169-25 at 71–72.  In that brief, Geomatrix asserted that:  (1) the '917 Application describes channels as comprising various materials such as stringy mats, stone, hollow flat pipes, and other materials, which would lead a person of ordinary skill in the art to understand that the pipes overlying the channels would not necessarily traverse them at 90°; (2) because the channels may be constructed in various ways, including by bending geonet into the desired shape, a person of ordinary skill in the art would understand that, in practice, a pipe would not necessarily cross each channel at exactly 90°; and (3) the hand-drawn figures in the '917 Application demonstrate oblique angles.  *Id.*  Although the PTO examiner did not articulate why he decided to overturn his original rejection on the oblique angle point, there is a possibility that at least one of Geomatrix's arguments was convincing to him.  Mr. Lombardo's report does not explain why any of these arguments fail.

31

With respect to Geomatrix's motion for summary judgment, the Court concludes Eljen has pointed to evidence from which a reasonable jury *could* conclude, by clear and convincing evidence, that the written description requirement was satisfied, rendering judgment as a matter of law in Geomatrix's favor inappropriate. The parties agree that the original patent application made no explicit reference to oblique angles, which a reasonable jury could find weighs in Eljen's favor. Geomatrix highlights that the '917 Application contains two hand-drawn figures that depict conduits traversing infiltrative surfaces at non-perpendicular angles. *See* Geomatrix's Opening Br. at 52 (referencing Figures 16 and 19 of the '917 Application); Geomatrix's Opp'n Br. at 30 (same). Geomatrix's expert concurs these drawings show oblique angles. ECF No. 169-11 ¶¶ 784–85; *see also* Geomatrix's Reply, ECF No. 185 at 17–18. But, as Eljen points out, because these figures were drawn by hand, it is not demonstrably clear whether the lines representing the infiltrative surfaces are intentionally crooked or if they are crooked simply due to the imprecision of drawing by hand. *See* Eljen's Opp'n Br. at 44–46. The Court also notes that Mr. Potts later replaced hand-drawn Figures 16 and 19 with digitally-rendered versions that appear to demonstrate wastewater distribution conduits that traverse the channels at only perpendicular angles. *Id.* at 45. From this evidence—and, depending on its resolution of the Z-shaped channel issue—a reasonable jury could conclude that there is clear and convincing evidence that the written description requirement had not been satisfied.[9]

---

[9] Eljen also argues that, even if it concedes that Figures 16 and 19 describe angles that are one to two degrees off from 90°, they do not sufficiently demonstrate that Mr, Potts possessed the "full scope" of the claimed invention, *i.e.*, all oblique angles, and thus the Court must find for Eljen as a matter of law. Eljen's Opp'n Br. at 46; Eljen's Reply at 7–8. Eljen's insistence that the written description must possess the "full scope" of the invention is misplaced. Cases that require such specificity in the written description usually arise in the context of pharmaceutical patents, which naturally require particularity and precision. *See, e.g.*, *AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1301 (Fed. Cir. 2014) (upholding jury verdict of invalidity for lack of adequate written description because the pharmaceutical patents did not describe representative examples "to support the full scope of the claims"); *cf.* Eljen's Opp'n Br. at 46–47 (citing only cases in the pharmaceutical context).

In sum, because the evidence presented by both parties regarding the Z-shaped channel and the hand-drawn figures create a genuine dispute of material fact on whether the '863 Patent is invalid for lack of written description, the Court denies both parties' motions for summary judgment on this issue.

## VI.    INVALIDITY

Next, the Court evaluates the parties' motions for summary judgment as to Eljen's invalidity theories of anticipation and obviousness under 35 U.S.C. §§ 102 and 103, respectively.[10]

As noted above, because the burden of establishing invalidity of a patent rests on the party asserting invalidity, 35 U.S.C. § 282, "a moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise.  Alternatively, a moving party seeking to have a patent held not invalid at summary judgment must show that the nonmoving party, who bears the burden of proof at trial, failed to produce clear and convincing evidence on an essential element of a defense upon which a reasonable jury could invalidate the patent."  *Eli Lilly*, 251 F.3d at 962.

---

[10] Sections 102 and 103 were amended by the Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, § 3, 125 Stat. 284, 285–89 (2011).  Because the original application for the '863 Patent was filed in 2006, the Court applies the pre-AIA version of these statutes throughout this opinion.

In its Amended Invalidity Contentions, Eljen argues that the '863 Patent is invalid because there are twelve prior art references[11] that anticipate one or more of its claims, and a combination of one or more of fifteen prior art references[12] renders its claims obvious to a person of ordinary skill in the art.  Amended Invalidity Contentions, ECF No. 169-10 at 18–21.  Eljen now moves for summary judgment that the '863 Patent is invalid because 1988 In-Drains, by itself, anticipates the Patent by disclosing all the elements of its independent claims 1, 22, and 26 and renders its claims obvious to a person of ordinary skill in the art.  Eljen's Opening Br. at 32–40.  Eljen also moves for summary judgment that 1992 In-Drains, combined with 1988 In-Drains or the Glasser '333 Patent, invalidates the '863 Patent by making its claims obvious to a person of ordinary skill in the art.  *Id.* at 40–44.

In turn, Geomatrix moves for summary judgment that the '863 Patent is valid because Eljen has not provided clear and convincing evidence that 1988 In-Drains, 1992 In-Drains, Ruck L Fins, the Mini/Max Brochure and the Mini/Max Letters (collectively, "Mini/Max References"), 1987

---

[11] Only nine of the twelve references are at issue in the parties' motions for summary judgment as to anticipation:  (1) a paper authored by Dr. Rein Laak titled "Using In-Drains at Soil Clogging Infiltration Surface" for presentation at the 1988 International Summer Meeting of the American Society of Agricultural Engineers ("1988 In-Drains"); (2) a promotional publication authored by Dr. Laak in 1992 titled "In-Drains: Sand Filled 6" x 4' W x 18" Long" ("1992 In-Drains"); (3) a product manual dated March 31, 1997 and written by Dr. Laak called, "Ruck L Fins"; (4) a brochure ("Mini/Max Brochure") and (5) letters from 2003 between Eljen's agent and the Connecticut Department of Public Health regarding an Eljen product called the Mini/Max Absorption System ("Mini/Max Letters"); (6) a paper authored by Dr. Laak titled, "On-Site Wastewater Drain Fields Using Light Weight In-Drains," for the Second International Conference on Cold Regions Environmental Engineering in 1987 ("1987 In-Drains"); (7) an undated "Eljen In-Drain" brochure ("In-Drain Brochure"); (8) a pre-1990 Eljen memorandum titled, "Procedure for Assembling a Ruck System In-Drain Unit" ("In-Drain Memo"); and (9) a paper authored by Dr. Laak titled, "Using In-Drain Geosynthetics in Soil Infiltration Systems" for presentation at the 1989 International Summer Meeting of the American and Canadian societies for agricultural engineering ("1989 In-Drains").  Geomatrix also moves for summary judgment that Eljen has not demonstrated by clear and convincing evidence that Eljen's Mini/Max product ("Mini/Max"), which was not included in Eljen's Amended Invalidity Contentions, is prior art that anticipates the '863 Patent.  Geomatrix's Opening Br. at 24.

[12] The fifteen prior art references are:  (1) the Donlin '994 Patent; (2) Ruck L Fins; (3) the Mini/Max Brochure; (4) the Mini/Max Letters; (5) 1987 In-Drains; (6) the In-Drain Brochure; (7) In-Drain Memo; (8) 1988 In-Drains; (9) 1989 In-Drains; (10) 1992 In-Drains; (11) U.S. Patent No. 4,880,333 (the "Glasser '333 Patent"); (12) U.S. Patent No. 6,048,131 (the "Laak '131 Patent"); (13) U.S. Patent No. 5,597,264 (the "Laak '264 Patent"); (14) U.S. Patent No. 4,824,287 (the "Tracy '287 Patent"); and (15) Dr. Rein Laak, *Wastewater Engineering Design for Unsewered Areas* (1st ed. 1986).

In-Drains, the In-Drain Brochure, the In-Drain Memo, 1989 In-Drains, and the Mini/Max are prior art references that anticipate the '863 Patent. Geomatrix's Opening Br. at 19–31. As to obviousness, Geomatrix argues that Eljen's Amended Invalidity Contentions are fatally deficient for untimeliness and for lacking specificity and support, *id.* at 32–35, and contends, on the merits, that Eljen has failed to present evidence on essential elements of its obviousness defense, *id.* at 37–45.

For the reasons described below, the Court denies Eljen's motion for summary judgment as to invalidity by anticipation and obviousness, grants in part and denies in part Geomatrix's motion for summary judgment as to no invalidity by anticipation, and grants in part and denies in part Geomatrix's motion for summary judgment as to Eljen's obviousness theories.

### A.   Threshold Issues:  Printed Publication and the Public Use/On-Sale Bars

Patents enjoy a presumption of validity. *Iovate Health Scis., Inc. v. Bio-Engineered Supplements & Nutrition, Inc.*, 586 F.3d 1376, 1380 (Fed. Cir. 2009). But a patent may be invalid if the challenger shows, by clear and convincing evidence, that the claimed invention was "described in a printed publication . . . or in public use or on sale . . . more than one year prior to the date of the application for patent in the United States." 35 U.S. § 102(b); *accord Iovate Health Scis.*, 586 F.3d at 1380. These bars to patentability are "grounded on the principle that once an invention is in the public domain, it is no longer patentable by anyone." *In re Lister*, 583 F.3d 1307, 1311 (Fed. Cir. 2009).

If a printed publication described the invention or if the invention was in public use or on sale prior to the critical date, the relevant prior art can fully anticipate the claimed invention or render it obvious, provided that other requirements for anticipation and obviousness are met. *See, e.g.*, *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 865 (Fed. Cir. 2010); *Tec Air, Inc. v. Denso Mfg. Mich. Inc.*, 192 F.3d 1353, 1358 (Fed. Cir. 1999). Thus, the Court first addresses the threshold

questions of whether certain references were either printed publications or show that the invention was in public use or on sale in the relevant period.

### 1. Printed Publication

Here, the parties first dispute whether certain proposed prior art references are "printed publications" under Section 102(b), such that they could be considered prior art for anticipation and obviousness purposes. *See Riverwood Int'l Corp. v. R.A. Jones & Co., Inc.*, 324 F.3d 1346, 1354 (Fed. Cir. 2003) (recognizing that the term "prior art," as used in Section 103, refers to at least "the statutory material named" in Section 102). Whether a reference is a printed publication "involves a case-by-case inquiry into the facts and circumstances surrounding the reference's disclosure to members of the public." *In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004) (citations omitted). "Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility' has been called the touchstone in determining whether a reference constitutes a 'printed publication' bar under 35 U.S.C. § 102(b)." *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1348 (Fed. Cir. 2016) (quoting *In re Hall*, 781 F.2d 897, 898–99 (Fed. Cir. 1986)). "A reference will be considered publicly accessible if it was 'disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it.'" *Id.* (quoting *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1350 (Fed. Cir. 2008)). "Whether an anticipatory document qualifies as a 'printed publication' under § 102 is a legal conclusion based on underlying factual determinations." *Suffolk Techs., LLC v. AOL Inc.*, 752 F.3d 1358, 1364 (Fed. Cir. 2014) (quoting *SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186, 1192 (Fed. Cir. 2008)).

a.   1988 In-Drains

First, the Court holds that 1988 In-Drains is a "printed publication," such that Eljen may

rely on it for its anticipation and obviousness arguments.

The parties agree that 1988 In-Drains is a paper authored by Dr. Laak, an inventor and

frequent collaborator of Eljen.  1988 In-Drains, ECF No. 169-19.  The paper states on its face that

it was "[w]ritten for presentation at the 1988 International Summer Meeting of the American

Society of Agricultural Engineers."  *Id.* at 2.  In a 2016 declaration, however, Dr. Laak simply

states that he authored the 1988 In-Drains paper, without reference to it being presented.  Dr. Laak

2016 Decl., ECF No. 168-16 ¶ 16.  According to Eljen's expert (Mr. Lombardo), Dr. Laak

presented the paper to 30 to 50 members of the Society of Agricultural Engineers.  ECF No. 169-

17 ¶ 38.  Mr. Lombardo states that the paper was spiral bound, assigned a paper number, and freely

distributed amongst conference-goers and anyone else who requested a copy.  *Id.*  Mr. Lombardo

makes these conclusions based on "a discussion with Dr. Laak," as well as Dr. Laak's declarations

and deposition testimony.  *Id.* ¶ 36.[13]

The Court previously held that Dr. Laak's statements to Mr. Lombardo were inadmissible

hearsay, and therefore 1988 In-Drains was not a printed publication, *see Geomatrix*, 2024 WL

4753310, at *15–17; but it has granted Eljen's motion for reconsideration of that ruling.  *See* Order

on Eljen's Mot. Reconsideration, ECF No. 220.  Eljen has overcome the evidentiary hurdle, in that

it has demonstrated that it could present the evidence in an admissible form at trial, through the

testimony of Dr. Laak.  Specifically, it is anticipated Dr. Laak would testify that he personally

publicly presented 1988 In-Drains to 30 to 50 members of the American Society of Agricultural

Engineers at the International Summer Meeting of this Society in 1988, and that he freely

---

[13] The Court expresses no opinion on whether Mr. Lombardo is qualified to provide an expert opinion that 1988 In-Drains is a printed publication.

distributed copies of the paper to the people who attended the presentation.  Laak Suppl. Decl., ECF No. 202-2 ¶ 3.[14]

This anticipated testimony strongly suggests 1988 In-Drains is a printed publication.  The Federal Circuit considers various factors in evaluating whether an oral presentation and accompanying publication qualify as a printed publication.  One factor is "the size and nature of the meetings and whether they are open to people interested in the subject matter of the material disclosed."  *Medtronic, Inc. v. Barry*, 891 F.3d 1368, 1382 (Fed. Cir. 2018).  "Another factor is whether there is an expectation of confidentiality."  *Id.*  In assessing these factors, the Federal Circuit has found that a paper delivered orally at a conference for somewhere between 50 and 500 attendees who were persons of ordinary skill in the art, offered freely for distribution, and then distributed to at least six attendees, qualifies as a printed publication.  *Mass. Inst. of Tech. v. AB Fortia*, 774 F.2d 1104, 1108–10 (Fed. Cir. 1985).  Therefore, Dr. Laak's testimony concerning 1988 In-Drains being presented and distributed at the conference likely qualifies it as a printed publication, such that it can be considered as a prior art reference.

The Court must thus take up Geomatrix's argument that *Finnigan Corp. v. International Trade Commission*, 180 F.3d 1354 (Fed. Cir. 1999), requires corroboration when a party's evidence of invalidity relies on a single witness's testimony.  *See* Geomatrix's Opening Br. at 21.  It is an open question whether the corroboration requirement applies to the present situation.  *Compare Netscape Commc'ns Corp. v. ValueClick, Inc. (Netscape III)*, 704 F. Supp. 2d 544, 553 (E.D. Va. 2010) ("Until the Federal Circuit further clarifies this issue, the safest course, in the circumstances,

---

[14] While Geomatrix has its doubts about Dr. Laak's ability to testify at trial, *see* ECF No. 209 at 24–25, and generally alludes to Dr. Laak's working relationship with Eljen, it has not made a frontal attack to his credibility with any specificity.  *See* Geomatrix's Opp'n Br. at 31–32; Geomatrix's Opening Br. at 15–16, 20–21.  As a result, the Court does not believe that Eljen's summary judgment motion must be denied on the basis that the jury must evaluate Dr. Laak's credibility.  *Cf. TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158 (Fed. Cir. 2004) (finding summary judgment inappropriate where the opposing party offered "specific facts that call[ed] into question the credibility of the movant's witnesses").

is to apply the *Finnigan* corroboration requirement broadly.") *with Stored Value Sols., Inc. v. Card Activation Techs., Inc.*, 796 F. Supp. 2d 520, 548 n.33 (D. Del. 2011), *aff'd* 499 F. App'x 5 (Fed. Cir. 2012) (holding that witness's testimony that prior art was publicly known by a certain date need not be corroborated under *Finnigan*).

The Court does not believe that *Finnigan*'s corroboration requirement applies here, with respect to 1988 In-Drains. The Federal Circuit has explained that the corroboration requirement is imposed "when a witness's 'testimony alone is asserted to invalidate a patent.'" *Philip Morris Prods. S.A. v. Int'l Trade Comm'n*, 63 F.4th 1328, 1352 (Fed. Cir. 2023) (quoting *Finnigan*, 180 F.3d at 1369); *see also Woodland Tr. v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371 (Fed. Cir. 1998) ("[T]here is a very heavy burden to be met by one challenging validity when the *only* evidence is the oral testimony of interested persons." (emphasis added)). That is not the case here, as Eljen is proffering more than simply the oral testimony of one witness to assert the invalidity of the '863 Patent: it also relies on the indicia of public distribution apparent on the copy of 1988 In-Drains itself. *See Norian Corp. v. Stryker Corp.*, 252 F. Supp. 2d 945, 957 (N.D. Cal. 2002), *aff'd in part, rev'd in part and remanded on other grounds*, 363 F.3d 1321 (Fed. Cir. 2004) (explaining that the *Finnigan* corroboration requirement does not apply to testimony about activities where corroborating records would ordinarily not be expected, such as whether a printed publication was disseminated at a conference). Thus, the Court does not believe that *Finnigan* would mandate corroborating evidence. Because the jury may reasonably find—based on the copy of 1988 In-Drains and Dr. Laak's trial testimony, if he does testify—that the clear and convincing standard is met, further corroboration is not required.

To the extent that corroboration of Dr. Laak's anticipated testimony is required under *Finnigan*, however, 1988 In-Drains itself bears indicia of public distribution that supports Dr.

Laak's statements.  The document was spiral bound, states it was written specifically for presentation at the 1988 conference, bears the dates of the conference (June 26–29, 1988), and was assigned a paper number.  *See* ECF No. 169-19 at 2.  This is unlike a situation where a document is undated and witness testimony fills the gaps regarding date of publication and public accessibility more generally.  *See TypeRight Keyboard Corp.*, 374 F.3d at 1158–59 (noting corroboration required where testimony of interested witnesses were used to support dissemination of an undated one-page document containing unlabeled photos).

The Court concludes that Eljen has demonstrated, by clear and convincing evidence, that 1988 In-Drains is a "printed publication" for purposes of Section 102(b).  Thus, it proceeds to consider below whether 1988 In-Drains anticipated or rendered obvious the invention described in the '863 Patent.

### b.  1992 In-Drains

Both Geomatrix and Eljen move also for summary judgment regarding whether 1992 In-Drains is a printed publication, although Eljen raises the issue in support of its obviousness theories only while Geomatrix discusses 1992 In-Drains in relation to both anticipation and obviousness. The Court holds that there are disputed questions of material fact regarding whether 1992 In-Drains is a printed publication.

As with 1988 In-Drains, in arguing that 1992 In-Drains is a printed publication, Eljen relies almost exclusively on a conversation Dr. Laak had with Mr. Lombardo.  *See* ECF No. 169-17 ¶¶ 36, 40.  The Court previously held that 1992 In-Drains, like 1988 In-Drains, was not a printed publication because Dr. Laak's comments, offered only through Mr. Lombardo, were inadmissible hearsay.  *See Geomatrix*, 2024 WL 4753310, at *17.  Eljen now asserts that Dr. Laak would testify that he authored and published 1992 In-Drains as a promotional publication, which he freely and

publicly disseminated to various state governmental agencies and "other participants in the industry such as engineers and installers."  ECF No. 202-2 ¶¶ 4, 6.  Thus, Eljen has surmounted the hearsay hurdle.

As with 1988 In-Drains, the Court does not believe that *Finnigan*'s corroboration requirement strictly applies for 1992 In-Drains because there is a written copy of 1992 In-Drains in the record.  *See* 1992 In-Drains, ECF No. 169-20.  Thus, Eljen does not solely rely on Dr. Laak's oral testimony concerning public distribution of 1992 In-Drains.  But the question of whether Eljen has demonstrated, by clear and convincing evidence, that 1992 In-Drains is a printed publication is a much closer one than it was for 1988 In-Drains.

First, although Dr. Laak says that he disseminated it to governmental agencies and others, the copy in the record bears indicia of distribution to only one person—a far cry from the conference presentation indicia on the cover of 1988 In-Drains.  *See id.* at 2 (bearing stamp for one person in Sacramento, California).  The paper itself also bears no indicia of use as a promotional document.  *See id.*; *cf. Valve Corp. v. Ironburg Inventions Ltd.*, 8 F.4th 1364, 1373–74 (Fed. Cir. 2021) (finding that a product review article was promotional because it made clear where the product could be purchased).  Moreover, 1992 In-Drains is undated.  *See* ECF No. 169-20.  The only date in the document, "May 1992," appears on the second page above a photograph of a sand filled in-drain installation in Connecticut.  *Id.* at 3.  The date ascribed to the photograph, however, says nothing about when the document was distributed or publicly accessible.  *See TypeRight Keyboard Corp.*, 374 F.3d at 1158–59.

But Eljen, for its part, notes that the photograph of the installation suggests that the technology described in 1992 In-Drains was already put to commercial use in 1992.  *See* Eljen's Opp'n Br. at 19; ECF No. 169-20 at 3; *Nobel Biocare Servs. AG v. Instradent USA, Inc.*, 903 F.3d

1365, 1376 (Fed. Cir. 2018) (noting a date on a document, while not dispositive of the date of public accessibility, is relevant to this question).  In addition, the document appears to provide an overview of installation instructions, and comments such as "the manufacturer will supply full instructions" and "units shipped partially assembled" could possibly suggest that 1992 In-Drains was written to be a promotional document.  ECF No. 169-20 at 7, 8; *cf. Valve Corp.*, 8 F.4th at 1374.

In the end, the Court cannot conclude on this record that a reasonable jury *must* conclude 1992-In Drains was a printed publication; though a reasonable jury *could* so conclude.  *See Nobel Biocare Services AG*, 903 F.3d at 1378 ("Sufficiency of corroboration is a question of fact."). Given that the status of 1992 In-Drains as a printed publication cannot be resolved as a matter of law based on the record before it, the Court is likewise unable to conclude as a matter of law that 1992 In-Drains does not anticipate the '863 Patent.  Accordingly, the Court denies Geomatrix's motion for summary judgment insofar as it seeks judgment of no invalidity by anticipation regarding 1992 In-Drains and denies Eljen's motion insofar as it seeks summary judgment on obviousness based on 1992 In-Drains.  These issues must be decided by the jury.

c.  Geomatrix's Motion:  Other References

Although Eljen moves for summary judgment as to anticipation regarding 1988 In-Drains and as to obviousness regarding 1992 In-Drains, Geomatrix also seeks summary judgment in its favor of no invalidity by anticipation as to seven other references as well:  Ruck L Fins, the Mini/Max References, 1987 In-Drains, the In-Drain Brochure, the In-Drain Memo, and 1989 In-Drains.  The Court holds that there are disputed questions of fact as to whether Ruck L Fins qualifies as a printed publication, but concludes that the Mini/Max References, 1987 In-Drains, the In-Drain Brochure, the In-Drain Memo, and 1989 In-Drains are not printed publications as a

matter of law. Thus, the Court grants in part and denies in part Geomatrix's motion for summary judgment as to these issues.

i.    Ruck L Fins

Similar to 1992 In-Drains, questions of material fact remain as to whether Ruck L Fins, which Eljen contends is a product manual published on March 31, 1997, was "freely disseminated to the public, including engineers and installers," Eljen's Opp'n Br. at 19, and thus qualifies as a printed publication. As with 1988 and 1992 In-Drains, the Court believes that the *Finnigan* corroboration requirement does not strictly apply here given that Dr. Laak's testimony about the document is corroborated by the existence of the document itself, bearing the March 31, 1997, date and installation instructions. *See* Ruck L Fins, ECF No. 169-21. Again, however, the extent and date of public dissemination of this document is a close question not conclusively answered by the face of the document. The Court concludes there are genuine questions of material fact precluding a finding in Geomatrix's favor that Ruck L Fins is not a printed publication. Accordingly, Geomatrix's motion for summary judgment as to no anticipation based on Ruck L Fins is denied.

ii.    The Mini/Max References

Geomatrix also moves for summary judgment as to no invalidity by anticipation for the Mini/Max References, on two grounds: that the Mini/Max References are not printed publications and the Mini/Max product was not in public use or on sale[15] more than a year before January 27, 2005, the critical date. The Court agrees with Geomatrix that the Mini/Max References are not printed publications, and addresses the public use/on-sale bar below.

---

[15] Geomatrix and Eljen dispute whether the Mini/Max product was "in public use, on sale, *or otherwise available to the public*." *See* Geomatrix's Opening Br. at 24 (emphasis added); Eljen's Opp'n Br. at 20. The Court intentionally does not refer to the clause "otherwise available to the public" because it does not appear in the pre-AIA version of § 102(b) applicable here. *Compare* 35 U.S.C. § 102(b) (2002) (amended 2011) *with* 35 U.S.C. § 102(a)(1) (2011).

Regarding the Mini/Max Brochure, ECF No. 169-22, and Mini/Max Letters, ECF No. 169-23, Eljen does not respond directly to Geomatrix's contention that these are not printed publications because their public accessibility is unknown.  The only evidence in the record that the Mini/Max References were publicly available is Mr. Lombardo's conversation with Mark Bram, Eljen's owner and former president, about the public accessibility of these documents.  ECF No. 169-17 ¶ 37.

The Mini/Max Brochure itself bears no date or indicia of public accessibility; therefore, as to that document, Eljen appears to rely only on Mr. Bram's testimony, and corroboration would likely be required under *Finnigan* to find that the document is a printed publication.  Eljen has not provided any corroboration for Mr. Bram's statements.  Based on this record, where *Finnigan* would require corroborating evidence, no reasonable jury could find in its favor that the Mini/Max Brochure is a printed publication.

As for the Mini/Max Letters, they bear dates in 2003, which is relevant to the potential date of public accessibility, so Eljen does not rely *solely* on Mr. Bram's testimony.  Nonetheless, although the Mini/Max Letters were addressed to the Connecticut Department of Public Health in December of 2003, there is no evidence, direct or circumstantial, that they were publicly available. *See* Eljen's Opp'n Br. at 20 (claiming, without citing to any evidence or rule, that the Mini/Max Letters are "publicly available").  The Court therefore concludes that no reasonable juror could conclude that the Mini/Max Brochure or Mini/Max Letters are printed publications, so Eljen may not use these documents to support its invalidity by anticipation or obviousness defenses.  The Court addresses the public use/on-sale bar issue below.

### iii.    The Remaining Proposed Prior Art References

Finally, Geomatrix has moved for summary judgment on the issue of whether 1987 In-Drains, the In-Drain Brochure, the In-Drain Memo, and 1989 In-Drains are printed publications. The Court finds that no reasonable juror could find that the foregoing references are printed publications.  While Mr. Lombardo did not base his anticipation opinions directly on these documents, and while Geomatrix's arguments are, admittedly, cursory, *see* Eljen's Opp'n Br. at 20–21, Eljen has not provided a document-by-document analysis as to why each document could be considered a printed publication. *See In re Klopfenstein*, 380 F.3d at 1350.  Eljen's passing reference to Dr. Laak's 2017 declaration is insufficient.  Eljen's Opp'n Br. at 20–21 (citing Dr. Laak 2017 Decl., ECF No. 169-34 ¶¶ 3–5).  In his declaration, Dr. Laak explains his marketing and production of the In-Drain system at a high level and in general terms.  ECF No. 169-34 ¶¶ 3–5.  But he explains none of the details from which it is possible to glean whether any of these documents are printed publications.  There is no evidence of their public accessibility through presentation, archiving, indexing, or any other form of public accessibility.  Accordingly, Geomatrix is entitled to summary judgment that 1987 In-Drains, the In-Drain Brochure, the In-Drain Memo, and 1989 In-Drains are not printed publications, and thus cannot form the basis of Eljen's invalidity by anticipation or obviousness defenses.

### 2.    *Public Use/On-Sale Bar*

The second threshold question the Court addresses is whether the invention described in the '863 Patent was in public use or on sale before the critical date of January 27, 2005.  This issue is raised only as to the Mini/Max in Geomatrix's motion for summary judgment.  *See* Geomatrix's Opening Br. at 24–25.  The Court finds that Geomatrix's motion must be denied on this issue, as a reasonable jury could conclude that the Mini/Max was in public use or on sale at the relevant time.

"Section 102(b)'s on-sale bar is triggered when a claimed invention is: (1) ready for patenting; and (2) the subject of a commercial offer for sale prior to the critical date." *Merck & Cie v. Watson Lab'ys, Inc.*, 822 F.3d 1347, 1351 (Fed. Cir. 2016) (citations omitted). "The public use bar is triggered where, before the critical date, the invention is in public use *and* ready for patenting." *Barry v. Medtronic, Inc.*, 914 F.3d 1310, 1320 (Fed. Cir. 2018); *see also Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1380 (Fed. Cir. 2005) (holding that the "ready for patenting component" is "another necessary requirement of a public use bar"). The public use prong of the public use bar is met if the purported use "(1) was accessible to the public" or "(2) was commercially exploited." *Invitrogen*, 424 F.3d at 1380. The accused infringer has the burden of showing by clear and convincing evidence that there was public use or a sale or offer to sell of a product more than one year before the relevant date, and the product "must satisfy each claim limitation of the patent." *Scaltech, Inc. v. Retec/Tetra, LLC*, 269 F.3d 1321, 1329 (Fed. Cir. 2001); *Quest Integrity USA, LLC v. Cokebusters USA Inc.*, 924 F.3d 1220, 1227 (Fed. Cir. 2019) (citing *id.* at 1328–29); *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1376, 1377 (Fed. Cir. 2011).

As a preliminary matter, the Court notes that Geomatrix only analyzes the public accessibility of the Mini/Max under the public use bar, even though it claims that Eljen has not established that the Mini/Max was either in public use *or* on sale. Geomatrix's Opening Br. at 24–25. "[T]here are differences in the analysis of the two bars: the public use bar focuses on the public's reliance on an invention that is thought to be in the public domain, while the on-sale bar centers on any commercialization beyond the one year grace period." *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 343 F. Supp. 2d 272, 290 (D. Del. 2004), *aff'd*, 488 F.3d 982, 996–1001 (Fed. Cir. 2007). Because Geomatrix makes no attempt to show that Eljen has not

demonstrated by clear and convincing evidence that the Mini/Max was *on sale* before January 27, 2005, the Court denies summary judgment to Geomatrix as to the on-sale bar.

Next, the Court concludes that genuine disputes of material fact preclude summary judgment on whether the Mini/Max was in public use before the critical date. "A public use under Section 102(b) includes any public use of the claimed invention by a person other than the inventor who is 'under no limitation, restriction, or obligation of secrecy to the inventor.'" *Star Sci., Inc.*, 655 F.3d at 1377. Commercial exploitation does, however, include "the sale of the device or a charge for its use of the invention within the confidential confines of the company to generate commercial benefits." *Invitrogen*, 424 F.3d at 1382. Eljen points to the Mini/Max Letters, through which Eljen had sought approval of the Mini/Max from the Connecticut Department of Public Health in December of 2003, and presents evidence that the Mini/Max was apparently first sold in September of 2004. *See* Eljen's Opp'n Br. at 20; ECF No. 169-23; Eljen's Response to Interrogatory No. 38, ECF No. 181-3 at 3 (referring to the first invoice for a sale of the Mini/Max dated September 16, 2004). Eljen alleges that the product described in the Mini/Max Letters and the Mini/Max Brochure is the product that was first sold on September 16, 2004, and cites as support Mr. Bram's discussions with Mr. Lombardo. Eljen's Opp'n Br. at 20. Taken together, Eljen's evidence could provide a sufficient basis for a reasonable factfinder to find that the Mini/Max was commercially exploited, and therefore in public use, prior to January 27, 2005. Thus, Geomatrix's motion for summary judgment as to no public use of the Mini/Max is denied.

Given that neither party attempts to analyze the "ready for patenting" prongs of the on-sale and public use bars, the Court need not consider the issue. The parties may present their arguments as to whether the Mini/Max was in public use or on sale before the critical date to the jury.

B.  Anticipation

To summarize, the only prior art reference that has, as a matter of law, satisfied the threshold requirements discussed above is 1988 In-Drains.  Thus, the Court moves to considering Eljen's argument that 1988 In-Drains renders the '863 Patent invalid by anticipation.  It concludes that it does not.  As the Court has found there are questions of fact concerning whether 1992 In-Drains, Ruck L Fins, and the Mini/Max meet the threshold requirements described above, it denies Geomatrix's motion for summary judgment insofar as it seeks judgment of no invalidity by anticipation through those references.

"A claim is anticipated if each and every element as set forth in the claim is found, either expressly or inherently, in a single prior art reference." *Arbutus Biopharma Corp. v. ModernaTX, Inc.*, 65 F.4th 656, 662 (Fed. Cir. 2023).  To be anticipatory, a prior art reference must satisfy particular requirements.  *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009).  "First, the reference must disclose each and every element of the claimed invention, whether it does so explicitly or inherently." *Id.*  While the Federal Circuit has held that a prior art reference anticipates a claim only if it discloses all the claimed limitations "arranged or combined in the same way as in the claim," it has also stated that a reference can anticipate a claim "even if it does not expressly spell out all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference, would at once envisage the claimed arrangement or combination." *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015) (cleaned up).  In that vein, an anticipatory reference must "clearly and unequivocally disclose the claimed [invention] or direct those skilled in the art to the [invention] without *any* need for picking, choosing, and combining various disclosures not directly related to each other by the teachings of the cited reference." *Sanofi-Synethelabo v. Apotex, Inc.*, 550 F.3d 1075, 1083 (Fed. Cir. 2008) (quoting *In re Arkley*,

455 F.2d 586, 587 (C.C.P.A. 1972)).[16]  Second, the reference must "enable one of ordinary skill in the art to make the invention without undue experimentation."  *In re Gleave*, 560 F.3d at 1334 (internal quotation marks omitted).

Although anticipation is a question of fact, "it may be decided on summary judgment if the record reveals no genuine dispute of material fact." *Encyclopaedia Britannica, Inc. v. Alpine Elecs. of Am., Inc.*, 609 F.3d 1345, 1349 (Fed. Cir. 2010).   "The dispositive question regarding anticipation is whether one skilled in the art would reasonably understand or infer from the prior art reference's teaching that every claim limitation was disclosed in that single reference." *Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.*, 344 F.3d 1186, 1192 (Fed. Cir. 2003).

As an initial matter, there appears to be a fundamental dispute between the parties' experts about whether embodiments disclosed in 1988 In-Drains may be combined.  *See BlephEx, LLC v. Myco Indus., Inc.*, 24 F.4th 1391, 1400–01 (Fed. Cir. 2022) (expert testimony needed as to whether a person of ordinary skill in the art would combine teachings in a prior art reference to show anticipation).  Mr. Dickson, Geomatrix's expert, is clear that he believes 1988 In-Drains contrasts "two different embodiments:  what the document calls 'Existing In-Drain Fields' (Fig. 4) and the author's 'New In-Drain Unit' (Fig. 5-7)."  Dickson Rebuttal Rep., ECF No. 169-11 ¶ 39.  Mr. Lombardo, on the other hand, does not explicitly address whether there are two different embodiments, although he does refer to the "new" in-drain unit as the "spacer embodiment" and the "existing" in-drain unit as the "no-spacer embodiment."  *See, e.g.*, ECF No. 169-17 ¶¶ 123(a)–(b).  He uses the embodiments' features interchangeably:  for instance, the dimensions of Figures 5 and 6 (depicting the "new" in-drain unit) are used to find that 1988 In-Drains discloses the '863

---

[16] As the Federal Circuit noted in *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008), "differences between the prior art reference and a claimed invention, however slight, invoke the question of obviousness, not anticipation."

Patent's claimed aspect ratio, but otherwise he uses Figure 4 (depicting the "existing" in-drain fields) to opine that the Patent's other claimed elements are disclosed. *See* Lombardo 1988 In-Drains Claims Chart, ECF No. 168-17; ECF No. 169-17 ¶ 47; *see also* ECF No. 169-11 ¶¶ 84–85 (Mr. Dickson's rebuttal report describing this discrepancy). Mr. Lombardo appears to assume, without explaining, that one of skill in the art would understand that the two embodiments may be combined. *See, e.g.*, ECF No. 169-11 ¶ 85 (Mr. Dickson opining that "Mr. Lombardo improperly mixes and matches different embodiments when analyzing whether the 1988 IN DRAIN discloses all of the limitations of Claim 1"). Eljen argues that it relies on Figure 7 to bring its anticipation defense based on 1988 In-Drains, which it characterizes as the "'new' system."[17] *See* Eljen's Reply at 9 ("Eljen is not relying on what Geomatrix calls the 'old unit' in 1988 In-Drains."); Eljen's Opp'n Br. at 21–22.

Even taking Mr. Lombardo's view that the embodiments in 1988 In-Drains can be combined, however, the Court finds that 1988 In-Drains does not disclose at least one element of Claims 1, 22, and 26 of the '863 Patent. These three claims each claim systems wherein channels are "separated along a majority of their length by two or more inches." *See* '863 Patent at cols. 17:5–6, 18:36–37, 19:11–12. Mr. Lombardo argues that Figure 4[18] of 1988 In-Drains (reproduced below) discloses the element of the claims requiring the channels to be separated by two or more inches, pointing to a measurement at the bottom of the figure identifying a distance of 9.1 centimeters, which is 3.6 inches. ECF No. 169-17 ¶ 63; ECF No. 168-17 at 2–3. But, as Mr. Dickson notes, that distance appears to measure the distance between the *centerlines* of the

---

[17] The Court notes that Eljen also appears to argue that the Figures show optionality rather than separate embodiments. *See* Eljen's Opening Br. at 35.

[18] Again, Eljen does not explain the apparent inconsistency between its position that it is relying on Figure 7 and the "new" in-drain unit to argue anticipation, and Mr. Lombardo's use of Figure 4 to illustrate what 1988 In-Drains teaches regarding the spacing between channels.

channels, not the distance between the channels themselves, and it is unclear whether the distance between the channels would actually measure two inches or more.  *See* ECF No. 169-11 at ¶¶ 88–89.



FIG. 4   EXISTING IN-DRAIN FIELDS IN PLACE

Characterizing this issue as "ultimately irrelevant," Eljen argues that the 1988 In-Drains discloses separations of two or more inches elsewhere in Table III, which showed that Dr. Laak tested spacings of 9, 18, and 27 centimeters.  *See* Eljen's Opp'n Br. at 22.  The Court finds this contention, which rests on attorney argument alone, unpersuasive.  Mr. Lombardo does not offer Table III as a basis for his opinion that the distance between the channels was at least two inches. *See* ECF No. 168-17 at 2–3.  Although expert testimony is not always required in patent cases, "[t]ypically, testimony concerning anticipation must be testimony from one skilled in the art and must identify each claim element, state the witnesses' interpretation of the claim element, and explain in detail how each claim element is disclosed in the prior art reference."  *Schumer v. Lab'y Computer Sys., Inc.*, 308 F.3d 1304, 1315 (Fed. Cir. 2002).  Here, Eljen does not point to any evidence from one skilled in the art that explains in detail how channel spacings of two inches or more is disclosed in 1988 In-Drains.  Thus, Eljen advances only attorney argument, rather than

evidence, on this issue.  *See Parkervision, Inc. v. Vidal*, 88 F.4th 969, 982 (Fed. Cir. 2023) (finding attorney argument failed to undermine evidence provided by the opposing party's expert).

Geomatrix's expert's purported agreement with Eljen's assertion is similarly insufficient. Mr. Dickson agreed during his deposition that Table III shows Dr. Laak ran tests "at those depths or spacing and he *seems* to have concluded that the system would work."  Dickson Dep., ECF No. 181-1 at 19 (emphasis added).  Yet when asked whether Table III suggests that the "new" in-drains illustrated in Figure 5 could be fitted with spacers larger than 2 centimeters, Mr. Dickson responded:  "From this, I would say that he tested spacings no greater than 2 centimeters."  *Id.* at 29.  These statements are not enough to satisfy Eljen's burden of showing clear and convincing evidence of invalidity, as Mr. Dickson was at best equivocal in his first statement and his second statement conflicted with the first.

For these reasons, the Court concludes that no reasonable jury could conclude that 1988 In-Drains discloses all of the elements of Claims 1, 22, and 26 of the '863 Patent.  Having found that 1988 In-Drains does not disclose all of these elements, the Court need not reach Geomatrix's other arguments on this point, as a prior art reference must disclose *all* claim limitations of an invention in order to anticipate it.  *See In re Gleave*, 560 F.3d at 1334.

Thus, Eljen's motion for summary judgment that 1988 In-Drains anticipates the '863 Patent is denied, and Geomatrix's cross motion for summary judgment of no invalidity by anticipation through 1988 In-Drains is granted.

C.  Obviousness

Eljen argues that, even if the '863 Patent is not invalid for anticipation, it is at least invalid for obviousness, because either 1988 In-Drains on its own or, alternatively, 1992 In-Drains, combined with 1988 In-Drains or the Glasser '333 Patent, made the invention described in the '863 Patent obvious.  As noted above, since 1988 In-Drains is a printed publication as a matter of

law, the Court reaches the arguments in Eljen's motion for summary judgment that 1988 In-Drains made the invention of the '863 Patent obvious. Since the jury must decide whether 1992 In-Drains is a printed publication and thus appropriately considered prior art, however, the Court leaves for the jury the question of whether 1992 In-Drains, combined with 1988 In-Drains or the Glasser '333 Patent, renders the '863 Patent obvious.

Under the pre-AIA version of § 103(a) of the Patent Act, a patent "may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." Under Section 103, "[a]n invention which has been made, and which is new in the sense that the same thing has not been made before, may still not be patentable if the difference between the new thing and what was known before is not considered sufficiently great to warrant a patent." *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 14 (1966). Section 103 ensures that "the results of ordinary innovation are not the subject of exclusive rights under the patent laws." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007). "Were it otherwise patents might stifle, rather than promote, the progress of useful arts." *Id.* (citing U.S. Const. art. I, § 8, cl. 8).

### 1. Geomatrix's Procedural Arguments

Before reaching the merits of obviousness, the Court addresses Geomatrix's procedural objections concerning Eljen's obviousness theories under 35 U.S.C. § 103. The Court denies Geomatrix's motion to the extent that Geomatrix argues that summary judgment should enter because Eljen's Amended Invalidity Contentions are inadequate and Mr. Lombardo's expert report is conclusory.

a. Invalidity Contentions Disclosures

The Court finds that Eljen's "bucket" approach to its Amended Invalidity Contentions is appropriate to the extent it discloses references that the parties do not dispute qualify as prior art for invalidity purposes.

Invalidity contentions require patent infringement defendants to disclose the invalidity theories the defendant plans to assert in its defense. *See Chapco, Inc. v. Woodway USA, Inc.*, 282 F. Supp. 3d 472, 489 (D. Conn. 2017) (citing *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1364 (Fed Cir. 2006)). Unlike many other federal district courts, the District of Connecticut has not adopted local patent rules governing the disclosure of invalidity theories. *See id.*[19] Other districts, like the Northern District of California, have adopted rules around the disclosure of invalidity contentions. *See id.* While the Court understands that the local patent rules from other districts are not binding, the Court finds it useful to reference them to the extent they elucidate the purposes served by invalidity contentions. The rules "seek to balance the right to develop new information in discovery with the need for certainty as to the legal theories." *Monolithic Power Sys.*, 467 F.3d at 1366 & n.12.

Geomatrix asserts that Eljen's Amended Invalidity Contentions, ECF No. 169-10, are inadequate because Eljen has not proposed specific combinations of the five "primary" references with the three "secondary" references. Geomatrix's Opening Br. at 32–33. Generally, "[b]road or general disclosures are 'insufficient'" to put a patent infringement plaintiff on notice as to the legal theories upon which a defendant may rely. *Mitsubishi Elec. Corp. v. Sceptre, Inc.*, No. 2:14-cv-04994-ODW (AJWx), 2015 WL 2369557, at *2 (C.D. Cal. May 18, 2015) (applying N.D. Cal. Patent L.R. 3-3(c)). Courts that have addressed the "bucket" approach to invalidity contentions—

---

[19] While the District has not adopted local rules for patent cases, as part of its scheduling order, this Court ordered Eljen to serve invalidity contentions by May 28, 2021. ECF No. 55.

the approach adopted by Eljen, with one "bucket" of primary references and another of "secondary" references—have found it appropriate where the defendant "reasonably specifies" the possible combinations of prior art, including by "organiz[ing] prior art references into groups and articulat[ing] an overarching theory of obviousness that applied to 'each and every possible combination[ ]' of prior art within the groups." *0912139 B.C. Ltd. v. Rampion USA Inc.*, No. C18-1464JLR, 2019 WL 3082290, at *6 (W.D. Wash. July 15, 2019) (alteration in original) (collecting cases).

The Court finds that Eljen's Amended Invalidity Contentions are adequate to provide notice to Geomatrix of Eljen's obviousness theories. First, Eljen has proposed a relatively modest number of prior art references as the basis for its proposed combinations (five primary sources that render the '863 Patent obvious on their own, along with three secondary references that render the '863 Patent obvious in combination). This counsels in favor of finding the disclosure appropriate—it is not as if Eljen has proposed "literally billions" of possible combinations. *Avago Techs. Gen. IP PTE Ltd. v. Elan Microelectronics Corp.*, No. C04-05385 JW (HRL), 2007 WL 951818, at *4 (N.D. Cal. Mar. 28, 2007). Second, Eljen's Amended Invalidity Contentions do provide an "overarching theory of obviousness" that applies to each and every possible combination of prior art. After listing each and every prior art reference that Eljen intends to rely on, Eljen explains the reasons why a person of ordinary skill in the art would be motivated to combine the prior art—as applied to each and every reference. *See* ECF No. 169-10 at 22–24.

Third, Eljen is correct that the specific two-reference combinations in Mr. Lombardo's report were disclosed in Eljen's Amended Invalidity Contentions. *See* Eljen's Opp'n Br. at 33. Geomatrix's only example of Eljen's alleged nondisclosure of the specific two-reference combinations in Mr. Lombardo's report is the combination of Ruck L Fins as the primary reference

and "Sand Filled In Drains" as the secondary reference.  Geomatrix's Opening Br. at 36–37.

Geomatrix misses the fact that "Sand Filled In Drains" and "1992 In-Drains" are the same

reference—1992 In-Drains is clearly listed as a secondary reference in Eljen's Amended Invalidity

Contentions.  ECF No. 169-10 at 25.

Finally, Eljen included a claims chart that explained how a person of ordinary skill in the

art would use the listed reference to achieve the '863 Patent's claims limitations.  *Id.* at 21

(incorporating by reference the claims charts found in Exhibits A through D to Eljen's initial

invalidity contentions); *see also* ECF No. 169-9 at 28–204 (Exhibit A to the initial invalidity

contentions explaining how the various disclosed art references meet the claim limitations).  Courts

applying the Northern District of California's local patent rules have found that claims charts are

"sufficient where the charts contain written descriptions of each element of each asserted claim

found in the particular prior art reference." *Avago*, 2007 WL 951818, at *2.  *But see Slot Speaker*

*Techs., Inc. v. Apple, Inc*., No. 13-CV-01161-HSG (DMR), 2017 WL 235049, at *3–4 (N.D. Cal.

Jan. 19, 2017) (finding claims chart inadequate where it left "too much to guesswork").  The claims

charts here are sufficient.  Accordingly, the Court does not address Geomatrix's arguments that Mr.

Lombardo uses a "mix-and-match" approach and that Eljen did not disclose the various

combinations on which Mr. Lombardo would rely.  Geomatrix's Opening Br. at 36–37.  As the

Court has already explained, Eljen was not required to explain each and every obviousness theory

and combination.  Mr. Lombardo properly relied on various combinations within the "buckets"

that Eljen has already adequately disclosed.

Thus, Eljen's Amended Invalidity Contentions provide adequate notice and Eljen may rely

on the disclosed combinations to the extent the Court has not otherwise found that the prior art

references cannot support an invalidity claim.

b. Mr. Lombardo's Expert Report

The Court also finds that Mr. Lombardo's expert report adequately disclosed Eljen's obviousness theories, such that these sections of his report should not be excluded.[20]  The Court disagrees with Geomatrix's basic argument against Mr. Lombardo's report.  This argument takes many forms, but remains consistent in theme across its permutations:  Mr. Lombardo's report analyzing obviousness is conclusory, so it must be excluded.

As both parties recognize, in conducting an obviousness analysis that relies on the combination of two or more references, "[t]here must be some suggestion or motivation to combine the references."  *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1368 (Fed. Cir. 2016) (citations and internal quotation marks omitted).  The motivation of a person of ordinary skill in the art to combine references "may be found in many different places and forms." *PAR Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1197 (Fed. Cir. 2014) (quoting *Allergan, Inc. v. Sandoz, Inc.*, 726 F.3d 1286, 1292 (Fed. Cir. 2013)).  For instance, the art itself may teach the motivation.  Also, "it often may be the case that market demand, rather than scientific literature, will drive design trends."  *KSR*, 550 U.S. at 419.  As for the reasonable expectation of success, the law does not require "conclusive proof of efficacy."  *Acorda Therapeutics, Inc. v. Roxane Lab'ys, Inc.*, 903 F.3d 1310, 1333 (Fed. Cir. 2018).  But cautious optimism is not sufficient, *Sanofi v. Watson Lab'ys Inc.*, 875 F.3d 636, 650 (Fed Cir. 2017), nor is mere "hope," *OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1385 (Fed. Cir. 2019).

---

[20] To the extent that Geomatrix also initially moved to exclude Mr. Lombardo's report because it did not contain claims charts for the Glasser '333 Patent, the Laak '264 Patent, or the Donlin '994 Patent,  Geomatrix's Opening Br. at 43–44, Geomatrix's reply brief recognizes that claims charts are not legal requirements, Geomatrix's Reply at 16 n.3 (citing *Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1373 (Fed. Cir. 2005)).  Thus, the Court does not address this argument as it is not a valid basis on which to exclude Mr. Lombardo's report.

Mr. Lombardo's report sufficiently discusses motivation and reasonable expectations of success, for purposes of evaluating whether his report should be excluded at the summary judgment stage.  For example, Mr. Lombardo explains that a person of ordinary skill in the art would be motivated to limit the space between channel separations because the prior art teaches that it can be advantageous to fit a leach field into a smaller area of land.  ECF No. 169-17 ¶ 122(d).  A person of ordinary skill in the art would have reasonable expectations of success because the prior art successfully tested those channel separations.  *Id.*  Similarly, Mr. Lombardo explains that a person of ordinary skill in the art would be motivated to modify and experiment the prior art so as to use majority-void spacers to make the separations between channels because of the costs-savings associated with using less backfill.  *Id.* ¶ 123(a).  A person of ordinary skill in the art would have reasonable expectations of success because the prior art successfully used those channel spacers.  *Id.*  Mr. Lombardo's analysis that the prior art teaches various cost and land saving measures certainly provides more than mere conclusory opinion that a person of ordinary skill in the art would have reason or motivation to combine the various prior art references and would have a reasonable expectation of success in doing so.  *See Elbrus Int'l Ltd. v. Samsung Elecs. Co.*, 738 F. App'x 694, 699–700 (Fed. Cir. 2018) (affirming Patent Trial and Appeal Board finding that a space saving feature is a reason to combine prior art).

Geomatrix's reference to *InTouch Technologies, Inc. v. VGO Communications, Inc.* is misplaced.  Geomatrix's Opening Br. at 39 (citing 751 F.3d 1327, 1353–54 (Fed. Cir. 2014)).  This case does not stand for the proposition that a district court must exclude expert testimony that fails to address motivation to combine—which Mr. Lombardo's report does in fact address.  Rather, the Federal Circuit reversed a jury verdict based on expert testimony that an inventor *could* combine prior art without explaining *why*.  An opinion discussing the weight and persuasiveness of

evidentiary support is qualitatively different than an opinion standing for the proposition that a court must exclude expert testimony that is not as fulsome as a theoretically perfect expert report. In any event, as the Court has explained, Mr. Lombardo's report in fact explains why a person of ordinary skill in the art would be motivated to combine prior art and would have a reasonable expectation of success in doing so.

Thus, the Court finds that Mr. Lombardo's expert report should not be excluded.

### 2.  Merits of Obviousness Defense

On the merits, though, Eljen's obviousness defense related to 1988 In-Drains alone fails.

The "ultimate judgment of obviousness is a legal determination" based on "underlying factual inquiries" of various factors: "(1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) any secondary considerations of non-obviousness." *ZUP, LLC v. Nash Mfg., Inc.*, 896 F.3d 1365, 1371 (Fed. Cir. 2018) (citing *Graham*, 383 U.S. at 17–18). "[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 418.  Rather, it must be shown "by clear and convincing evidence that a skilled artisan would have had reason to combine the teaching of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success from doing so." *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1068–69 (Fed. Cir. 2012).

The Court denies Eljen's motion seeking summary judgment that 1988 In-Drains alone renders obvious the invention that is the subject of the '863 Patent, as Eljen has not shown, by clear and convincing evidence, why a person of ordinary skill in the art would be motivated to modify 1988 In-Drains or that there would be a reasonable expectation of success in doing so.

Eljen moves for summary judgment that 1988 In-Drains on its own renders the '863 Patent obvious for the following reasons: (1) 1988 In-Drains teaches channels can be interconnected in a serpentine fashion; (2) it teaches using 9, 18, or 27 centimeter separations between channels; and (3) it teaches that sand or spacers could be used between channels. *See* Eljen's Opening Br. at 39. As a preliminary matter, Eljen is correct that the document contains all of the foregoing information. Figure 7 of 1988 In-Drains clearly shows an in-drain unit with a serpentine channel configuration, ECF No. 169-19 at 10, which Mr. Lombardo understands to be "interconnected" channels under the plain meaning of the term. *See* ECF No. 169-17 ¶¶ 77–78. Table III demonstrates Dr. Laak tested separations of 9, 18, and 27 centimeters, ECF No. 169-19 at 7, although Mr. Lombardo never refers to Table III in his report to assert that 1988 In-Drains discloses spacings of 2 inches or more between channels. Finally, Figures 4 and 5 show that sand or spacers, respectively, may be used in between channels. *Id.* at 6, 8. Mr. Lombardo opines that a person of ordinary skill in the art would know that the spacers used in 1988 In-Drains allow for majority void space. ECF No. 169-17 ¶ 117.

Merely observing that these specifications or features appear in 1988 In-Drains, however, is not enough to prove obviousness. As noted above, "a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 418. The experts appear to agree that Figures 4 and 5 are different embodiments of the in-drain unit. *See* ECF No. 169-17 ¶¶ 123(a)–(b) (Mr. Lombardo referring to Figure 4 as the "no-spacer embodiment" and Figure 5 as the "spacer embodiment"); ECF No. 169-11 ¶¶ 39–42 (Mr. Dickson describing the differences between Figures 4 and 5). Eljen fails to adequately explain why a person of ordinary skill in the art would be motivated to combine the serpentine interconnection found in Figure 7 with one of the separation distances tested in

Table III and also use one of the fills indicated in Figures 4 and 5. Mr. Lombardo's report lacks a detailed discussion on the motivation of combining various elements in 1988 In-Drains *specifically*, and Eljen admits as much. Eljen claims that "Mr. Lombardo explained in depth why a person of ordinary skill in the art would be motivated to make the minor substitutions proposed within the *narrow set of Dr. Laak's in-drain products*," rather than just 1988 In-Drains, "with a reasonable expectation of success." Eljen's Reply at 10–11 (emphasis added). As Mr. Dickson explains, "[t]he size and length of various components in a wastewater system have a profound effect on the suitability of the wastewater system as a whole because they impact core considerations." ECF No. 169-11 ¶ 375. Without expert evidence as to the motivation to combine certain elements found throughout 1988 In-Drains, the Court cannot find that Eljen has shown by clear and convincing evidence that 1988 In-Drains alone renders the '863 Patent obvious.

Even assuming, however, that the features of Figures 4, 5, and 7 may be combined because it would not require "a leap of inventiveness" to incorporate embodiments "disclosed adjacent to each other in a prior art patent," *see Boston Sci. Scimed, Inc. v. Cordis Corp.*, 554 F.3d 982, 992 (Fed. Cir. 2009), Eljen has not demonstrated that a person of ordinary skill in the art would have reasonable expectations of success in using the spacings from Table III. Mr. Lombardo never mentions the spacings in Table III in his report, and Eljen does not cite to any part of his report to support its claims on this issue. Moreover, there is no indication that Dr. Laak concluded that the separation distances noted in Table III would work with both channel separations filled with sand and with channel separations filled with spacers. The Court only has enough information before it to conclude that Dr. Laak tested those separation distances on in-drain units with unidentified fills. As with Eljen's anticipation theory based on 1988 In-Drains, Mr. Dickson's deposition testimony is insufficient to supports its obviousness theory here. While Mr. Dickson agreed that

Dr. Laak tested the 9, 18, and 27 centimeter spacings in Table III, he sounded uncertain that Dr. Laak concluded that those spacings would actually work. Nor did he specify whether those spacings would work with both sand and spacers. Moreover, Mr. Dickson never admitted that an embodiment using spacers would work with spacings of 9, 18, or 27 centimeters.

As a result, Eljen's motion for summary judgment on obviousness related to 1988 In-Drains alone is denied. Eljen may, however, pursue its invalidity by obviousness defense as to the combination of 1992 In-Drains with 1988 In-Drains or the Glasser '333 Patent at trial. As Geomatrix's cross motion for summary judgment on obviousness takes issue with Eljen's single-reference theories in general, it is granted in part to the extent that it is related to 1988 In-Drains.

As to Geomatrix's remaining arguments concerning obviousness, Geomatrix's motion for summary judgment is denied. Geomatrix argues generally that the single-reference theories and the two-reference combination theories in Mr. Lombardo's report are insufficiently supported, as it contends the report provides only conclusory explanations of the motivations to modify and reasonable expectations of success of such modifications for each specific theory. *See* Geomatrix's Opening Br. at 37–43. The single-reference obviousness theories include 1988 In-Drains, the Donlin '994 Patent, 1992 In-Drains, Ruck L Fins, and the Mini/Max. *See* ECF No. 169-17 ¶ 139. The two-reference combination theories include: (1) Ruck L Fins in view of 1992 In-Drains; (2) Ruck L Fins in view of the Glasser '333 Patent; (3) Ruck L Fins in view of 1988 In-Drains; (4) 1992 In-Drains in view of the Glasser '333 Patent; (5) 1992 In-Drains in view of 1988 In-Drains; (6) the Laak '264 Patent in view of 1992 In-Drains; (7) the Laak '264 Patent in view of the Glasser '333 Patent; (8) the Laak '264 Patent in view of 1988 In-Drains; (9) the Mini/Max in view of 1992 In-Drains; (10) the Mini/Max in view of the Glasser '333 Patent; (11) the Donlin '994 Patent in

view of 1992 In-Drains; and (12) the Donlin '994 Patent in view of the Glasser '333 Patent.  *See id.* ¶140.

The Court first notes that the majority of the seventeen obviousness theories that Geomatrix moves on depend on references for which genuine disputes of material fact exist as to whether they qualify as prior art references.  As explained above, there are genuine questions of material fact precluding a determination as to whether 1992 In-Drains and Ruck L Fins are printed publications and as to whether the Mini/Max was on sale or in public use.  In addition, for the reasons described below, the Court finds that there is a genuine issue of material fact as to the priority of the Donlin '994 Patent over the '863 Patent.  Thus, the status of the references in fifteen obviousness theories still need to be determined at trial.

Moreover, the parties' arguments regarding the remaining theories are too broad for the Court to make specific determinations as to whether each obviousness theory is supported by clear and convincing evidence.  The Court is mindful that it is ultimately Eljen's burden to show, by clear and convincing evidence, that the combinations render the invention described in the '863 Patent obvious.  But as the moving party on summary judgment, Geomatrix must discharge its burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1354 (Fed. Cir. 2001) (citing *Celotex*, 477 U.S. at 325). Geomatrix concedes that it is unable to address each obviousness theory separately in its motion, Geomatrix's Opening Br. at 38 n.16, but it asks the Court to nonetheless make findings as to factual inquiries that underlie the obviousness determination.  *See Commonwealth Sci. & Indus. Rsch. Org. v. Buffalo Tech. (USA), Inc.*, 542 F.3d 1363, 1375 (Fed. Cir. 2008) (recognizing obviousness analysis requires factual inquiries, including determining the scope and content of the prior art and

the differences between the prior art and the claims at issue).  Geomatrix does not analyze the alleged deficiencies of each specific theory, and instead proclaims generally that "Mr. Lombardo never articulates any motivation to modify" and that his "discussion of reasonable expectation of success . . . is also superficial" by picking out various sentences from the report out of context. *See* Geomatrix's Opening Br. at 38, 42.  As the moving party, Geomatrix is only required to show that Eljen has failed to produce clear and convincing evidence supporting Eljen's obviousness theories—but pointing to a few sentences that appear to be conclusory does not support that *every* obviousness theory in Mr. Lombardo's report is conclusory.  While it may certainly be true that all seventeen obviousness theories are indeed unsupported by clear and convincing evidence, "it is not the trial judge's burden to search through lengthy technologic documents for possible evidence" or lack of evidence supporting Eljen's remaining obviousness theories.  *See Biotec Biologische*, 249 F.3d at 1353.  Neither Geomatrix's surface-level briefing nor its chart showing which paragraphs of Mr. Lombardo's report discuss which references satisfy this burden.

As to the one "example" Geomatrix uses to illustrate its point—Ruck L Fins in view of 1992 In-Drains—the Court is unable to conclude that Geomatrix is entitled to summary judgment.  The Court agrees with Geomatrix that paragraph 140(a) of Mr. Lombardo's report does not fully explain why it would have been obvious to modify Ruck L Fins in light of 1992 In-Drains.  *See* ECF No. 169-17 ¶ 140(a).  But, as Geomatrix concedes, Mr. Lombardo generally explains motivations to combine and reasonable expectations of success elsewhere in his report.  *See id.* ¶¶ 119–26.  A reasonable jury could conclude, considering Mr. Lombardo's report and opinions as a whole, that Eljen has met its burden of demonstrating obviousness.

For these reasons, the Court declines to award summary judgment of no invalidity to Geomatrix as to such a broad swath of Eljen's obviousness theories simply based on Geomatrix's

assertion that the theories overall are unsupported.  The jury must decide whether Eljen has met its burden as to its obviousness theories.  Of course, if Mr. Lombardo fails to adequately explain the theories to the jury, Eljen's defense may fail.  *See InTouch Techs.*, 751 F.3d at 1351–52 (finding expert's trial testimony insufficient to justify judgment of obviousness).

## VII.    PRIORITY:  ACTUAL AND CONSTRUCTIVE REDUCTION TO PRACTICE

Next, the Court denies Geomatrix's motion for summary judgment of no invalidity by obviousness to the extent it seeks a finding, as a matter of law, that Mr. Donlin did not reduce his invention to practice prior to Mr. Potts.  Eljen does not move for summary judgment that the Donlin '944 Patent has priority over the '863 Patent in its own motion.

A person is entitled to a patent unless "before such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it."  35 U.S.C.  § 102(g)(2).   In determining priority, the Court must consider "not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other."  35 U.S.C. § 102(g).  Thus, priority of invention "goes to the first party to reduce an invention to practice unless the other party can show that it was the first to conceive of the invention and that it exercised reasonable diligence in later reducing that invention to practice."  *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir. 1998).  "A reduction to practice can be either a constructive reduction to practice, which occurs when a patent application is filed, or an actual reduction to practice."  *Id.*  "Priority of invention is a question of law, based on findings of evidentiary fact directed to conception, reduction to practice, and diligence."  *Scott v. Koyama*, 281 F.3d 1243, 1246 (Fed. Cir. 2002).

For the reasons that follow, the Court finds that summary judgment in Geomatrix's favor is not warranted as to Eljen's priority defenses of actual and constructive reduction to practice.

A.  Actual Reduction to Practice

The Court finds that there are disputed issues of material fact concerning Eljen's theory of actual reduction to practice, which is based on Mr. Donlin building prototypes before Mr. Potts. Thus, summary judgment in Geomatrix's favor is inappropriate as to this theory.

"In order to establish an actual reduction to practice, the inventor must prove that:  (1) he [or she] constructed an embodiment or performed a process that met all the limitations of the interference count; and (2) he [or she] determined that the invention would work for its intended purpose."  *Cooper*, 154 F.3d at 1327.  An inventor must also show "(3) the existence of sufficient evidence to corroborate inventor testimony regarding these events."  *Medichem, S.A v. Rolabo, S.L.*, 437 F.3d 1157, 1169 (Fed. Cir. 2006) (citing *id.* at 1330).  The corroborative evidence may take the form of "[d]ocumentary or physical evidence that is made contemporaneously with the inventive process," which is the "most reliable proof," or post-invention oral testimony of someone other than the alleged inventor—though the latter category is "more suspect, as there is more of a risk that the witness may have a litigation-inspired motive to corroborate the inventor's testimony, and that the testimony may be inaccurate."  *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350–51 (Fed. Cir. 2001).  An inventor may also introduce circumstantial evidence about the inventive process.  *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1461 (Fed. Cir. 1998).

As both parties agree, Mr. Donlin's health precludes him as a testimonial witness.  *See* Geomatrix's Opening Br. at 48 n.21; Eljen's Opp'n Br. at 39 n.10.  Thus, the parties dispute the sufficiency of non-inventor testimony offered by Eljen to support its view that Mr. Donlin reduced the invention to practice before Mr. Potts, by making prototypes in the weeks after he (Mr. Donlin)

recorded his conception of the idea in his laboratory notebook on July 8, 2004. Specifically, Eljen offers testimony of two longtime Eljen employees: Linette Streete, an Eljen plant manager who served as the witness on Mr. Donlin's laboratory notebook and who Eljen says was engaged to make the prototypes, and Zijada Hamzabegovic, whom Eljen represents was made the "Mantis team leader" to help commercialize the product after her prototyping work. *See* Eljen's Opp'n Br. at 38. Both witnesses can be considered "interested" witnesses, in the sense that they may stand to gain if Mr. Donlin's invention is found to have priority over the '863 Patent's claims. *See Thomson, S.A. v. Quixote Corp.*, 166 F.3d 1172, 1176 (Fed. Cir. 1999). As corroboration, Eljen offers indicia of credibility of the witnesses' testimony and documentary evidence in the form of Ms. Streete's signature as a witness on Mr. Donlin's laboratory notebook pages from July 2004 and a fax from Mr. Donlin to his patent attorney in August of 2004 containing the relevant laboratory notebook pages. Eljen's L.R. 56(a)2 St., ECF No. 181 ¶ 40 (first citing Signed Laboratory Notebook Pages, ECF No. 181-5; and then citing Fax, ECF No. 181-6). Thus, Eljen has proffered, at the very least, *some* documentary evidence tending to corroborate the testimony of the two interested witnesses. Geomatrix counters by asserting that the witnesses are longtime employees of Eljen, suggesting that they may have a motive to testify in favor of Mr. Donlin's invention having priority. The probative value of the corroborating evidence and the credibility of interested witnesses (and the extent to which their interest even raises the specter of incredibility), are issues for the jury, not the Court on summary judgment. *See TypeRight Keyboard Corp.*, 374 F.3d at 1159 & n.8.

Thus, summary judgment as to Eljen's claim of actual reduction to practice is inappropriate.

### B.  Constructive Reduction to Practice

As an alternative ground, Eljen argues that Mr. Donlin's filing of a patent application on February 28, 2005, serves as a constructive reduction to practice that demonstrates Mr. Donlin

invented before Mr. Potts. For the moment, the Court puts aside the parties' dispute as to the date that Mr. Potts reduced to practice a prototype of the '863 Patent; the Court addresses these arguments in the inequitable conduct section below. The Court only addresses the parties' dispute as to whether the filing of Mr. Donlin's patent application on February 28, 2005, serves as a constructive reduction to practice that gives him priority. The Court finds that there are disputed issues of material fact and issues related to witness credibility on this issue, such that Geomatrix's motion for summary judgment should be denied.

As noted above, "priority of invention goes to the first party to reduce an invention to practice unless the other party can show that it was the first to conceive the invention and that it exercised reasonable diligence in later reducing that invention to practice." *Monsanto Co. v. Mycogen Plant Sci., Inc.*, 261 F.3d 1356, 1362 (Fed. Cir. 2001). A showing of diligence "is necessary for a party who was first to conceive but the second to reduce to practice." *Id.* at 1362–63. The party alleging prior invention must be able to show diligence during the "critical period," which is between the "date just prior to the other party's conception to the date of reduction to practice by the party first to conceive." *Id.* at 1363 (cleaned up).

Assuming for purposes of this discussion that Mr. Donlin was the first to conceive of the invention, the parties only dispute whether Mr. Donlin was reasonably diligent in reducing his conception to a patent during the critical period between August 15, 2004, when Mr. Potts allegedly conceived of his invention, and February 28, 2005, when Mr. Donlin filed the patent application directed to his invention that eventually became the Mantis product. Geomatrix's Opening Br. at 49. "Reasonable diligence" is "*reasonably continuous* diligence." *Perfect Surgical Techs., Inc. v. Olympus Am., Inc.*, 841 F.3d 1004, 1009 (Fed. Cir. 2016). "Under this standard, an inventor is not required to work on reducing his invention to practice every day during the critical period. . . .

And periods of inactivity within the critical period do not automatically vanquish a patent owner's claim of reasonable diligence." *Id.* (citing *Monsanto*, 261 F.3d at 1369). Furthermore, there is no rule requiring a specific type of activity to determine whether the applicant was reasonably diligent in proceeding toward a constructive reduction to practice from the date of conception. *See Brown v. Barbacid*, 436 F.3d 1376, 1380 (Fed. Cir. 2006) ("[D]iligence and its corroboration may be shown by a variety of activities."). "[T]he point of the diligence analysis . . . is to assure that, in light of the evidence as a whole, 'the invention was not abandoned or unreasonably delayed.'" *Perfect Surgical Techs.*, 841 F.3d at 1009 (quoting *Barbacid*, 436 F.3d at 1379).

There are two disputed periods of "inactivity." The first is from August 4, 2004, when Mr. Donlin faxed his invention disclosure to Attorney Jim Piotrowski, to January 7, 2005, when Eljen completed the Design and Installation Guidelines for the Mantis product. Geomatrix's Opening Br. at 49–50. The second is from the completion of the guidelines on January 7, 2005, to Eljen's filing of U.S. Patent Application No. 60/657,308 on February 28, 2005. *Id.*

Summary judgment is inappropriate on the question of Mr. Donlin's diligence because assessing his diligence during this period requires making findings as to witness credibility that the Court cannot make on summary judgment. For both periods, the key witness testimony comes from Ms. Hamzabegovic, who was team lead for designing and testing Mantis products during the critical period of its development from Mr. Donlin's conception to the first sale of the Mantis product. Hamzabegovic Dep., ECF No. 181-11 at 18–22. During her deposition, Ms. Hamzabegovic stated that during this critical period, she made many sample products at Mr. Donlin's request and that the samples were of various designs and sizes. *Id.* at 20–22. During this same period, Mr. Donlin put together a detailed Design and Installation Guidelines for this developing product. *See* ECF No. 181-7. While the parties agree that the document was completed

on January 7, 2005, the parties dispute what, if any, effort Mr. Donlin exerted before that date to finalize the guidelines.  Relying on Ms. Hamzabegovic's testimony and the corroborating guidelines, a reasonable juror could conclude that during the critical period, Mr. Donlin directed Ms. Hamzabegovic to test various versions of the Mantis product, the results of which informed the creation of the Design and Installation Guidelines.  Similarly, in a letter dated March 18, 2005, Mr. Donlin wrote to the Connecticut Department of Public Health to discuss the Mantis product's design and Mr. Donlin's calculations of the product based on the designs.  ECF No. 181-10 at 2–5.  A reasonable juror could infer that the calculations in Mr. Donlin's letter were a direct result of the sample products Ms. Hamzabegovic produced during the critical time period—whether through testing or production.  Eljen need not demonstrate the day-to-day activities that took place during the critical period.  *See ATI Techs. ULC v. Iancu*, 920 F.3d 1362, 1369–70 (Fed. Cir. 2019).  A reasonable juror could take the evidence presented on the whole and conclude that Mr. Donlin was reasonably diligent in proceeding towards a constructive reduction to practice.

Thus, the Court denies Geomtarix's motion for summary judgment as to Eljen's defense of priority through constructive reduction to practice.

## VIII.    INEQUITABLE CONDUCT

Finally, the Court denies Geomatrix's motion for summary judgment as to Eljen's claims that Mr. Potts committed inequitable conduct during the prosecution of the '863 Patent.  Eljen does not move for summary judgment on inequitable conduct in its own motion.

Applicants for patents are required to prosecute patent applications in the PTO with candor, good faith, and honesty."  *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995) (internal footnote omitted).  "Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent."  *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d

1276, 1285 (Fed. Cir. 2011) (collecting cases). It derives from Supreme Court cases that applied the doctrine of unclean hands to dismiss patent cases involving egregious misconduct. *Id.* The remedy for inequitable conduct has been deemed the "'atomic bomb' of patent law," because inequitable conduct as to any individual claim renders the entire patent unenforceable. *Id.* at 1288 (quoting *Aventis Pharma S.A. v. Amphastar Pharms., Inc.*, 525 F.3d 1334, 1349 (Fed. Cir. 2008) (Rader, J., dissenting)).

Eljen's theory is two-fold. First, Eljen argues that Mr. Potts intended to deceive the PTO in his description of the prototype he constructed, to prove that Mr. Potts invented before Mr. Donlin. Eljen's Opp'n Br. at 52. It is Eljen's position that Mr. Potts falsely swore that a device shown in photographs submitted to the PTO was "an example of a wastewater leaching system," a "leach field system," and/or "worked as a wastewater treatment system" and that the PVC pipes above the device did not "serve[] as the dosing pipe." *Id.*; *see also* ECF No. 169-25 at 253 ¶¶ 5– 8; *id* at 256 ¶¶ 22–24. Second, Eljen argues that Mr. Potts lied when he stated in his declaration to the PTO that the photographs of his prototype were taken before February 28, 2005. Eljen's Opp'n Br. at 55; *see also* ECF No. 169-25 at 253 ¶ 9 (describing metadata showing date before February 28, 2005); Hochman Rep., ECF No. 169-47 at 8 ¶ 20 (stating that the photographs were taken on October 26, 2004, and copied to a Windows computer system on October 28, 2004).

For the reasons that follow, the Court denies Geomatrix's motion for summary judgment as to both theories.

A. <u>Legal Standard</u>

"Inequitable conduct includes affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Bd. of Educ. ex rel. Bd. of Trs. of Fla. State Univ. v. Am. Bioscience, Inc.*, 333 F.3d 1330, 1343 (Fed. Cir. 2003) (citing *Molins*, 48 F.3d at 1178). The standard for establishing

inequitable conduct is a demanding one.  "To prevail on the defense of inequitable conduct, the accused infringer must prove that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO." *Therasense*, 649 F.3d at 1290.  "The accused infringer must prove both elements—intent and materiality—by clear and convincing evidence." *Id.* at 1287.

"Information is 'material' when there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent." *Molins*, 48 F.3d at 1179.  In *Therasense*, the Supreme Court held that in making the materiality determination, "the court should apply the preponderance of the evidence standard and give claims their broadest reasonable construction." 649 F.3d at 1291–92. *Therasense* held further that "but-for materiality generally must be proved to satisfy the materiality prong of inequitable conduct," although there is an exception for "cases of affirmative egregious misconduct," which do not require such proof. *Id.* at 1292.  Thus, "[w]hen the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit," the misconduct is unquestionably material. *Id.*

To bring an inequitable conduct defense, the accused infringer must also show the plaintiff had the specific intent to mislead or deceive the PTO. *Molins*, 48 F.3d at 1181.  In a misrepresentation or omission case, a "gross negligence" or "should have known" standard does not satisfy the requirement; instead, an accused infringer must show the patentee "*made a deliberate decision* to withhold a *known* material reference." *Therasense*, 649 F.3d at 1290 (quoting *Molins*, 48 F.3d at 1181).  "Because direct evidence of deceptive intent is rare, [the Court] may infer intent from indirect and circumstantial evidence. . . .  However, to meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable

inference able to be drawn from the evidence.'" *Id.* (citations omitted) (quoting *Star Sci. Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed Cir. 2008)).

Because this is Geomatrix's motion, Eljen need only demonstrate that there are disputed issues of material facts that preclude summary judgment.

B. Description of Device

The Court cannot enter summary judgment in favor of Geomatrix as to Eljen's theory that Mr. Potts' description of his reduction to practice constituted inequitable conduct, because there are disputed issues of fact as to whether the prototype could in fact function as Mr. Potts described.

The two experts, Mr. Lombardo and Mr. Dickson, disagree as to whether the prototype that Mr. Potts produced could function as "an example of a wastewater leaching system," or a "leach field system," and/or "worked as a wastewater treatment system" and that the PVC pipes above the device "served as the dosing pipe." *See* Geomatrix's Opening Br. at 63–64; Eljen's Opp'n Br. at 52–53. Mr. Dickson created a prototype reconstruction of Mr. Potts' prototype in the photographs he submitted to the PTO and determined that the prototype using these materials would function as a wastewater system. ECF No. 169-11 ¶¶ 714–18, 731–41. In Mr. Lombardo's opinion, on the other hand, a person of ordinary skill in the art would understand the Mr. Potts' prototype could not work as explained for two reasons. First, the pipes could not be used as a dosing pipe for the dispersion of water, but were simply intended for use as support in holding the channels in place. ECF No. 169-17 ¶¶ 149–50. Second, a person of ordinary skill in the art would understand that the prototype could not work as described because the filament mats used in the test were inserted halfway through the pipe, meaning that water would flow directly into the soil, rather than into the mat for treatment. *Id.* ¶ 151.

It is not appropriate through this motion for the Court to resolve the expert dispute over whether in fact Mr. Potts' prototype could operate as described. Where the factual record supports

opposing expert views, as it does here, then summary judgment is inappropriate because there is a disputed issue of material fact. *See Optical Disc Corp. v. Del Mar Avionics*, 208 F.3d 1324, 1338–39 (Fed. Cir. 2000) (overturning grant of summary judgment due to conflicting expert testimony that was supported by the factual record); *Edwards Sys. Tech., Inc. v. Digit. Control Sys., Inc.*, 99 F. App'x 911, 921–22 (reversing grant of summary judgment because "a classic battle of the experts . . . creates a genuine issue of material fact"). The Court finds that there is a genuine dispute of material fact, as the evidence in the record appears to support both Mr. Lombardo and Mr. Dickson's opinions.

Thus, the Court cannot enter summary judgment as to this theory.

C. The Metadata

Finally, the Court denies Geomatrix's motion for summary judgment as to Eljen's theory of inequitable conduct based on the metadata issue because there remain issues related to Mr. Potts' memory and credibility that requires resolution by the trier of fact.

The Court reiterates that because this is Geomatrix's motion, the Court does not consider whether Eljen has met its burden of proof in demonstrating that, by clear and convincing evidence, that Mr. Potts committed inequitable conduct in his declaration to the PTO that the metadata of the photographs and computer files showed that the photographs were taken before February 28, 2005. Rather, the Court only assesses whether there is a genuine issue of disputed fact that should preclude granting the motion.

The Court finds that Mr. Potts' credibility is at the heart of Eljen's theory of inequitable conduct based on the metadata, and that the issue is therefore inappropriate for summary judgment. *See, e.g., TypeRight Keyboard Corp.*, 374 F.3d at 1158 ("[S]ummary judgment was improper because genuine issues remain as to the credibility of [defendant's] witnesses."); *Mosaic Brands, Inc. v. Ridge Wallet LLC*, 55 F.4th 1354, 1365 (Fed. Cir. 2022) ("Where an issue as to a material

fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." (quoting Fed. R. Civ. P. 56 Notes of Advisory Committee on Rules to 1963 Amend.)).

Mr. Potts' contemporaneous and subsequent recounting of when the photographs were taken are contradictory and must be weighed for credibility by the trier of fact.  On December 17, 2013, Mr. Potts emailed his patent attorney, Attorney Fred Grasso, that he had taken photos of a prototype he created in "March" without noting the year.  Email from D. Potts, ECF No. 181-18 at 2.  Starting in "December" of that unidentified year, Mr. Potts writes, he was testing the performance of the high aspect ratio systems with standard systems.  *Id.*  A draft of Mr. Potts' 1.131 declaration says that he reduced his invention to practice "no later than March ___, 2005" and that he was "diligent from before February 28, 2005 until the reduction to practice shown in [the attached photograph]."  Potts 1.131 Decl. Draft, ECF No. 181-22 at 3.

Then, in the actual declaration that was filed with the PTO, Mr. Potts explained that the "[t]he metadata of the photograph as well as the computer file it was stored to confirm that the photo was taken before February 28, 2005, which is consistent with [his] recollection that [he] built the example shown in the photograph before February 28, 2005."  ECF No. 169-25 at 253 ¶ 7.  In his deposition, Attorney Grasso explained that Mr. Potts' statement in his email that the photographs were from "March" (presumably of 2005) was merely an oversight or misremembering of the facts.  Grasso Dep., ECF No. 181-23 at 10–11.  A trier of fact could believe Attorney Grasso's explanation as for the date discrepancy, or, alternatively, could believe that Mr. Potts did not accurately recount to the PTO when the photo was taken.  This question goes squarely to whether Mr. Potts intended to deceive the PTO.

The report by Geomatrix's computer science expert Jonathan Hochman does not change the Court's conclusion that disputed facts remain. Mr. Hochman opined that the photograph was taken on October 26, 2004, and copied to a Windows computer system on October 28, 2004. ECF No. 169-47 ¶ 20. However, as Eljen points out, Mr. Hochman's expert analysis is undercut by the fact that he based his opinion on a screenshot of the photograph and computer file, not the actual, native database file. Eljen's Opp'n Br. at 59. In fact, neither Mr. Potts nor his wife, Elizabeth Potts, can account for the origin of the screenshot with which Mr. Potts based his declaration of when the photograph of the prototype was taken. *Id.* Despite considering filing suit based on this Patent as early as 2008, Mr. Potts disposed of the camera, memory card, and computer. *Id.* at 58.

Given these genuine and material factual disputes and issues of credibility, summary judgment must be denied, and this issue must be presented to the jury.

## IX.    CONCLUSION

For the reasons discussed herein, Eljen's motion for summary judgment is DENIED in its entirety, and Geomatrix's motion for summary judgment is GRANTED in part and DENIED in part.


**SO ORDERED** at Hartford, Connecticut, this 11th day of March, 2025.


  /s/ Sarala V. Nagala
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE